Erin Hogan-Freemole, OSB # 212850
503-234-0788 │ erin@crag.org
Oliver J. H. Stiefel, OSB # 135436
503-227-2212 │ oliver@crag.org
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Nicholas S. Cady, OSB # 113463
541-434-1463 │ nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

    *Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon nonprofit corporation; and **OREGON WILD**, an Oregon nonprofit corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>**CHERYL ADCOCK**, in her official capacity as Field Manager for the Siuslaw Field Office; and the **UNITED STATES BUREAU OF LAND MANAGEMENT,**<br><br>        Defendants. | Case No. 6:22-cv-1344<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Environmental Matters – Violations of National Environmental Policy Act; Administrative Procedure Act) |

## GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| Cascadia | All named Plaintiffs |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| DNA | Determination of NEPA Adequacy |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy & Management Act |
| FONSI | Finding of No Significant Impact |
| HLB | Harvest Land Base |
| LSR | Late Successional Reserve |
| N126 Project | N126 LSR Landscape Plan Project |
| NEPA | National Environmental Policy Act |
| Northwestern RMP | 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan |
| Programmatic FEIS | 2016 Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon |
| RMP | Resource Management Plan |
| Siuslaw Project | Siuslaw HLB Landscape Plan |
| Southwestern RMP | 2016 Southwestern Oregon Record of Decision and Resource Management Plan |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## NATURE OF ACTION

1.      Plaintiffs Cascadia Wildlands and Oregon Wild (collectively, "Plaintiffs" or "Cascadia") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to the final administrative action of Cheryl Adcock and the Bureau of Land Management, Northwest Oregon District, Siuslaw Field Office (collectively, "BLM" or "Defendants"). In issuing the Siuslaw HLB Landscape Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR") for the Siuslaw HLB Landscape Plan ("Siuslaw Project" or "Project") in the Siuslaw Project Area ("Project Area"), Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h.

2.      The Siuslaw DR/FONSI approves a multi-decade series of logging projects on 13,225 acres of BLM-administered lands in Lane County west of Eugene, Oregon. The Project Area, which spans ten separate watersheds, is located primarily in the eastern foothills of the Oregon Coast Range. The Project Area contains structurally complex, late-successional forest habitat; large and old trees; and several species of fish and wildlife protected under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, including northern spotted owls, marbled murrelets, Oregon Coast coho salmon, steelhead trout, Chinook salmon, Pacific marten, and red tree voles. The majority of the Project Area is slated for "regeneration harvesting," colloquially known as "clearcutting."

3.      Despite the Project's large scale, and the number of resources adversely impacted by clearcut logging operations, the BLM refused to prepare a searching and careful Environmental Impact Statement ("EIS") and otherwise failed to take the requisite "hard look" at the Project's impacts as required by NEPA.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

4.      Although the BLM identified dozens of issues relevant to the Project and its environmental impacts, it excluded nearly all of them from detailed analysis on the grounds that they did not relate to the Siuslaw Project's narrowly defined purpose of timber production. Consequently, the agency gave no in-depth consideration to the Project's effects on, *inter alia*, protected fish and wildlife species, invasive species infestations, detrimental soil disturbance, or carbon sequestration and greenhouse gas emissions.

5.      Having predetermined that these issues merited no detailed consideration, the BLM failed to gather any relevant site-specific data or fully analyze and disclose the Project's potential site-specific impacts. Instead, the EA relied on a generalized 2016 analysis of all 2.5 million acres of BLM land in western Oregon which contained no site- or project-specific detail.

6.      Many of the units slated for logging under the Siuslaw Project are interspersed with areas of old-growth forest which the BLM intends to commercially log pursuant to a second large-scale, multi-decade project called N126. The overlapping projects will have significant cumulative effects on fish and wildlife, erosion and water quality, invasive species infestations, and wildlife habitat, yet the agency failed to analyze or disclose the combined and synergistic impacts.

7.      Overall, the BLM's analysis was incomplete and cursory, and failed to provide a sufficient basis for the public and the decisionmaker to determine the significance of the Project's impacts as required by NEPA.

8.      The BLM has specifically identified and begun to prepare at least one timber sale implementing the Siuslaw Project, with dozens more to come.

9.      This action seeks: 1) a declaration that the BLM violated NEPA and its implementing regulations by failing to take a hard look at, and adequately analyze and disclose

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—3

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2725*

the Siuslaw Project's potentially significant impacts; 2) a declaration that the BLM violated NEPA and its implementing regulations by failing to prepare an Environmental Impact Statement; and 3) the vacatur and remand of the Siuslaw Project to the BLM.

10.    The requested relief is necessary to prevent unlawful agency action and to forestall irreparable injury to Cascadia and to the environment. If necessary, Cascadia intends to seek narrowly tailored injunctive relief during the pendency of this litigation.

11.    Should Cascadia prevail, Cascadia will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346. Final agency action has occurred that is subject to judicial review pursuant to 5 U.S.C. §§ 704–706. An actual, justiciable controversy exists between Plaintiffs and Defendants. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.    Cascadia has exhausted its administrative remedies by timely participation throughout the BLM's planning process and by submitting an administrative appeal of the Siuslaw Project. Release of the DR/FONSI constitutes final agency action subject to review.

14.    Venue in this Court is proper under 28 U.S.C. § 1391 because all, or a substantial part, of the events or omissions giving rise to this litigation occurred within this judicial district. The BLM officials who authorized the decisions at issue maintain offices within this judicial district. The decisions at issue were developed and signed within this judicial district.

15.    This case is properly filed in the Eugene Division pursuant to Local Rule 3-2 because the Siuslaw Project Area, and the Defendants' office where the DR/FONSI was signed,

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

are located in Lane County, Oregon. The events and omissions giving rise to this claim occurred

and the public lands to which the DR/FONSI pertains are situated in the Eugene Division.

## **PARTIES**

16.     Plaintiff CASCADIA WILDLANDS is a nonprofit corporation headquartered in

Eugene, Oregon with approximately 12,000 members and supporters throughout the United

States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore

wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska.

Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in

the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia

Bioregion.

17.     Plaintiff OREGON WILD is a nonprofit corporation with approximately 20,000

members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild

is headquartered in Portland, Oregon and maintains field offices in Bend, Eugene, and

Enterprise, Oregon. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds

programs protect pristine drinking water, unparalleled recreation opportunities, and vital fish and

wildlife habitat across Oregon.

18.     Plaintiffs and their members, supporters and staff have concrete aesthetic,

recreational, spiritual, scientific, and professional interests in the Siuslaw Project Area.

19.     Plaintiffs' members, supporters, and staff regularly visit and enjoy the Siuslaw

Project Area—including the area in which the BLM is currently preparing a timber sale—and

have concrete plans to do so in the future. Plaintiffs' members, supporters, and staff use the

Project Area to hike, camp, enjoy nature, attempt to observe wildlife (including northern spotted

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

owls, marbled murrelets, and coho and Chinook salmon), photograph wildlife and forest ecosystems, and otherwise enjoy the aesthetics and scientific bounty of the Siuslaw area.

20.     Plaintiffs' members, supporters, and staff intend to return to the Siuslaw Project Area in the near future to recreate and otherwise enjoy the Project Area. Plaintiffs' members, supporters, and staff are less likely to revisit the Project Area if the Siuslaw Project is implemented as approved; if Plaintiffs' members, supporters, and staff do return, their ability to observe wildlife and intact forest ecosystems will be significantly and permanently impaired by the Project activities.

21.     Plaintiffs and their members, supporters, and staff would sustain concrete injury to their aesthetic, recreational, spiritual, scientific, and professional interests in the Siuslaw Project Area if the BLM implements the Siuslaw Project as authorized.

22.     Plaintiffs have organizational interests in the proper and lawful management of the Project Area. Plaintiffs and their members, supporters, and staff have actively participated in the Project's administrative processes. Plaintiffs and their members, supporters, and staff expend significant resources to track management activities on these lands, comment on agency proposals, work with BLM staff on the development of land-management plans, and field-check federal projects on these lands.

23.     Plaintiffs submitted scientific literature which conflicts with the BLM's conclusions. The BLM did not substantially address this opposing evidence, as it would have been required to do in an EIS.

24.     Plaintiffs and their members, supporters, and staff are thus procedurally harmed by the BLM's failure to comply with federal law.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

25.      Additionally, Plaintiffs' injuries are predicated on unlawful BLM actions that have diminished the trust between the BLM and the conservation community; facilitated the risk of unsupported and uninformed management and decision-making; increased the risk of actual, threatened, and imminent environmental harm; and created actual, concrete injuries to Plaintiffs and their interests.

26.      Defendant CHERYL ADCOCK is the Field Manager for the Siuslaw Field Office of the BLM Northwest Oregon District, where the Siuslaw Project Area is located, and the responsible official for the Siuslaw Project. She signed the decision approving the Siuslaw Project.

27.      Defendant the BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior charged with administering public lands and resources in accordance with federal laws and regulations. The BLM, which is headquartered in Colorado, administers roughly 2.5 million acres of forest in western Oregon, including 166,852 acres managed by the Siuslaw Field Office, where the Siuslaw EA and DR/FONSI were signed.

## LEGAL BACKGROUND

### Administrative Procedure Act

28.      The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

29.      Upon review under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations,

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—7

or short of statutory right; or without observance of procedure required by law. 5 U.S.C.

§ 706(2)(A), (C), (D).

**National Environmental Policy Act**

30.     Congress enacted the National Environmental Policy Act to "declare a national

policy which will encourage productive and enjoyable harmony between man and his

environment; to promote efforts which will prevent or eliminate damage to the environment and

biosphere and simulate the health and welfare of man; [and] to enrich the understanding of the

ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

31.     To accomplish these purposes, NEPA and its implementing regulations set forth

procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental

consequences of their proposed actions, and (2) foster meaningful public participation.

32.     NEPA requires federal agencies to prepare, consider, publicly disclose, and

approve a "detailed statement" describing the environmental impacts of and alternatives to any

major federal action which may "significantly affect[] the quality of the human environment." 42

U.S.C. § 4332(2)(C). This detailed statement, known as an "Environmental Impact Statement,"

or "EIS," must "provide full and fair discussion of significant environmental impacts and shall

inform decisionmakers and the public of the reasonable alternatives which would avoid or

minimize adverse impacts" 40 C.F.R. §§ 1508.11, 1502.1.[1] The agency must release its analysis

---

[1] The Council on Environmental Quality ("CEQ") first promulgated NEPA regulations in 1978. *See* 40 C.F.R. Part 1500 (1978). On July 16, 2020, CEQ issued a final rule promulgating new NEPA regulations. *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Final Rule*, 85 Fed. Reg. 43,304 (July 16, 2020). The CEQ has since revoked parts of the 2020 revision and restored much of the original language. *National Environmental Policy Act Implementing Regulations Revisions; Final Rule*, 87 Fed. Reg. 23,453 (April 20, 2022) (to be codified at 40 C.F.R. §§ 1502, 1507, 1508). Because development of the Siuslaw Project began before the effective date of the CEQ's 2020 revisions, the analysis (cont.)

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

to the public before concluding its decisionmaking process or committing resources to the project. 40 C.F.R. § 1500.1(b).

33.    If the agency is uncertain whether a proposed action may have a significant effect on the human environment, the agency may prepare an Environmental Assessment, or "EA." 40 C.F.R. § 1501.4(b). An EA should be a concise public document that briefly describes the proposal, examines reasonable alternatives, and considers the potential significance of environmental impacts. 40 C.F.R. § 1508.9.

34.    Whether in an EIS or EA, an agency must take a "hard look" at the direct, indirect and cumulative environmental impacts of a proposed action. 40 C.F.R. §§ 1502.16, 1508.7–.8. Direct impacts are those that are caused by the action and occur at the same time and place. 40 C.F.R. § 1508.8(a). Indirect impacts also are caused by the action, but occur later in time or are farther removed in distance. *Id*. § 1508.8(b). Cumulative impacts are the impacts of the proposed action, as well as impacts from other past, present, and reasonably foreseeable future actions, both federal and non-federal. *Id*. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." *Id*.

35.    In determining whether a proposed action may have a "significant" environmental effect, an agency must consider its context and intensity. 40 C.F.R. §§ 1508.8, 1508.27. An action's "intensity" depends on several factors, including impacts that may be both beneficial and adverse; the unique characteristics of the relevant geographic area; the degree to which the environmental effects are likely to be highly controversial; the degree to which the environmental effects are highly uncertain or involve unique or unknown risks; whether the

---

was carried out pursuant to the 1978 regulations. Unless otherwise noted, references to the CEQ NEPA regulations will be to the 1978 version under which the Project was developed.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—9

action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its critical habitat; and whether the action threatens to violate federal, state, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b).

36.    NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. To determine which aspects may require analysis, an agency should look to the considerations and values expressed in the substantive statute driving or enabling the proposed action. If a particular resource value is addressed by the substantive statute, it is relevant to the analysis and must be duly considered by the agency.

37.    If the agency concludes that the action *may* have a significant impact, it must prepare an EIS. If the agency does not prepare an EIS, it must undertake a thorough environmental analysis and supply a convincing statement of reasons explaining why the project's impacts will not be significant.

38.    The CEQ regulations encourage agencies to "tier" their NEPA documents to eliminate repetitive discussions of the same issues. 40 C.F.R. § 1502.20. After a programmatic analysis is completed, a subsequent environmental review may incorporate the earlier analysis by reference and "concentrate on the issues specific to the subsequent action." *Id.*

39.    Courts view tiered analyses as a whole when determining whether they adequately address all impacts, and may reject the subsequent NEPA analysis if a significant issue is not fully considered in either document. An agency must conduct a site-specific analysis of the proposed action and its effects—a general overview of possible effects over a broad planning area is insufficiently detailed at the project level.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

40.     After conducting a full NEPA analysis of a project, the BLM may sometimes approve an implementing action pursuant to a Determination of NEPA Adequacy ("DNA"). DNAs are not themselves NEPA documents. As described in the BLM's NEPA Handbook, DNAs may be used to confirm that an action is adequately analyzed in an existing NEPA document and conforms to the approved land use plan. DNAs do not contain the environmental analysis required by NEPA.

41.     The BLM has stated that there are four appropriate uses for DNAs: (1) when there is a new proposed action that is similar to a previous action that was already fully analyzed in a NEPA document, (2) when there is a new proposed action that is a part of a broader action that was already fully analyzed in a NEPA document, (3) when the original NEPA analysis is old and the agency needs to determine whether new analysis is needed due to new information or changed circumstances, and (4) when there is new information not considered in existing NEPA analysis and the agency needs to determine whether that new information warrants new analysis.

42.     A DNA cannot compensate for an earlier, inadequate NEPA document.

**Federal Land Policy and Management Act**

43.     Congress enacted the Federal Land Policy and Management Act to ensure that our public lands are "managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(A)(8). It directs the BLM to develop a land use planning process for present and future uses of public lands. 43 U.S.C. § 1701(a)(2).

44.     To achieve these goals, FLPMA requires the BLM to develop resource management plans ("RMPs") that govern the use of BLM-administered land. 43 U.S.C. § 1712. An RMP defines the values for which the BLM must manage the land to which it applies, and

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—11

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

contains substantive standards by which it must do so. Once the plan has been adopted, the BLM

must manage its lands in compliance with, and ensure that any site-specific projects conform to,

the applicable RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

45.     An RMP does not change the BLM's responsibility to comply with applicable law

and regulation, nor does it establish or alter BLM national policy. An RMP does not analyze or

authorize any specific projects. An RMP is a preliminary step in the overall process of managing

public lands, and is intended to guide and control future management actions and the

development of subsequent, more detailed and limited-scope plans for resource management.

## FACTUAL BACKGROUND

### The 2016 Northwestern Resource Management Plan

46.     The 2016 Northwestern and Coastal Oregon Record of Decision and Resource

Management Plan ("Northwestern RMP") provides overall direction for the management of all

resources on approximately 1.3 million acres of BLM-administered lands, including the Siuslaw

Field Office and the Project Area.

47.     The BLM adopted the Northwestern RMP after preparing a Final Environmental

Impact Statement ("programmatic FEIS") which analyzed both the Northwestern RMP and the

Southwestern Oregon Record of Decision and Resource Management Plan ("Southwestern

RMP"), which covers an additional 1.2 million acres of BLM-administered lands in southern

Oregon. The programmatic FEIS thus broadly describes and analyzes a total of 2.5 million acres

across Oregon. Vegetation, hydrology, geology, wildlife populations, fire history, proximity to

human development, and past resource use vary widely across this enormous planning area.

48.     The management objectives of the Northwestern RMP include, in relevant part, to

provide a sustained yield of timber, enhance the health and stability of forest stands; prevent the

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—12

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

introduction of invasive species; contribute to the conservation and recovery of threatened and endangered species, provide clean water in watersheds, and restore fire-adapted ecosystems. These objectives guide the management decisions for all BLM lands in northwestern Oregon.

49.    To achieve these objectives, the Northwestern RMP imposes substantive standards and guidelines for managing a broad range of resource values.

50.    The Northwestern RMP divides BLM-administered land between five specific land use allocations: Congressionally Reserved Lands and National Conservation Lands, District-Designated Reserves, Late-Successional Reserves, Riparian Reserves, and Harvest Land Base. Each allocation has different management objectives and directions that identify which future actions may or may not be allowed within a particular area.

51.    The Project Area is categorized as Harvest Land Base ("HLB"). Many of the units also contain Riparian Reserves and are interspersed with Late-Successional Reserves ("LSR").

52.    Management directives specific to the HLB include conducting silvicultural treatments to enhance timber values and reduce fire risk; restoring and maintaining habitat for sensitive species; providing complex early-seral ecosystems; promoting the development of structural complexity; meeting snag retention and creation levels; and retaining large trees.

53.    The BLM is required to demonstrate how any project developed under the Northwestern RMP will follow relevant management directions to achieve the RMP's objectives. This includes site-specific analyses of landscape characteristics—including wildlife populations, snags, stand density and conditions, tree diameter and age, invasive species infestations, extent of detrimental soil disturbance, water quality, and availability of wildlife habitat—to ensure compliance with the RMP's substantive standards and guidelines.

///

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

**The Siuslaw Project**

54.     The Siuslaw Project is a multi-decade logging program which authorizes commercial timber harvest—largely through regeneration cutting, colloquially known as clearcutting—on 13,225 acres of BLM-administered forestland directly west of Eugene, Oregon.

55.     Much of the public forestland near the Siuslaw Project is slated to be commercially logged under the BLM's "N126 LSR Landscape Plan Project" ("N126 Project").[2] The N126 Project Area overlaps with the Siuslaw Project Area, and many N126 units are directly or diagonally adjacent to Siuslaw units. While the Siuslaw Project targets only HLB-designated lands, the N126 Project authorizes logging in LSR and riparian reserves, which are typically protected from commercial timber harvest. Within the overlapping project areas, the combined projects thus authorize logging on virtually all BLM land, regardless of land use allocation.

56.     Both projects will negatively affect wildlife habitat, soil disturbance and productivity, invasive species infestations, carbon sequestration and greenhouse gas emissions, sensitive wildlife species and their habitat, and water quality throughout the overlapping and adjacent project areas.

57.     The BLM issued a preliminary draft EA for the N126 Project on December 3, 2018 and a full draft for public comment on May 15, 2020. The agency released the final N126 EA, FONSI, and DR on August 12, 2020 and a revised EA on February 22, 2021. A final DNA and DR were issued for the first implementing timber sale on July 8, 2021.

58.     The BLM did not disclose the concurrent development of the N126 Project in its Siuslaw Project scoping letter, which it released on November 20, 2019.

---

[2] Plaintiffs have also challenged the BLM's approval of the N126 Project in a separate case, 6:22-cv-00767, now pending before this Court.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

59.     The BLM released the Siuslaw Project draft EA on August 17, 2021.

60.     In the draft Siuslaw EA, the BLM stated that the Siuslaw Project's purpose and

need was to commercially harvest timber to contribute timber volume to the Allowable Sale

Quantity.[3] It stated that the Project would conform to the Northwestern RMP.

61.     The draft EA noted that comments from BLM personnel and the public had

identified a number of issues, but the agency had chosen not to analyze most of them in detail.

62.     Cascadia timely submitted comments on both the scoping notice and the draft EA.

It raised a number of issues, noting, *inter alia*, that the proposed Siuslaw Project would have

significant impacts to wildlife habitat, invasive species, water quality, wildfire hazard, soils,

sensitive plant species, and wildlife; that the BLM had arbitrarily excluded these issues from

detailed analysis; that the EA did not contain adequate site-specific information; that the EA did

not contain adequate analysis of cumulative impacts; and that the BLM should therefore prepare

an EIS to fully analyze and disclose the Project's potential impact.

63.     The BLM issued the final Siuslaw Project EA on March 31, 2022.

64.     In the final EA, the BLM considered only five related issues for analysis: (1) how

"regeneration harvest" would affect the forest age-class distribution; (2) how timber harvest

would contribute to the Siuslaw Field Office's timber volume goals; (3) how timber harvest

would create different relative levels of complexity for early-successional ecosystems; (4) how

timber harvest and reforestation would affect stand-level fire hazard and resistance; and (5) how

timber harvest and reforestation would affect fire risk.

---

[3] Defined in the Northwestern RMP as the timber volume that a forest unit can produce
continuously under the intensity of management described in the RMP for those lands allocated
for permanent timber production.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

65.    The EA identified an additional 42 issues which it excluded from detailed analysis, including the Project's impacts on carbon sequestration, greenhouse gas emissions, and climate change; protected wildlife such as northern spotted owls, marbled murrelets, and Bureau Sensitive Species; botany; invasive species; forest structure and species diversity; fisheries; water quality, temperature, and availability; recreation; and soils.

66.    The issues excluded from detailed analysis were all discussed in the programmatic FEIS and relate to resource management standards or guidelines adopted in the Northwestern RMP.

67.    The EA stated that these issues had not been analyzed in detail because they were not related to the Project's purpose and need and no analysis of these issues was necessary to determine the significance of the Project's impacts.

68.    In an appendix to the EA, the BLM briefly discussed the issues not presented in detailed analysis. In each case, the agency summarily concluded that there would be no significant effects, either individually or cumulatively, beyond those described in Northwestern RMP and the programmatic FEIS to which the Siuslaw Project EA purportedly tiered.

69.    The BLM declined to fully analyze several issues related to the ESA-listed northern spotted owl and marbled murrelet, stating that the programmatic FEIS contained sufficiently detailed analysis of the matter and that the Project would have no significant effects beyond those identified in the FEIS.

70.    The BLM did not consult with the U.S. Fish and Wildlife Service regarding the Project's potential impacts on ESA-listed terrestrial wildlife species—specifically, northern spotted owl and marbled murrelet. Instead, the BLM stated that the Project's effects fell under a programmatic biological opinion for actions "likely to adversely affect" listed species. The BLM

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—16

explained that site-specific information for each Siuslaw Project timber sale would be provided to the Fish and Wildlife Service later, but that no formal consultation would occur. The effects of the Project as a whole on northern spotted owls and marbled murrelets would not be analyzed or subject to interagency consultation.

71.    The BLM acknowledged that the Siuslaw Project is likely to adversely affect both northern spotted owls and marbled murrelets. However, the BLM dismissed the issue from detailed analysis on the grounds that these adverse effects to ESA-listed species had been adequately considered in the programmatic FEIS.

72.    Similarly, the BLM failed to consult with the National Marine Fisheries Service regarding the Project's potential impacts on ESA-listed aquatic species—specifically, coho and Chinook salmon. Instead, the BLM stated that the Project fell under a second programmatic biological opinion. The agency entirely failed to analyze the Project's impacts on these threatened salmonids, simply stating that they would "vary from no effect, not likely to adversely affect, or likely to adversely affect" coho and Chinook salmon and their critical habitat.

73.    The BLM explained that no formal consultation on the threatened fish species would occur. It dismissed the issue from detailed analysis on the grounds that any adverse effects to coho and Chinook salmon had been adequately considered in the programmatic FEIS.

74.    Neither the programmatic FEIS, the Siuslaw Project EA, nor either programmatic biological opinion analyzed the Siuslaw Project's specific impacts on ESA-listed species.

75.    The BLM also identified, but dismissed as non-significant, several issues related to other "special status"[4] wildlife species and their habitat. Special status species are species for

---

[4] A blanket term for Bureau sensitive species, Bureau strategic species, former Survey and Manage species, landbird focal species, species with specific management direction in the RMP, and federally listed species.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—17

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2725*

which population viability is a concern, as evidenced by significant current or predicted downward trends in population numbers or density and habitat capability that would reduce a species' existing distribution. Pursuant to BLM policy, the agency must use all methods and procedures necessary to improve the condition of Special Status Species and their habitats to a point where their Special Status recognition is no longer warranted. BLM actions must not contribute to the need for ESA-listing of these species.

76.     The agency noted the possible presence of 32 special status terrestrial wildlife species which could be affected by the Siuslaw Project, but did not survey the Project Area for any of these species. It did not analyze the Project's potential impact on any of these species. Instead, the BLM cited the generalized discussion in the programmatic FEIS.

77.     In dismissing the Project's impacts on special status species, the BLM cited the programmatic FEIS projections that, in 50 years, implementation of both the Northwestern and Southwestern RMPs would provide for an overall increase in habitat for the majority of special status species throughout the 2.5-million-acre planning area. The agency concluded that no further analysis of the issue was therefore required for the Siuslaw Project.

78.     Neither the programmatic FEIS nor the Siuslaw Project EA analyzed the Siuslaw Project's specific impacts on special status wildlife species.

79.     The BLM stated that the Siuslaw Project would lead to potentially significant increases in noxious and invasive weed infestations, but dismissed the issue from detailed consideration. It noted that the Northwestern RMP and programmatic FEIS "prescribe control measures for invasive species but do not detail their extent or expected level of success," and that "[f]or these reasons, the BLM considered this issue but did not analyze it in detail."

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

80.     The Northwestern RMP and programmatic FEIS lack any site- or project-specific analysis of invasive species issues; the FEIS specifically noted that the introduction and spread of invasive plant species in any specific watershed could not be analyzed at such a broad scale.

81.     Neither the programmatic FEIS nor the Siuslaw Project EA analyzed the Siuslaw Project's specific impact on invasive species infestations.

82.     Under the Northwestern RMP, the BLM is obligated to limit cumulative detrimental soil disturbance to under 20 percent of a treatment area. The BLM acknowledged that all Project activities would generate detrimental soil disturbance in many ways, but dismissed all soil-related issues from detailed analysis on the grounds that the effects would occur on the same landscapes analyzed under the programmatic FEIS.

83.     In the programmatic FEIS—which covers a broad range of landscapes, previous management actions, and soil and vegetation types—the BLM stated that it lacked sufficient information to quantify past soil disturbance levels or predict the intensity, location, or extent of further disturbance. It acknowledged that the high variability in soil condition due to site-specific factors precluded quantifying the type, extent, or effectiveness of any mitigation measures.

84.     The Siuslaw Project EA does not quantify the extent of existing soil damage in the Project Area, analyze the Project's expected impact, or prescribe specific mitigation measures. It states that the BLM would analyze soil disturbance at some future time before individual timber sale operations began and that this would allow it to predict the level of damage and stay below the 20 percent disturbance threshold.

85.     The extent of detrimental soil damage caused by the Project as a whole will not be analyzed or quantified before the Project is complete.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

86.    Neither the programmatic FEIS nor the Siuslaw Project EA analyzed the Siuslaw Project's specific impact on detrimental soil disturbance.

87.    The BLM identified several issues related to the Project's impacts on greenhouse gas emissions, carbon sequestration, and climate change, but did not consider any of them in detail. The EA does not quantify the Project's impact on carbon sequestration or greenhouse gas emissions, nor does it calculate the Project's social cost of carbon. Instead, the EA cites to the programmatic FEIS, which contains an estimate of the effects of implementing the Northwestern and Southwestern RMPs across 2.5 million acres over the course of 50 years.

88.    The EA does not explain how the Siuslaw Project would contribute to these projected results.

89.    The programmatic FEIS noted multiple areas of uncertainty in its analysis. The BLM stated that it lacked sufficiently specific information to predict carbon sequestration or emissions levels with any accuracy. The agency further noted significant scientific controversy and uncertainty as to the effect of timber management activities on carbon storage and emissions, forest resiliency to climate change, and fire regimes.

90.    Neither the programmatic FEIS nor the Siuslaw Project EA analyze the Siuslaw Project's specific impact on greenhouse gas emissions, carbon storage, or climate change.

91.    The EA also fails to discuss the Siuslaw Project's cumulative impacts on carbon sequestration and greenhouse gas emissions, invasive species, or special status wildlife species.

92.    Moreover, what cumulative impacts analysis the EA does contain—even for the "issues considered in detail"—lacks any reference to the N126 Project, which also authorizes

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

commercial logging on BLM lands over the same time frame across a project area which overlaps with the Siuslaw Project Area.[5]

93.    The N126 Project was reasonably foreseeable during the development of the Siuslaw Project—a preliminary draft of the N126 EA was released nearly a year before public scoping began on the Siuslaw Project, the final N126 EA and FONSI were released before the draft Siuslaw EA, and an N126 implementing project was authorized roughly eight months before the Siuslaw DR/FONSI was signed.

94.    Both projects will have adverse impacts on the ESA-protected northern spotted owl, marbled murrelet, coho salmon, and Chinook salmon. In the Siuslaw Project EA, the BLM dismissed the need to analyze these issues in depth specifically because adequate LSR and riparian reserve areas in the Siuslaw Field Office are protected as wildlife habitat. The Siuslaw Project EA neglects to mention that the N126 Project authorizes commercial logging in large portions of these reserves and is likely to adversely impact both species.

95.    The BLM acknowledges that the Siuslaw Project will have potentially significant effects on invasive species infestation and spread and, moreover, that the Project would add to the agency's overall inability to control invasive species on the Siuslaw Field Office. The BLM had similarly acknowledged the N126 Project's potentially significant effects on invasive species. Neither EA discussed cumulative impacts on invasive species spread throughout the overlapping project areas, despite the potential significance of each project's individual effects.

---

[5] The Siuslaw EA refers to the N126 Project only once, in the context of sedimentation from road use and construction. It asserts that there is no need to independently analyze the Siuslaw Project's impact because over 90 percent of its haul routes are within the N126 analysis area and will therefore experience the same impacts from the two projects. The Siuslaw EA does not explain what the cumulative impact of the projects will be on water quality or aquatic habitat.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

96.     Despite the lack of site-specific or cumulative impact analyses and the agency's acknowledgement that the Siuslaw Project would have potentially significant environmental effects, the BLM issued a Finding of No Significant Impact and approved the Siuslaw Project in a March 31, 2022 Decision Record. The BLM's issuance of the FONSI and DR constitute final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

97.     Cascadia administratively appealed the decision to the BLM on April 28, 2022. It reiterated its concerns regarding the lack of site-specific analysis, the potential impacts on a number of different resource values, and the need for an EIS.

98.     This administrative appeal was dismissed on June 13, 2022 for lack of standing.

99.     On June 6, 2022, the BLM's Northwest Oregon District, which encompasses the Siuslaw Field Office and Project Area, released an updated timber sale plan for fiscal year 2023. The plan included the "Power Down Timber Sale" with a planned sale date of August 24, 2023. The BLM estimated that the Power Down Timber Sale will be 160 acres and produce roughly 7,000 million board feet of timber. The sale's status is listed as "In Prep."

100.    The Power Down Timber Sale, which is located near the community of Vaughn, Oregon, is on a unit slated for logging under the Siuslaw Project. By knowledge and belief, it is the BLM's first planned implementing project for the Siuslaw HLB Landscape Plan.

**CLAIM FOR RELIEF**
**(Violations of the National Environmental Policy Act)**

**Count 1:        Failure to Establish Baseline Environmental Conditions**

101.    Cascadia realleges and incorporates by reference all preceding paragraphs.

102.    Federal agencies are required to "describe the environment of the area to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. These "baseline conditions" must be set forth before any project implementation occurs, otherwise the

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

agency cannot determine what effect the project will have and, therefore, cannot comply with NEPA or ensure that the proposed action will comply with applicable substantive standards.

103.    Here, for example, the Northwestern RMP imposes a specific limit on the allowable extent of detrimental soil disturbance within a particular treatment area: twenty percent. However, the BLM did not attempt to quantify the existing levels of soil disturbance within the Siuslaw Project Area in either the programmatic FEIS or the EA. It therefore has no way of determining whether it will be possible to conduct logging operations—which it acknowledges will create detrimental soil disturbance—in any of the timber units, much less across the entire Project Area, in compliance with the Northwestern RMP.

104.    As another example, the BLM did not conduct surveys to determine the population size—or even the presence or absence—of special status wildlife species in the Project Area. It thus has no basis to determine how the Project will impact species viability or trends toward ESA listing, as required by the Northwestern RMP.

105.    The BLM noted in the EA that roughly 15,000 acres of logging had occurred on the Siuslaw Field Office in the past 15 years, but did not describe the impact of these past "treatments" on the Project Area or the broader planning area.

106.    Because the BLM failed to collect and study baseline conditions in the planning area, it has no way of rationally determining what the impacts of the Project will be or whether it can manage them in compliance with the Northwestern RMP. The BLM also cannot adequately monitor and document the effect of Project activities because it will have no accurate baseline to measure the impact against.

107.    The BLM's failure to provide accurate and complete data on baseline conditions violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

discretion, not in accordance with and without observance of procedure required by law. 5

U.S.C. § 706(2).

**Count 2:      Failure to Consider Significant Aspects of the Project's Impact**

108.    Cascadia realleges and incorporates by reference all preceding paragraphs.

109.    NEPA places upon federal agencies the obligation to consider every significant

aspect of the environmental impact of any proposed action. *See* 42 U.S.C. § 4332(2)(C).

110.    In the Siuslaw EA, the BLM identified issues for detailed analysis based on

whether (1) analysis of the issue is related to the purpose and need for action, and (2) analysis of

the issue is necessary to determine the significance of impacts. For this analytical approach, the

BLM cited its Handbook (USDI, Bureau of Land Management, 2008). The Handbook, in turn,

provides that supplemental authorities that provide procedural or substantive responsibilities

relevant to the NEPA process may help identify issues for analysis. In other words, to determine

which issues require NEPA analysis, the agency must look to the substantive statute which

directs and enables the proposed action.

111.    The BLM, however, excluded nearly all potential environmental issues from

detailed consideration in the EA on the grounds that they were not related to the Project's

purpose and need.

112.    A project's purpose and need statement does not dictate the required scope of

NEPA review. An agency may not artificially exclude potentially significant environmental

impacts from analysis and disclosure simply by identifying a narrow purpose and need.

113.    Rather, the substantive statutes directing and enabling the project help define the

scope of the NEPA analysis. Here, the Siuslaw EA states that the Project is intended to

implement FLPMA, vis-à-vis the management directives expressed in the Northwestern RMP,

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—24

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

amongst other statutes. The scope of the NEPA analysis must therefore be defined by the resource values expressed in FLPMA and the Northwestern RMP.

114.    FLPMA, as implemented through the Northwestern RMP, instructs the BLM to manage for ESA-listed species and habitat, Bureau Sensitive Species, soil health and productivity, water quality, invasive species control, and carbon sequestration. All of these values are therefore relevant to the agency's NEPA analysis of the Siuslaw Project, but the BLM nonetheless dismissed them from detailed review.

115.    Moreover, the BLM lacked the requisite basis for determining the significance of the Project's impacts on these values. For all issues other than those directly connected to the purpose and need, the BLM ended the inquiry before it even began; by refusing to review in detail impacts on ESA-listed species and habitat, Bureau Sensitive Species, soil health and productivity, water quality, invasive species control, and carbon sequestration, the BLM effectively predetermined there would be no significant impacts.

116.    The BLM's failure to consider the significant aspects of the environmental impact of the proposed action violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 3:      Failure to Take a Hard Look at Site-Specific Impacts**

117.    Cascadia realleges and incorporates by reference all preceding paragraphs.

118.    Federal agencies are required to disclose and analyze the direct, indirect, and cumulative effects of proposed actions on the environment. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25(c), 1508.27(b)(7). The impacts analysis in an EA must be "site-specific"

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

because in order to determine the "significance" of an action, the agency must consider impacts on the affected region, the affected interests, and the locality. 40 C.F.R. § 1508.27(a).

119.    NEPA allows agencies to tier their analyses to a previous NEPA document (generally, a programmatic assessment) in order to eliminate repetitive discussions and concentrate on the issues specific to the proposed action, 40 C.F.R. § 1508.20, 1508.28. Tiering refers to coverage of "general matters" in the programmatic NEPA document with a subsequent narrower NEPA document incorporating by reference the "general discussions." 40 C.F.R. § 1508.28. The agency must conduct a site-specific and project-specific analysis in the subsequent NEPA document. *Id.*

120.    The BLM failed to conduct site-specific analyses of, or disclose the potential impacts to, a number of issues in the Siuslaw Project EA. Specifically, the BLM failed to take a hard look at impacts on ESA-protected and other special status wildlife species and their habitat; invasive species; soil disturbance; or carbon sequestration, greenhouse gas emissions, and climate change, amongst other resource issues. It therefore failed to take a sufficiently hard look at the Project's impacts.

121.    Instead, the BLM improperly tiered the Siuslaw EA to the Northwestern RMP and programmatic FEIS. While this is appropriate for generalized analyses and background discussion of the issues, such tiering was insufficient to meet the BLM's NEPA obligations here.

122.    The programmatic FEIS contains no site-specific analysis of special status wildlife species and their habitat; invasive species; soil disturbance; or carbon sequestration, greenhouse gas emissions, and climate change within the Siuslaw HLB project area. The programmatic FEIS itself repeatedly states that it contains no such analysis or data. The programmatic FEIS states that future implementing decisions should contain this site-specific

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

analysis and data. The programmatic FEIS provides a broad-scale description of 2.5 million acres and two separate resource management plans; it does not contain the level of analysis to properly draw conclusions regarding the significance of impacts the Siuslaw HLB Project could have.

123.    Nor can the BLM defer this site-specific analysis to individual-sale-level reviews to be completed after it has authorized the Siuslaw Project—the decision to proceed with the Project as a whole will have already occurred, without consideration and disclosure of its total effects or a reasoned determination that it will comply with the Northwestern RMP and FLPMA. The BLM has also already determined the project will not have "significant" impacts, bypassing any mitigation or more thorough cost/benefit analyses inherent to an EIS. The BLM's significance determination will not be revisited.

124.    Even if the BLM completed a full EA with site-specific analysis for each individual sale—which it has made no commitment to doing—it would not compensate for the Siuslaw EA's shortcomings. The BLM has an obligation under NEPA to consider and disclose environmental effects at the earliest possible time, when this analysis can meaningfully inform the management decision. A post-hoc analysis performed after the decision has occurred defeats the purpose of NEPA.

125.    Moreover, deferring this review would mean that the Project's specific impacts would *never* be considered. The programmatic FEIS and Northwestern RMP did not analyze and disclose the Siuslaw Project's impacts—the Project had not yet been proposed, much less fully analyzed and developed. A timber-sale-specific DNA, or even EA, would not analyze and disclose the Siuslaw Project's impacts—the Project would already have been approved, and subsequent review would be limited to the effects of a single implementing action. If the BLM

chooses to make landscape-scale management decisions, as here, it must analyze the specific impacts of those actions across that landscape.

126.    The BLM's failure to take the requisite hard look at the Project's direct, indirect, and cumulative effects, and failure to make a reasoned determination of non-significance violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 4:    Failure to Take a Hard Look at Cumulative Impacts**

127.    Cascadia realleges and incorporates by reference all preceding paragraphs.

128.    NEPA and its implementing regulations require federal agencies to take a hard look at the cumulative environmental impacts of proposed actions. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1508.7, 1508.25(a)(2). When analyzing cumulative effects, an agency must analyze the effects on the environment resulting from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R.§ 1508.7.

129.    The Siuslaw Project will have significant cumulative impacts, which the BLM did not analyze or disclose in the Siuslaw EA, FONSI, and DR.

130.    The BLM performed no cumulative impacts analysis at all for the majority of the issues identified in the EA.

131.    As to the limited discussion of cumulative impacts that the BLM did undertake, it was wholly inadequate because it failed to consider, analyze, and disclose the foreseeable cumulative impacts of the Siuslaw and N126 Projects, which together authorize nearly 30,000 acres of commercial logging, in overlapping project areas, over the same period of time, across much of the Siuslaw Field Office. Both projects will have potentially significant impacts on,

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*inter alia*, ESA-listed wildlife species and their habitat, soil disturbance, invasive species spread, and wildfire hazard and risk.

132.    The BLM also failed to consider the cumulative impacts of the Siuslaw Project in the context of past actions in the Siuslaw Field Office. The EA acknowledges that the BLM has managed land and approved timber projects through "multiple" landscape plans, resulting in at least 15,000 acres of logging on the district over the past 15 years. However, the BLM did not explain what the cumulative effects of these projects have been or what the cumulative impact of these past projects, the Siuslaw Project, and the concurrent N126 Project might be.

133.    The BLM's failure to take the requisite hard look at the cumulative effects the Siuslaw Project when added to other past, present, and reasonably foreseeable future actions, violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 5:       Failure to Prepare an Environmental Impact Statement.**

134.    Cascadia realleges and incorporates by reference all preceding paragraphs.

135.    Federal agencies are required to prepare an EIS when "substantial questions" are raised as to whether a major federal action "may" cause significant degradation of some human environmental factor. 42 U.S.C. § 4332(C).

136.    An agency's decision not to prepare an EIS must be fully-informed and well-considered, supported by a convincing statement of reasons why the action's effects will not be significant.

137.    In deciding whether an action may have a significant impact, the agency must consider the context and intensity of the proposed project. 40 C.F.R. § 1508.27. CEQ regulations

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—29

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

specify ten factors the agency must consider when assessing a project's intensity. 40 C.F.R.
§ 1508.27(b).

138.    The agency's statement of reasons must show that none of the intensity factors are
present. The significance of one individual factor, or of multiple factors in combination, may
require preparation of an EIS.

139.    The Siuslaw Project implicates numerous intensity factors that individually and
cumulatively compel the preparation of an EIS. The BLM therefore acted arbitrarily and
capriciously in releasing a FONSI and failing to prepare an EIS.

140.    The Siuslaw Project will affect areas with unique characteristics, including mature
and old-growth forests that provide habitat for ESA-listed species and other special status
wildlife species. 40 C.F.R. § 1508.27(b)(3).

141.    The Siuslaw Project is likely to adversely affect ESA-listed species, specifically
northern spotted owl, marbled murrelet, and coho and Chinook salmon. The BLM did no site- or
project-specific analysis of or consultation regarding the Project's impacts on these species, but
acknowledges that the Project is likely to adversely affect all four ESA-listed species.

142.    The Siuslaw Project will result in effects that are highly controversial, including
the impact of logging on carbon sequestration and greenhouse gas emissions, northern spotted
owl habitat, fire regimes, and forest resiliency to climate change. The programmatic FEIS to
which the Siuslaw EA purports to tier specifically noted the scientific controversy around these
issues; however, the EA does nothing to address or even acknowledge this ongoing controversy.

143.    The Siuslaw Project threatens to violate federal law, specifically FLPMA, as the
BLM has not explained how the Project will conform to the Northwestern RMP and its
substantive standards. The BLM has not shown it can implement the Project without exceeding

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

the RMP's 20 percent detrimental-soil-disturbance cap. The BLM has not explained how it will

meet its responsibility to provide habitat that supports the recovery of ESA-listed species and

minimizes the likelihood of ESA-listing of Bureau Sensitive Species; indeed, it has not even

determined which species of interest currently inhabit the Project Area. The BLM has not

explained how the Project will meet RMP direction to prevent, detect, and rapidly control new

invasive species infestations or to manage existing infestations—the EA expressly states that the

Project would add to the agency's inability to control invasive weeds in the Siuslaw Field Office.

144.    The Siuslaw Project will result in effects that are highly uncertain or involve

unique or unknown risks because the BLM failed to analyze and disclose baseline conditions and

conduct site-specific NEPA analyses. Project activities are slated to occur over the course of

multiple decades; uncertainty about the Project's effects and the existence of as-yet unknown

risks are inevitable.

145.    The Siuslaw Project will cause significant cumulative impacts, as Project

activities will occur over the course of multiple decades, on over 13,000 acres intermixed with

lands under private, state, and federal management, most of which are likely to be commercially

logged in the coming decades. Specifically, the BLM's N126 Project—which the agency entirely

failed to consider or disclose in the Siuslaw Project EA—authorizes commercial logging on

16,000 acres overlapping the Siuslaw Project Area. The cumulative environmental effect of

implementing both projects is significant for purposes of NEPA.

146.    The intensity factors implicated by the Siuslaw Project are significant

individually. The intensity factors implicated by the Siuslaw Project are significant when

considered cumulatively. The Siuslaw EA simply does not contain adequate support for the

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—31

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

BLM's conclusion that, despite the presence of these factors, the Project will have no significant impact.

147.    The BLM's decision to authorize the Siuslaw Project without first preparing an EIS violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A.    Declare the BLM's issuance of the Siuslaw Environmental Assessment, Finding of No Significant Impact, and Decision Record arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

B.    Declare that the BLM violated the National Environmental Policy Act and its implementing regulations by approving the Siuslaw Project without preparing an EIS;

C.    Vacate and set aside the EA, FONSI, and DR for the Siuslaw Project, and order the BLM to withdraw any decisions or contracts made pursuant to the Siuslaw DR until such time as the BLM demonstrates that it has complied with the law;

D.    Enjoin the BLM and its contractors, assigns, and other agents from proceeding with implementing the Siuslaw Project until such time as the BLM demonstrates that it has complied with the law;

E.    Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be subsequently requested by Plaintiffs;

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—32

F.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements,

including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access

to Justice Act or other applicable statutes; and

G.      Grant such further relief as the Court deems just, proper, and equitable.


Respectfully submitted and dated this 8th day of September, 2022.

/s/ Erin Hogan-Freemole
Erin Hogan-Freemole, OSB # 212850
503-234-0788 │ erin@crag.org
Oliver J. H. Stiefel, OSB # 135436
503-227-2212 │ oliver@crag.org
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214
/s/ Nicholas S. Cady
Nicholas S. Cady, OSB # 113463
541-434-1463 │ nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

*Attorneys for Plaintiffs*


COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF—33

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2725*