**U.S. Department of the Interior**
**Bureau of Land Management**

---

**DECISION RECORD**

**Siuslaw HLB Landscape Plan EA**

**DOI-BLM-ORWA-N030-2020-0002-EA**

T 15S R 6W; T 16S R6-7W; T 17S R 6-8W; T 18S R 4-8W; T 19S R 3-8W; T 20S R 3,4,6W
Willamette Meridian Lane County, Oregon

**April 2022**

United States Department of the Interior
Bureau of Land Management
Northwest Oregon District
Siuslaw Field Office


Responsible Agency:          USDI – Bureau of Land Management

Responsible Official:        Cheryl Adcock
                             Field Manager
                             Siuslaw Field Office
                             3106 Pierce Parkway, Suite E
                             Springfield, OR 97477-7910
                             (541) 683-6145

For further information, contact:   Morgan Schneider
                                    Planning and Environmental Coordinator
                                    Siuslaw Field Office
                                    3106 Pierce Parkway, Suite E
                                    Springfield, OR 97477-7910
                                    (541) 683-6407



EXHIBIT 2

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

## DECISION RECORD

DOI-BLM-ORWA-N030-2020-0002-EA
Siuslaw HLB Landscape Plan Decision Record

## INTRODUCTION

This document describes my decision, and reasons for my decision, regarding the selection of a management strategy for the Siuslaw HLB Landscape Plan project. The Northwest Oregon District Bureau of Land Management (BLM), Siuslaw Field Office has completed the environmental analysis for the Siuslaw HLB Landscape Plan, which the BLM documented in the Environmental Assessment (DOI-BLM-ORWA-N030-2020-0002-EA). The analysis in the Siuslaw HLB Landscape Plan Environmental Assessment supported a Finding of No Significant Impact (FONSI).

## DECISION

I have decided to select Alternative 4 for the entire Siuslaw HLB Landscape Plan project area as described in the introduction section of the Siuslaw HLB Landscape Plan Environmental Assessment (herein referred to as the EA). The EA and associated Finding of No Significant Impact (FONSI) analyzed Alternative 4 and found no significant impacts to the human environment.

Implementation of this decision will result in forest management activities such as commercial timber harvest, fuels reduction actions, prescribed fire, snag creation, road construction, road renovation, and road decommissioning across the Siuslaw HLB Landscape Plan project area. The BLM will implement all design features identified in the EA. This decision does not authorize any specific implementation actions but outlines a program of work for managing the Harvest Land Base within the Siuslaw HLB Landscape Plan project area.

**Public notification and involvement for project-level decision:**

Prior to decisions on projects within the program of work encompassed by this decision, the BLM will complete a tiered environmental assessment, categorical exclusion review, or Determination of NEPA Adequacy (DNA), as appropriate. The BLM will send out updates quarterly about planned projects encompassed by this decision in the Northwest Oregon District Quarterly Planning Update. This planning update can be found at the following url, as of the date of this decision:

https://www.blm.gov/programs/planning-and-nepa/plans-in-development/oregon-washington

This update is also transmitted electronically to members of the Northwest Oregon District mailing list. Interested parties can request to be added to that mailing list by emailing BLM_OR_NO_Publiccomments_NEPA@blm.gov and stating they would like to be added to the quarterly update mailing list. The BLM will include in this quarterly planning update information on the name of the planned project, the acres, the township/range/section of the project, the planning status of the project, and a contact person for the project. The BLM will also send all tiered environmental assessments, categorical exclusions, and DNAs within the program of work encompassed by this decision to the public for a 30-day public comment period. This comment period will begin a minimum of 3-months prior to the anticipated sale date for all commercial timber sales.

**Unit selection:**

The BLM will select commercial timber harvest projects based on its ability to manage the Interdisciplinary Team (IDT) work associated with the project implementation (all wildlife, botany, fish, hydrology, and soils surveys and consistency analysis) as well as its ability to develop and administer the contracts. Unit selection depends, in part, on avoidance of nesting ESA-listed species, the ability of the commercial harvest work to occur outside of the breeding seasons for ESA-listed species, logistics of timber removal and the ability to take advantage of recent infrastructure upgrades (e.g., haul route maintenance, culvert additions or replacements, unit adjacency,

1

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

legal access and right of way agreements), coordination with neighboring landowners so that projects are generally not active adjacent to each other, and the ability of the project to distribute the workload evenly for the purchasers and the BLM throughout the year. The RMP sets an Allowable Sale Quantity of timber volume for the entire SYU (p. 5-6) and directs the implementation of timber harvest in the Harvest Land Base but does not set an acreage target or require specific timing.

**PLAN CONFORMANCE**

This action is in conformance with the 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan.

**ACTION ALTERNATIVES ANALYZED**

Below is a brief description of the action alternatives and basic information on what each alternative would implement. For a full description of these alternatives, please see the EA Chapter 2.

**Alternative 2**

Under this alternative, the BLM would provide ASQ volume exclusively through the use of commercial thinning. No regeneration harvest would be implemented under this alternative. Alternative 2 would conduct harvest on 3,889 acres per decade and produce 70 MMbf of ASQ volume per decade. Because regeneration harvest would not take place, the age class distribution within the project area would not be adjusted and would not reach an even age class distribution over time. There would be no change in the overall relative complexity of the early successional ecosystem on treated acres, as there would as no regeneration harvest creating an early successional structural stage.

Thinning would decrease the fire hazard category from High to Moderate. Fire resistance would increase from Low to Moderate. Over the next 50 years, the thinned stands and the associated fire hazard and resistance categories would transition from Moderate to Mixed.

The fire risk would remain Low to Moderate inside the Wildland Development Areas (WDAs) and Very Low to Low outside the WDA. Neighboring homeowners would continue to experience the same overall fire risk that they currently experience, similar to the No Action alternative.

**Alternative 3**

Under this alternative, the BLM would provide ASQ volume through a combination of commercial thinning and regeneration harvest. Alternative 3 would produce 61-79 MMbf of ASQ volume per decade by harvesting between 2,290- 2,994 acres per decade. Of these acres 1,444-1,944 would be commercially thinned. Alternative 3 would harvest 846-1,050 acres per decade through regeneration harvest; resulting in 8-10.75 decades to reach even class distribution within the Low Intensity Timber Areas (LITA) and 5.5-7.75 decades to reach even class distribution in the MITA. The acres treated with regeneration harvest would produce an early successional structural stage, the overall relative complexity of the resulting early successional ecosystem would be rated high.

The 846-1,050 acres that were regeneration harvested would change from their current stand structural stages to Early Successional with a fire hazard and resistance category of Moderate. Towards the end of the short-term these stands would transition into Stand Establishment which has a High hazard rating and Moderate/Low resistance rating. Over the next 10 to 30 years, these stands would transition from Early Successional to Stand Establishment and Young High Density, which would increase their fire hazard rating from Moderate to High and decrease their resistance rating from Moderate to Low. In the long term these stands would transition from Young-High Density into Mature, which would change the fire hazard from High to Low/Mixed and the resistance from Low to High/Mixed.

2

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

The 1,444-1,944 commercially thinned harvest acres would occur in Young High-Density stands. These stands would transition to Young-Low Density stands, decreasing their fire hazard category from High to Moderate and increasing their resistance from Low to Moderate. Over the next 50 years, the stands would develop into Mature-Multistory or Structurally Complex stands with a Mixed fire hazard and resistance category.

In each decade proposed timber harvest would create short term localized changes in fire risk at the project level; however, overall fire risk would not increase beyond current levels from the residual activity fuels. The local scale would remain at Low to Moderate fire risk because of the presence of structures and infrastructure along the Valley Fringe and main road corridors of Hwy 126, and Hwy 36.

## Alternative 4

Under this alternative, the BLM would provide ASQ volume through a combination of commercial thinning and regeneration harvest. Alternative 4 would produce 58-82 MMbf of ASQ volume per decade by harvesting between 1,404-2,305 acres per decade. Of these acres 278-944 would be commercially thinned. Alternative 4 would harvest 1,126-1,361 acres per decade through regeneration harvest. Resulting in 6-8 decades to reach even class distribution within the LITA and 4-4.75 decades to reach even class distribution in the MITA.  The acres treated with regeneration harvest would produce an early successional structural stage, the overall relative complexity of the resulting early successional ecosystem would have a divided rating with 1/3 acres rated High and 2/3 acres rated Medium (EA p.46).

The 1,126-1,361 acres that were regeneration harvested would change from their current stand structural stages to Early Successional, with a fire hazard and resistance category of Moderate. Over the next 10 to 30 years, these stands would transition from Early Successional to Stand Establishment and Young High Density, which would increase their fire hazard rating from Moderate to High and decrease their resistance rating from Moderate to Moderate/Low. In the long term, these stands would transition from Young-High Density into Mature, which would change the fire hazard from High to Low/Mixed and the resistance from Low to High/Mixed.

The 278-944 commercially thinned harvest acres would occur in Young High-Density stands. These stands would transition to Young-Low Density stands, decreasing their fire hazard category from High to Moderate and increasing their resistance from Low to Moderate. Over the next 50, years the stands would develop into Mature-Multistory or Structurally Complex stands with a Mixed fire hazard and resistance category.

In each decade proposed timber harvest would create short term localized changes in fire risk at the project level; however, overall fire risk would not increase beyond current levels from the residual activity fuels. The local scale would remain at Low to Moderate fire risk because of the presence of structures and infrastructure along the Valley Fringe and main road corridors of Hwy 126, and Hwy 36.

## Alternative 5

Under this alternative, the BLM would provide ASQ volume through a combination of commercial thinning and regeneration harvest. Alternative 5 would produce 60-83 MMbf of ASQ volume per decade by harvesting between 1,126-1,917 acres per decade. Of these acres 0-556 would be commercially thinned. Alternative 5 would harvest 1,126-1,361 acres per decade through regeneration harvest. Resulting in 6-8 decades to reach even class distribution within the LITA and 4-4.75 decades to reach even class distribution in the MITA. The acres treated with regeneration harvest would produce an early successional structural stage, the overall relative complexity of the resulting early successional ecosystem would be rated low.

The 1,126-1,361 acres that were regeneration harvested would change from their current stand structural stages to Early Successional with a fire hazard and resistance category of Moderate. Over the next 10 to 30 years, these stands would transition from Early Successional to Stand Establishment and Young High Density, which would increase their fire hazard rating from Moderate to High and decrease their resistance rating from Moderate to Moderate/Low. In the long term these stands would transition from Young-High Density into Mature, which would change the fire hazard from High to Low/Mixed and the resistance from Low to High/Mixed.
The 0-556 commercially thinned harvest acres would occur in Young High-Density stands. These stands would transition to Young-Low Density stands decreasing their fire hazard category from High to Moderate and

increasing their resistance from Low to Moderate. Over the next 50 years, the stands would develop into mature-multistory or Structurally Complex stands with a Mixed fire hazard and resistance category.

The 1,123-1,361 acres of regeneration harvest would have a Low to Moderate risk from activity fuels. The 0-556 acres of commercial thinning would have a Low risk from activity fuels. Off-site and on-site values at risk would see a slight increase in risk from as populations increase over time.

In each decade proposed timber harvest would create short term localized changes in fire risk at the project level; however, overall fire risk would not increase beyond current levels from the residual activity fuels. The local scale would remain at Low to Moderate fire risk because of the presence of structures and infrastructure along the Valley Fringe and main road corridors of Hwy 126, and Hwy 36.

**Alternative 6**

Under this alternative, the BLM would provide ASQ volume exclusively through regeneration harvest. Alternative 6 would produce 77 MMbf of ASQ volume per decade by harvesting an average of 1,470 acres per decade. Alternative 6 would harvest 1,470 acres per decade through regeneration harvest. Resulting in 4 decades to reach even class distribution within the LITA and 3.75 decades to reach even class distribution in the MITA. The acres treated with regeneration harvest would produce an early successional structural stage, the overall relative complexity of the resulting early successional ecosystem would be rated low.

The 1470 acres that were regeneration harvested would change from their current stand structural stages to Early Successional with a fire hazard and resistance category of Moderate. Over the next 10 to 30 years, these stands would transition from Early Successional to Stand Establishment and Young High Density, which would increase their fire hazard rating from Moderate to High and decrease their resistance rating from Moderate to Moderate/Low. In the long term, these stands would transition from Young-High Density into Mature, which would change the fire hazard from High to Low/Mixed and the resistance from Low to High/Mixed.

In each decade proposed timber harvest would create short term changes in fire risk at the local scale; however, overall fire risk would not increase beyond current levels from the residual activity fuels. The local scale would remain at Low to Moderate fire risk because of the presence of structures and infrastructure within the Valley Fringe and along the main road corridors of Hwy 126, and Hwy 36.

**RATIONALE FOR SELECTION**

In consideration of public comments and the findings presented in the EA, along with referenced supporting documentation, I have decided to implement Alternative 4 in the Siuslaw HLB  Landscape Plan project area as described in the EA and above, based on the following rationale.

The purpose is to conduct commercial timber harvest to contribute timber volume to the Allowable Sale Quantity. The Siuslaw Field Office has a decadal target of 56 to 84 MMbf to contribute to the declared ASQ for the Eugene SYU (EA pp. 3-4). Additionally, there were differences in how the action Alternatives would meet the other selection criteria. The EA analyzed four additional issues that were important to the final decision (EA pp. 5-6). I identified these issues as necessary to choose a management strategy for the project area: Age class (time to reach an even age class distribution); complex early seral ecosystem (relative complexity rating); changes to wildfire hazard and resistance, and changes to wildfire risk.

The No Action Alternative would not meet the purpose of and need for the project. It was, therefore, not a reasonable alternative and was not selected.

All action Alternatives would meet the project's purpose and need of contributing to timber volume to meet the ASQ decadal target. Also, across all action Alternatives the overall fire risk would not increase beyond current levels from the residual activity fuels.

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

I have selected Alternative 4 because it will meet the purpose and need for the project into perpetuity, while also meeting the other management direction from the ROD/RMP, such as adjusting the age class and the producing the complex early seral ecosystem.

Alternative 3 produces the highest quality of complex early seral, but the large amount of natural reforestation would require BLM to perform intensive monitoring and possible intensive future stand maintenance to meet RMP direction for reforestation and stocking requirements. Alternative 4 has the next highest rating of creating relatively complex early seral ecosystems, and has a planting density that will require less future maintenance. Additionally, Alternative 4 meets the even age class distribution faster than Alternative 3; which would provide more predictability in ASQ timber volume in perpetuity.

Alternative 5 and 6 would produce the most acres of early seral ecosystem, but of a relatively low complexity rating, lower than Alternative 4. Alternative 6 would reach even age class distribution the fastest. The harvest levels in alternatives 4, 80 to 100 year rotation in MITA and the 120 to 140 year rotation in LITA, are consistent with the decadal harvest acres predicted for both regeneration and thinning from the Proposed RMP/Final EIS modeling (EA, p. 26). The acres of regeneration harvest would increase their fire hazard category from Moderate to High, over the next 10 to 30 years. In the long term these stands would transition from High to Low/Mixed. Alternative 4 has less acres of regeneration harvest than Alternative 5 and 6, and thus would have the less acres in the High fire hazard category over the next 10 to 30 years.

Alternative 2 would reduce the Fire hazard rating from High to Moderate in the short term, and then to a mixed category over the next 50 years. However, because it does not propose regeneration harvest this alterative would produce no complex early seral ecosystem, and would not contribute to an even age class distribution.

## CONSULTATION AND COORDINATION

As described in Chapter 4 of the EA, the BLM has completed initial consultation with the appropriate regulatory agencies. The BLM has agreements in place with both the National Marine Fisheries Service (NMFS) and the Oregon State Historic Preservation Office (SHPO) to seek final consultation prior to the implementation of projects. In accordance with those agreements, and consistent with the "Final Guidance for Effective Use of Programmatic NEPA Reviews" (EOP - CEQ, 2014), the BLM will seek final consultation with NMFS and SHPO prior to signing a decision authorizing any implementation of this project. Initiation of project level work is contingent upon completion of the identification and protection of archaeological resources and compliance with applicable provisions of NHPA in accordance with the Programmatic Agreement. That final consultation will be included in the implementation decision record.

Consultation with the US Fish and Wildlife Service on the effects of this project on Threatened and Endangered wildlife species is under the Biological Assessment for Timber Harvest and Routine Activities that are Likely to Adversely Affect Listed Species and Critical Habitat (USDI Bureau of Land Management and USDA Forest Service, 2019) and its associated Biological Opinion (TAILS:01EOFW00-2020-F-0170) (USDI Fish and Wildlife Service, 2020c). Northern spotted owl and marbled murrelet are the threatened wildlife species occurring within the project area that are covered by this consultation. Site-specific information for each project under this consultation would be reported to the US Fish and Wildlife Service prior to project implementation. Monitoring of projects under this consultation would be submitted to the US Fish and Wildlife Service annually.

## PUBLIC INVOLVEMENT

The BLM conducted extensive public scoping for this project, which is described in the EA (p.5). BLM conducted a 30-day public scoping period, held a stakeholder meeting open to the public during the 30-day public scoping period, issued draft chapters 1 and 2 of the EA for a 20-day public comment period, and then released the entire EA for a 30-day public comment period on 8/17/2021. During the 30-day public comment period, BLM received comments from six individuals, a group of neighbors, and four local interest groups (American Forest Resource Council, Cascadia Wildlands/Oregon Wild [joint comment letter], and the Lane County Audubon Society). The BLM reviewed the comments submitted and identified all substantive comments. The BLM has responded to all timely, written substantive comments in Appendix B of this decision.

## ADMINISTRATIVE REMEDIES

A person adversely affected by this forest management decision may appeal the decision to the Interior Board of Land Appeals (Board), within the Office of the Secretary, Office of Hearings and Appeals.  Appeals to the Board are governed by the Department's regulations at 43 CFR Part 4.  The BLM has provided the attached Form 1842-1 as a courtesy to assist a member of the public who chooses to appeal this decision.  However, the appellant (the person filing the appeal) bears the responsibility to know, understand, and comply with the appeals regulations.

To appeal this decision, the appellant or designated representative (see 43 CFR § 1.3) must file a notice of appeal within thirty (30) calendar days of the date of this decision in this office, addressed to the deciding official, Cheryl Adcock, BLM Northwest Oregon District's Springfield Interagency Office at 3106 Pierce Parkway, Suite E, Springfield, OR 97477. Written appeals that are electronically transmitted (e.g., email, facsimile, or social media) will not be accepted.  It is the responsibility of the deciding official to promptly transmit a notice of appeal to the Board.  If the notice of appeal does not include a statement of reasons, the appellant must file the statement of reasons with the Board and the BLM within thirty (30) calendar days after the notice of appeal is filed.  A copy of the notice of appeal, any statement of reasons, any written arguments, and any briefs must also be filed with the Office of the Regional Solicitor, Pacific Northwest Region, U.S. Department of the Interior, 601 SW 2nd Ave, Suite 1950, Portland, OR  97204-3172.

An appellant has the right to petition the Board to stay implementation of the decision.  A petition for stay, if any, must accompany the notice of appeal, and be served upon the deciding official and the Office of the Regional Solicitor.

The decision described in this document is a forest management decision. The BLM has revised the forest management regulations at 43 CFR 5000, and those revised regulations became effective on January 19, 2021. The Final Rule was published in the Federal Register on December 18, 2020 (85 FR 82359).  In the Final Rule, the BLM eliminated the administrative protest provisions formerly found at 43 C.F.R. § 5003.3; accordingly, there is no opportunity to administratively protest this forest management decision.

This decision is selecting a management strategy for the Siuslaw HLB Landscape Plan EA project area, and is only appealable once, during the appeal period described above. Subsequent decisions implementing projects as part of the Siuslaw HLB Landscape Plan will be forest management actions and subject to administrative remedies described in 43 CFR 5003.3. However, those subsequent appeals must describe how those subsequent decisions are not in conformance with the decision described in this document, or must describe changed circumstances that could not have been accounted for in this decision. Subsequent appeals that challenge this decision will be untimely and the BLM cannot consider them.

**Signature of the Responsible Official:**

CHERYL
ADCOCK

Digitally signed by CHERYL
ADCOCK
Date: 2022.03.31 09:27:00
-07'00'

Cheryl Adcock                                                              Date
Field Manager, Siuslaw Field Office
Northwest Oregon District BLM

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

**Appendix A: Change Log for EA**

Minor changes (clarifications and additions) to the text of the EA that occurred after the public comment period are summarized below. These additions and clarifications were made based on comments received during the public comment period. No information added to the EA changed the environmental effects resulting from the alternatives.

Clarification regarding the Advanced Oregon Wildfire Risk Explorer was added to the issue, "How would timber harvest and reforestation affect fire risk?" (EA, p.63). Update to the status to the consultation added (EA, p.69). A clarifying update to the issue, "What are the effects of the alternatives on spotted owl habitat?" (EA, pp.113-11) was included. This clarification focused on explaining the physiographic province and northern spotted owl movement. Update to the issue "What are the effects of the alternatives on known northern spotted owl sites and incidental take of spotted owls?" (EA, p. 115-116). A greater explanation of the known or potential sites was included. Clarifying update to the issue, "What are the effects of the alternatives on marbled murrelet nesting habitat?" (EA, pp.121-123).

Three additional wildlife issues considered but not presented in detailed analysis listed in the EA:

- What are the effects of the alternatives on fisher habitat? (EA, pp.130-133)
- What are the effects of the alternatives on Pacific marten habitat? (EA, pp.133-135)
- What are the effects of the alternatives on birds observed in the Fox Hollow area? (EA, pp.135-137)

The words, "per decade" were added to the description for the Soil Disturbance from Road Construction Across Alternatives table (EA, p.145). A Footnote explanation added for the Pacific Marten (EA, p.148). Fisher presence in project area and impacts of project on population changed from "Unlikely" to Possible, but unlikely (EA, p.152). Two additional Project Design Features were included for Pacific marten and fisher (EA, p.177).

1

**Appendix B: Response to Comments Received During 30-Day Public Comment Period**

Abbreviations:

| | |
|---|---|
| AFRC | American Forest Resource Council |
| OWCW | Oregon Wild and Cascadia Wildlands [submitting a joint comment letter] |
| Fox Hollow Neighbors | A group of neighbors who live in close proximity to the three BLM parcels south of Fox Hollow Road in Eugene, Oregon |
| EA | The Siuslaw HLB Landscape Plan EA |
| ROD/RMP | Northwestern and Coastal Oregon Record of Decision and Approved Resource Management Plan |
| FEIS | Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon |
| FOMBO | Western Oregon Forest Management Biological Opinion |
| NMFS | National Marine Fisheries Service |

BLM responds to substantive comments, substantive comments do one or more of the following:

- question, with reasonable basis, the accuracy of information in the EA.
- question, with reasonable basis, the adequacy of, methodology for, or assumptions used for the environmental analysis.
- present new information relevant to the analysis.
- present reasonable alternatives other than those analyzed in the EA.
- cause changes or revisions in one or more of the alternatives.

**RMP management direction**

**Commenter: OWCW, Public Comment Letter, p.18**

*Why is certain management direction in the RMP treated as negotiable, while other provisions are rigidly adhered to? For example, the RMP directs BLM to:  Apply the concepts of Ecological Forestry consistent with the owl recovery plan and the designation of critical habitat for the northern spotted owl. Among the Ecological Forestry approaches of the Proposed RMP are: Protection of larger and older trees within harvested areas… Retention of key forest structural components following natural disturbances in the reserves.* (citation ROD/RMP p.64)

**BLM Interpretation:**

Follow the management direction of the RMP outlined on page 64 of the ROD/RMP for the Late Successional Reserve.

**_Response:_**

BLM received a comment to follow the management direction of the ROD/RMP outlined on page 64 of the ROD for the Late Successional Reserve. This was summarized by the commenters as the, "*Protection of larger and older trees within harvested areas… Retention of key forest structural components following natural disturbances in the reserves.*"

The management direction on page 64 of the ROD/RMP is for the Late Successional Reserve:

- "Manage for large blocks of northern spotted owl nesting-roosting habitat that support clusters of reproducing spotted owls, are distributed across the variety of ecological conditions, and are spaced to facilitate the movement and survival of spotted owls dispersing between and through the blocks.
- In stands that are currently northern spotted owl nesting-roosting habitat, maintain nesting-roosting habitat function, regardless of northern spotted owl occupancy.

1

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

- Protect stands of older, structurally-complex conifer forest. Such stands are a subset of, and represent the highest value, northern spotted owl nesting-roosting habitat."

The Late Successional Reserve is outside the project area (EA, p.2) and therefore Late-Successional Reserve management direction does not apply to this project.  This EA follows the HLB management direction and referred the reader to a complete description on pages 59-63 in the ROD/RMP (EA p.8). BLM is in conformance with the ROD/RMP (EA, p.4) and is following the appropriate management direction for land use allocation proposed for treatment in this project (EA, p. 8).

**Commenter: OWCW, Public Comment Letter, p.18**

*Why is certain management direction in the RMP treated as negotiable, while other provisions are rigidly adhered to? For example, the RMP directs BLM to: Promote beaver habitat restoration.*

**_BLM Interpretation:_**

Consider an alternative that would promote beaver habitat restoration.

**_Response:_**

BLM received comments during the public comment period asking the BLM to consider an alternative that would promote beaver habitat restoration. Management direction for the Riparian Reserve directs BLM to "Promote beaver habitat restoration where the presence of beaver and their associated dams would improve fish and aquatic habitat" (ROD/RMP p. 70). The Riparian Reserve is outside the project area (EA, p.2).  This EA follows the HLB management direction and referred the reader to a complete description on pages 59-63 in the ROD/RMP (EA p.8). For that reason, BLM did not consider this management direction.

**Commenter: OWCW, Public Comment Letter, p.18**

*Why is certain management direction in the RMP treated as negotiable, while other provisions are rigidly adhered to? For example, the RMP directs BLM to: Conserve and recover species that are ESA-listed, proposed, or candidates, and the ecosystems on which they depend.*

**_BLM Interpretation:_**

Consider an alternative that follows the management objective to "*conserve and recover species that are ESA-listed.*"

**_Response:_**

BLM received a comment to follow the management objective outlined on page 95 of the ROD/RMP, "Manage habitat for species that are ESA-listed, or are candidates for listing, consistent with recovery plans, conservation agreements, and designated critical habitat." As described in the ROD/RMP on page 3, "Management objectives are descriptions of desired outcomes for BLM-administered lands and resources in an RMP; the resource conditions that the BLM envisions or desires would eventually result from implementation of future actions consistent with the decisions in the RMP. As such, management objectives are not rules, restrictions, or requirements by which the BLM determines which implementation actions to conduct or how to design specific implementation actions."

Consultation for the ESA listed species (northern spotted owl, marbled murrelet, Oregon coast coho salmon, and the Upper Willamette River Chinook salmon) are covered on pp. 69-70 of the EA. BLM is following all relevant management direction for the project area list ESA species and considered ESA listed species in the following issues considered but not presented in detailed analysis:

- What are the effects of timber harvest, timber sale road activities, and timber haul on fish populations and fish habitat? (EA, pp.86-88)
- What are the effects of the alternatives on spotted owl habitat? (EA, pp.112-114)
- What are the effects of the alternatives on known northern spotted owl sites and incidental take of spotted owls? (EA, pp.114-117)
- What are the effects of the alternatives on spotted owl prey species, e.g., flying squirrel and red tree vole? (EA, pp.117-118)
- What are the effects of the alternatives on spotted owl and barred owl interactions? (EA, pp.118-119)
- What are the effects of the alternatives on spotted owl suitable habitat considering competitive interactions with barred owl? (EA, pp.119-120)
- What are the effects of the alternatives on marbled murrelet nesting habitat? (EA, pp.120-123)
- How would the alternatives affect altered microclimate and nest predation of marbled murrelets? (EA, pp.123-124)

The discussion on how the alternatives would affect ESA listed species in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA, pp. 88, 114, 117, 118, 119, 120, 123, and 124).

**Commenter: OWCW, Public Comment Letter, p.18**

*Why is certain management direction in the RMP treated as negotiable, while other provisions are rigidly adhered to? For example, the RMP directs BLM to: Conserve Bureau Special Status Species.*

**<u>BLM Interpretation:</u>**

BLM is not following management direction to *Conserve Bureau Special Status Species.*

**<u>Response:</u>**

BLM received comments during the public comment period asking the BLM to consider the management direction to *Conserve Bureau Special Status Species*. The management objective outlined on p.95 of the ROD/RMP states, "Implement conservation measures that reduce or eliminate threats to Bureau Sensitive species to minimize the likelihood of and need for the ESA listing of these species." As described in the ROD/RMP on page 3, "Management objectives are descriptions of desired outcomes for BLM-administered lands and resources in an RMP; the resource conditions that the BLM envisions or desires would eventually result from implementation of future actions consistent with the decisions in the RMP. As such, management objectives are not rules, restrictions, or requirements by which the BLM determines which implementation actions to conduct or how to design specific implementation actions." BLM considered Special Status Species in three separate issues and applied appropriate project design features to meet management direction.

1) How would the alternatives affect Bureau Sensitive Species such as songbirds, salamanders, and invertebrates such as butterflies? (EA, pp.124-125). Special Status Wildlife Species are documented in section 5.4.2, where species, status, presence in the Siuslaw Field Office, presence in project area, habitat associations, and impacts of project on populations is documented. See table, "Species on the Siuslaw Field Office with Management Direction in the Northwest and Coastal Oregon RMP, but not listed under the Endangered Species Act." (EA, pp.139-146). After evaluation, BLM determined that Siuslaw HLB Landscape Plan EA is consistent with the management direction for Special Status Species under the ROD/RMP (USDI Bureau of Land Management, 2016, p. 95) and with the assumptions and analysis for Special Status Species in the Proposed RMP/Final EIS (USDI Bureau of Land Management, 2016b, pp. 830-852) (EA, p.125).

2) What are the effects of timber harvest on Special Status Plants, Lichens, and Fungi? (EA, pp.79-81). In all action alternatives analyzed in detail the BLM would conduct pre-disturbance surveys for Bureau Special Status plant species and apply conservation measures to protect these sites. The BLM determined that under all action alternatives effects to Special Status botanical species are not associated with significant direct, indirect, or cumulative impact (EA, p.81). Appendix E, Project Design Features, outlines the BLM's commitments for

protecting Special Status Plants. BLM would, "Survey proposed project areas for Special Status vascular plants, lichens, and bryophytes prior to project design" and "Create project design features to provide for the management of Bureau Special Status botanical species on a project and species specific basis" (EA, p.164). BLM determined that Siuslaw HLB Landscape Plan EA is consistent with the management direction for Special Status Species (EA, p. 80) under the ROD/RMP (USDI Bureau of Land Management, 2016, p. 86)

3) What are the effects of timber harvest, timber sale road work, and timber haul on fish populations and fish habitat? (EA, pp.86-88). A summary of bureau sensitive fish species and their distributions within the analysis area can be found in the Special Status Fisheries Species table in Section 5.4.4: Coastal cutthroat trout, brook lamprey, sculpin, speckled dace, and Northern pikeminnow which are found in both the Siuslaw and Willamette drainages (EA, p.86). In this table species, status, presence in the Siuslaw Field Office, presence in project area, habitat associations, and impacts of project on populations is documented. Further, the "Project design features and BMPs (see, Appendix E; also, Section 5.2.4.1), and consultation with NMFS would minimize potential for negative impacts." (EA, pp.162-163). BLM determined that Siuslaw HLB Landscape Plan EA is consistent with the management direction for Special Status Species (EA, p. 86) under the ROD/RMP (USDI Bureau of Land Management, 2016, p. 68-74)

**Commenter: OWCW, Public Comment Letter, p.18**

*Why is certain management direction in the RMP treated as negotiable, while other provisions are rigidly adhered to? For example, the RMP directs BLM to: Conserve and create habitat for species covered under the Migratory Bird Treaty Act and the Bald and Golden Eagle Protection Act.*

**_BLM Interpretation:_**

BLM is not following ROD/RMP management direction to protect *Bald and Golden Eagles*.

**_Response:_**

BLM received comments during the public comment period asking the BLM to consider management direction to protect *Bald and Golden Eagles*. The management objective on p.95 of the ROD/RMP is to, "Conserve or create habitat for species addressed by the Migratory Bird Treaty Act and the Bald and Golden Eagle Protection Act and the ecosystems on which they depend." BLM directly incorporated the management direction for protecting Bald eagle (*Haliaeetus leucocephalus*) and Golden eagle (*Aquila chrysaetos*) in the project design features for this project. See Appendix E, p. 177 of the EA:

- "Protect known bald eagle or golden eagle nests (including active nests and alternate nests) and bald eagle winter roosting areas. Prohibit activities that would disrupt bald eagles or golden eagles that are actively nesting (RMP p. 96)"
- "Do not remove overstory trees within 330 feet of bald eagle or golden eagle nests, except for removal of hazard trees (RMP p. 96)."
  "Do not conduct timber harvest operations (including road construction, tree felling, and yarding) during the breeding season within 660 feet of bald eagle or golden eagle nests (RMP p. 96)."

All action alternatives are in conformance with the management direction for bold and golden eagles. BLM concluded that, "If present in the project area, required protection measures will be applied" and that the project is not likely to cause a trend toward listing (EA, p.139).

**Commenter: OWCW, Public Comment Letter, p.18**

*Why is certain management direction in the RMP treated as negotiable, while other provisions are rigidly adhered to? For example, the RMP directs BLM to: Protect bat colonies.*

**_BLM Interpretation:_**

BLM is not following the ROD/RMP management direction to protect bat colonies.

**_Response:_**

BLM received comments during the public comment period asking the BLM to consider management direction to protect bat colonies. The Bureau Sensitive bat species likely to be found within this project area is the Fringed myotis (*Myotis thysanodes*). This species was described in the Special Status Wildlife Species table section 5.4.2, where species, status, presence in the Siuslaw Field Office, presence in project area, habitat associations, and impacts of project on populations is documented. See table, "Species on the Siuslaw Field Office with Management Direction in the Northwest and Coastal Oregon RMP, but not listed under the Endangered Species Act." (EA, pp.139-146). The BLM determined that known maternity colonies and hibernacula within caves, abandoned mines, bridges, and buildings would be protected (EA, p.147).

The ROD/RMP, page 96, stayed to "Protect known maternity colonies and hibernacula for Bureau Sensitive bat species within caves, abandoned mines, bridges, and buildings with a 250-foot buffer:
  o   Maintain existing habitat conditions and protect the site from destruction or species disturbance, to the extent practicable consistent with safety and legal requirements.
  o   Prohibit blasting.
  o   Implement hazard fuel reduction treatments to protect the site from wildfire or to maintain site conditions conducive to the colony.

Prohibit blasting during periods of reproduction and hibernation within 1 mile of known maternity colonies and hibernacula for Bureau Sensitive bat species within caves, abandoned mines, bridges, and buildings."

By following the above mentioned management direction BLM would remain within the effects of the ROD/RMP and not likely to cause a trend toward listing of this species (EA, p.147). All action alternatives are in conformance with the management direction for Bureau Sensitive bat species.

## NEPA Compliance

**Commenter: OWCW, Public Comment Letter, pp. 2-3**

*As BLM is aware, we object to the landscape, scale "programmatic EA" structure, as previously proposed on the N126 Landscape Plan on this District (as well as the IVM-RL, Roseburg LSR, and Coos Bay LSR programs on other districts). As with this HLB program EA, we believe the choice to relegate landscape-scale analysis across multiple decades to a slim EA that analyzes few issues and leaves out many significant impacts, and fails to provide for site-specific analysis of actions and impacts, is legally unsupportable. (p.2)*

*The Siuslaw HLB Program EA cannot be a substitute for site-specific analysis and public comment. We ask you to alter your approach. The BLM cannot comply with the spirit and intent of the National Environmental Policy Act by taking an approach that authorizes logging and road construction without the opportunity for meaningful public input. The BLM's contention that a post-decisional Determination of NEPA Adequacy (DNA) would satisfy the public engagement requirements of NEPA is misplaced. Instead, please conduct NEPA around individual projects and create a meaningful process to engage the public when the BLM has identified the actual project and project location in which this program will be implemented. (p.3)*

*The BLM needs to perform site-specific analysis and community input prior to project implementation. The public cannot provide substantive comments and the BLM cannot make informed decisions prior to site-specific information being available. Further, the BLM needs to strengthen the involvement of stakeholders and affected communities in public lands management rather than to cut corners and exclude the public. Simply put, the BLM has a lot of work to do to develop "buy in" and that work is long overdue. (p.3)*

*Avoiding full NEPA review through the mechanism of a "programmatic" EA followed by DNAs for individual projects is the third major error in BLM's recent planning process. We have strenuously objected to the BLM's implicit characterization of the HLB, particularly where, as here, much of it lies within the checkerboard, as its*

*"sacrifice zone." Staff conversations and environmental documents reveal the agency's opinion that it is not required to think carefully through impacts to wildlife, water quality, and climate change, among others, in the HLB, because meeting its ASQ means those areas will be logged despite impacts. Whether that last part is true does not excuse the agency from is responsibility to do the required NEPA analysis of potentially significant impacts, like those just listed. (p.3)*

### BLM Interpretation:

BLM is not following legal requirements of programmatic EAs, CEQ, NEPA, and FLPMA.

### Response:

BLM received comments during the public comment period asking the BLM to consider legal requirements of programmatic EAs, CEQ, NEPA, and FLPMA. This EA complies with NEPA, FLPMA, and CEQ regulations. The conformance section of the EA, section 1.5 (EA, p.4), outlines how the EA would meet the legal obligations of NEPA. The EA described how the proposed actions are in conformance with the ROD/RMP and tiers this project to the Final EIS that supports the ROD/RMP (EA p. 4). The EA then takes a "hard look" at the environmental effects of the actions and incorporates information by reference from the FEIS where appropriate throughout the EA, most notably in effects analysis and issues considered but not presented in detailed analysis sections. The BLM would then issue project implementation decisions if conformance with the EA is determined.

"Specific project implementation would verify that treatment effects fall within the range of effects described for the selected alternative under this Environmental Assessment (EA) and would be consistent with the selected management approach. BLM would evaluate whether specific projects could be implemented using a Determination of NEPA Adequacy (DNA) and Decision Record (if appropriate), based upon the analysis in this EA. For example, if BLM determined through a DNA that a specific project would occur within HLB - MITA or LITA stands of similar structural condition, harvest sideboards, and effects to site-specific resources which represent a sub-set of total effects disclosed in this programmatic Environmental Assessment, then BLM would issue a Decision Record based upon the DNA without preparing a second Environmental Assessment. As a part of this programmatic approach, the Siuslaw Field Office will continue track specific project implementation actions, to verify that specific project effects fall within the range of effects described for the selected alternative under this EA" (EA, p.4).

**Commenter OWCW, Public Comment Letter, p.4**

*"Now the EA has also failed to do the required analyses, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to:… Proposed action in light of the relevant watershed analyses"* (p.4)

### BLM Interpretation:

Consider an alternative that would conduct Watershed Analysis.

### Response:

BLM received comments during the public comment period asking the BLM to consider an alternative that would conduct Watershed Analysis. BLM considered an alternative that would conduct Watershed Analysis and/ or use the Riparian Reserve buffers from the Northwest Forest Plan (as amended) in Appendix C, EA, page 133 "The BLM received comments during the scoping period requesting the analysis of an alternative consistent with the 1995 Eugene Resource Management Plan. An alternative that is consistent with the 1995 Eugene Record of Decision and Resource Management Plan was considered but not analyzed as it is inconsistent with the basic policy objectives for the management of the area." BLM considered this alternative but did not present it

because it is "not in conformance with the existing Land Use Plan (2016 ROD/RMP) would be inconsistent with the basic policy objectives for the management of the area..." (EA, p.133).

**Commenter: OWCW, Public Comment Letter, p.5**

"Now the EA has also failed to do the required analyses, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to: Invasive weeds (p. 5)

**BLM Interpretation:**

Consider an issue on the impacts invasive weeds.

**Response:**

BLM received comments during the public comment period asking the BLM to consider an issue on the impacts invasive weeds. BLM considered this topic in the issue, "What are the effects of timber harvest and road construction on Noxious and Invasive Weeds?" (EA, pp.78-79). The BLM has disclosed in the EA the relevant and applicable information about invasive species available to the agency. The BLM received comments during scoping that requested the BLM consider how the alternatives would affect the risk of invasive plant introduction and spread. The BLM discussed the risk of invasive plant introduction and spread in the EA (pp. 78-79). The BLM tiered this discussion to the FEIS analysis (p. 419-438), which considered 267 watersheds in Western Oregon. The analysis from the FEIS for the risk of spread from timber harvest activities (FEIS p. 428) and new road construction (FEIS p. 433), the BLM incorporated by reference in the EA (p. 79).

Of the watersheds in Western Oregon that the FEIS evaluated, "The project area falls in watersheds considered at high to highest risk due to timber harvest, and road construction." (EA, p. 79). The EA goes on to state, "The action alternatives analyzed in detail would have potentially significant effects concerning invasive species. However, the Proposed RMP/Final EIS acknowledged the risk of potentially significant increases in invasive plant infestation due to timber harvest activities and road construction." (EA p. 79).

The RMP requires the BLM to prevent, detect, and rapidly control the spread of invasive plant species (ROD/RMP p. 80). BLM included project design features to help prevent, detect, and rapidly control existing and new invasive weeds (EA, p. 164):

- The Authorized Officer would ensure that all logging and road equipment is cleaned prior to arrival on BLM managed lands to reduce the spread of invasive plant species. Remove soil, plant parts, and seed.
- Project areas would be evaluated using BLM Manual 9015 for invasive plant species risk assessment, based on site conditions. Depending on assessment outcomes and field office weed treatment priorities, BLM would treat weed species prior to project activity and monitor for at least three to five consecutive years after timber sale completion, controlling infestations of invasive plant species.
- The BLM would sow native grass species for invasive weed exclusion on decompacted roads and other areas of exposed soil, as appropriate, after operations have been completed.
- The BLM would avoid placement of logging slash on closed roads in cases where it would inhibit ongoing weed control efforts.
- Weed free gravel or aggregate used for road construction, improvement and renovation would be recently crushed rock from active quarry sites, or from sites inspected by BLM personnel and found to be weed free, or from gravel sources certified as weed free by Oregon Department of Agriculture (ODA) Weed Free Forage & Gravel Program.

The discussion on how the alternatives would affect the risk of invasive plant species introduction and spread in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA, p.79).

**Commenter: AFRC, Public Comment Letter, pp.7-8**

*Constructing forest roads is essential if active management is desired, and we urge the BLM to propose the roads that are needed to access and treat as much as the project area as possible in an economically feasible way. Proper road design and layout should pose little to no negative impacts on water quality or slope stability. Consistent and steady operation time throughout the year is important for our members not only to supply a steady source of timber for their mills, but also to keep their employees working. These two values are intangible and hard to quantify as dollar figures in a graph or table, but they are important factors to consider. The ability to yard and haul timber in the winter months will often make the difference between a sale selling and not, and we are glad the BLM is working to accommodate this. The recently completed London Road EA on the Upper Willamette Field Office identified the provision of winter operations a **"need"** of the project. We urge you to consider doing the same on the HLB Landscape Plan project.*

**<u>BLM Interpretation:</u>**

Add winter haul as part of the purpose and need within the EA.

**<u>Response:</u>**

BLM received comments during the public comment period asking the BLM to add winter haul to part of the purpose and need. All action alternatives would allow for winter haul. The EA did not include type of haul as an aspect of the alternatives, because each alternative would include all types of haul. BLM chose not to include the winter haul in the purpose and need, as doing so would restrict all action alternatives to provide for winter haul for every project. As this is landscape level EA, which is evaluating a management strategy, BLM determined that allowing for both winter and summer haul would provide the greatest flexibility.

Environmental designs were outlined in the Appendix E – Project Design Features (EA, p.164-177). The project design features include a "wet-season road use" section (EA, p.175). The following list outlines the provisions that would be followed during winter haul:

- On active haul roads, during the wet season, use durable rock surfacing and sufficient rock depth to resist rutting or development of sediment on road surfaces that drain directly to wetlands, floodplains, and waters of the State (R 93).
- Prior to winter hauling activities, implement structural road treatments such as: increasing the frequency of cross drains, installing sediment barriers or catch basins, applying gravel lifts or asphalt road surfacing at stream crossing approaches, and armoring ditch lines (R 94).
- Maintain road surface by applying appropriate gradation of aggregate and suitable particle hardness to protect road surfaces from rutting and erosion under active haul where runoff drains to wetlands, Riparian Reserve, floodplains, and waters of the State (R 97).
- To reduce sediment tracking from natural surface roads during active haul, provide a gravel approach before entrance onto surfaced roads (R 98).

**Commenter: AFRC, Public Comment Letter, p.7**

*Another factor contributing to timber sale economic viability is rock source for required and/or optional road work. Costs associated with hauling rock long distances has been escalating in recent years and often represents a significant cost in timber sale implementation for our members. AFRC requested that the BLM explore options to expand existing quarries or develop new one. The EA explains that these options were not considered since doing so would not meet the purpose and need of conducting timber harvest. We disagree. Effective timber harvest is often a function of economics. If a timber sale is un-economical it will not sell and will not be implemented. Our request for quarry development was done so to **improve timber sale economic viability**, and would thus very much meet the purpose and need for conducting timber harvest.*

**<u>BLM Interpretation:</u>**

Add quarry development to the purpose and need and consider an alternative that would create a quarry.

***Response:***

BLM received comments during the public comment period asking the BLM to consider an alternative that would create a quarry. BLM recognizes that quarries are invaluable to the economic viability of the sales. However, it is premature at this point to determine a specific quarry location for this entire program of work. Due to the programmatic nature of the EA, and the dispersed geographic location of the HLB, BLM does not know the location of all future timber sales. For that reason, it is difficult to determine where quarry development would best benefit the sale plan. If BLM identifies the need for rock in the future, BLM would consider rock work at that time. Nothing in this EA precludes quarry development; BLM could develop a quarry site in a separate NEPA document to benefit the out-year sale plan.

BLM considered quarry development in Appendix C – Alternatives Considered but not Presented in Detailed Analysis, in "An Alternative that would develop a Quarry" (EA, p.133). "BLM considered this alternative but did not analyze it in detail because it does not meet the Purpose and Need." (EA, p.133) The BLM has properly justified the agency's purpose and need in the EA. This project and the purpose and need statement are consistent with BLM policy, the ROD/RMP, and FLPMA as described in the Record of Decision (ROD/RMP pp. 1-15). The ROD/RMP selected management direction for each land use allocation and specific resources; this management direction directs the BLM on how to manage the land and resources covered under the ROD/RMP (pp. 43-102). The Siuslaw HLB Landscape Plan project area is encompassed by the ROD/RMP as its governing LUP. The BLM identified a need for this project area as the lands in the HLB (EA, p. 3). The BLM then considered what actions and reasons for actions the ROD/RMP selected as management direction for these LUAs (EA, p. 8).

### Commenter: AFRC, Public Comment Letter, p.7

*One component of the 2016 RMP that has been a recent concern to AFRC and has contributed to questionable timber sale viability is the method in which the agency has chosen to satisfy the RMP's requirements for snag creation. The 2016 RMP includes explicit requirements for snag creation; however, it does not include prescriptive instructions on how to create those snags. The simplest and safest way to create a snag is to girdle it at breast height. This can be done safely by any timber faller. However, the BLM has begun requiring operators to create snags by climbing high into the canopies and sawing off the top of a tree or girdling the tree. Chainsaw operation at such heights is not only expensive but extremely dangerous. In some cases, operators are also required to carve v-shaped notches at the sawn-off tops! Why create such a liability when snag requirements can be met with a simple girdle at breast height? Perhaps higher quality wildlife habitat could be attained through such practices—but is it worth the safety risk? And is it worth compromising the economic viability of timber sales? **We strongly urge the BLM to carefully consider the tradeoffs when selecting such a dangerous method of creating snags when a much safer option is readily available. We would also like the BLM to analyze an alternative in the HLB Landscape Plan EA that creates snags by breast height girdling.***

### ***BLM Interpretation:***

Consider an alternative that creates snags solely by girdling at breast height.

### ***Response:***

BLM received comments during the public comment period asking the BLM to consider an alternative that creates snags solely by girdling at breast height. BLM analyzed an alternative that creates snags solely by girdling at breast height, in Alternative 6. Which states, "Snags would be created by base girdling…" (EA, p.11).

### Commenter: OWCW, Public Comment Letter, p.5

*"Now the EA has also failed to do the required analyses, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction*

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

*to manage for all of the below…. An EIS should be completed that analyzes impacts to:* Recreation experience (p. 5)

### BLM Interpretation:

Consider an issue that analyzes recreation experience.

### Response:

BLM received comments during the public comment period asking the BLM to consider an issue that analyzes recreation experience. BLM considered this topic in the issue, "How would timber harvest impact dispersed recreation, public safety and illegal or non-sanctioned, nuisance activities?" (EA, p.100-101). Of the 13,225 acre project area only 9% has public access and no locations specifically managed for recreation purposes. The recreation that does occur on these lands is considered "dispersed (not developed or maintained by the BLM) in nature." The only impact from the proposed project to dispersed recreation activities, "would be temporary access restrictions for public safety during active management." (EA, p.101). The discussion on recreation in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS"* (EA, p. 101).

### Carbon

**Commenter: OWCW and Fox Hollow Neighbors, Public Comment Letters**

*Another extremely important issue not analyzed in detail is impacts to carbon storage and sequestration. The RMP's analysis was insufficient in this respect. Oregon's coastal forests are among the most carbon-intensive in the world. Conversely, Oregon's logging industry is the state's largest emitter. Particularly when considering the logging of mature and old-growth forests, as here, lost carbon sequestration potential and direct and indirect carbon emissions analysis should be done on a case-by-case basis. As with so many of our converging crises, carbon accounting must be done to avoid the "death by a thousand cuts" that has characterized management of "resources" like old-growth forests, wildlife, and others.*

*The agency should reconsider timber targets in light of the fact that the public needs carbon storage to reduce global climate change much more than they need wood products. The NEPA analysis also needs to account for the fact that managing forests for water quality, water quantity, quality of life, and carbon storage for a stable climate will contribute far more to community stability than propping up the timber boom-bust industry with subsidized logging.*

*The agency must recognize that wood products are already under-priced and over-supplied due to "externalities" (costs that are not included in the price of wood, so those costs are shifted from wood product producers and consumers to the general public who suffer the 12 consequences of climate change without compensation from those who profit from logging related externalities). Ecosystem carbon storage on the other hand is under-supplied because there is not a functioning market for carbon storage and climate services. The agency is in a position to address these market imperfections by focusing on unmet demand for carbon storage instead of offering wood products that are already oversupplied.*

*Land protection, both public and private, provides substantial ecological benefits by avoiding conversion of natural systems to intensive, developed uses. These benefits include carbon sequestration, watershed functioning, soil conservation, and the preservation of diverse habitat types (e.g., Daily 1997, Brauman et al. 2007, Kumar 2012, Watson et al. 2014). Land protection also solves a key market failure: private markets tend to underprovide socially beneficial land uses such as natural forests, agricultural lands, or managed timberlands. The reason for this failure is that many of the benefits of these lands go to the public in general, not individual landowners. When private values and market transactions determine land uses, less land will be devoted to socially beneficial uses than if citizens could collectively determine use on the basis of social values (e.g., Angelsen 2010, Tietenberg and Lewis 2016). (OWCW Public Comment Letter, p.11-12)*

*CLIMATE CHANGE, POLLUTION, AND CARBON*

*The forest practices involved in logging contribute to global warming and climate change. Clearcutting is the highest contributor to carbon emissions in Oregon. Slash burning is a significant contributor to air pollution. It would affect not only those of us who live nearby, but would contribute to smoke and pollution in the adjacent area of the valley. Additionally, clear cutting removes older trees, which are a major source of carbon sequestration for combatting climate change.* (Fox Hollow Neighbors, Public Comment Letter, p.2-3)

**_BLM Interpretation:_**

BLM needs to consider the impact of carbon storage and sequestration.

**_Response:_**

BLM received comments during the public comment period asking the BLM to consider an issue on how the alternatives affect carbon storage and sequestration. The BLM did consider the effects of the alternatives on greenhouse gas emissions, carbon sequestration, and carbon storage in the issue "How would the timber harvest affect carbon storage, greenhouse gas emissions and carbon sequestration in the planning area?" (EA, pp. 83-85). This issue was considered but not presented in detailed analysis because "…analysis of this issue isn't necessary to evaluate how the alternatives respond to the Purpose and Need and there is no potential for significant effects beyond those described in the Proposed RMP / Final EIS." (EA, p.85)

**Commenter: OWCW, Public Comment Letter, p. 4**

*"Now the EA has also failed to do the required analyses, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to: …The Carbon/climate system from logging and roads, including the social cost"* (OWCW, Public Comment Letter, p. 4)

**_BLM Interpretation:_**

BLM needs consider an issue on the social cost of carbon.

**_Response:_**

BLM received comments during the public comment period asking the BLM to consider an issue on how the alternatives affect the social cost of carbon. The BLM did consider this in the issue, What would be the social cost of carbon from the alternatives?" (EA, P.85) This issue was considered but not presented in detailed analysis because "…analysis of this issue isn't necessary to evaluate how the alternatives respond to the Purpose and Need and there is no potential for significant effects beyond those described in the Proposed RMP / Final EIS." (EA, p.85)

**Fisheries**

**Commenter: OWCW, Public Comment Letter, pp. 4, 5, &12**

*"Now the EA has also failed to do the required analyses, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to: Coho, chinook, steelhead, and other listed and/or sensitive fish (p. 4)…Water quality and fish habitat degradation (p. 5)*

*Logging, road construction, and road use will adversely affect fish habitat. An EIS-level analysis of impacts to flow rate and stream temperature from proposed logging should be completed, and we question the frequent assertion that BLM does not need to manage for hydrologic recovery. As rangewide declines of listed species in the Coast Range can be attributed in large part to forestry practices followed by failure to manage for hydrologic*

11

*recovery, BLM would be failing to carry out its mandate to contribute to species recovery by failing to manage for hydrologic recovery. (p.12)*

### BLM Interpretation:

BLM has not followed the ESA mandate that authorized activities are carried out without contributing to further harm of the ESA listed species or its habitat.

### Response:

The BLM received a comment during the public comment period asking the BLM to consider hydrologic recovery and impacts to ESA listed fish species in the Coast Range. The BLM considered ESA listed fish and other native fish species in the issue, "What are the effects of timber harvest, timber sale road work, and timber haul on fish populations and fish habitat?" (EA, pp.86-88). Coho salmon is the only ESA listed fish species present in the Siuslaw watershed within the analysis area (EA, p.86). The discussion on ESA listed fish in the EA was sufficient to conclude that the actions are "not associated with impacts beyond those analyzed the Proposed RMP / Final EIS" (EA, p.88).

The BLM completed Western Oregon Forest Management Biological Opinion (FOMBO) consultation with the National Marine Fisheries Service (USDC - NMFS, 2018) to ensure authorized activities would not jeopardize ESA listed anadromous fish species in western Oregon, including in the Siuslaw Field Office. This consultation was designed such that NMFS can review site-specific actions and verify that the project is consistent with the Biological Opinion (EA, pp. 69-70). The EA describes the evaluation process by BLM: "Prior to a final project implementation decision, BLM would either make a no effect determination or receive verification from NMFS that the project is consistent with consultation as outlined in the NMFS Biological Opinion" (EA, p.69). Projects that would not have take would be deemed a no effect; projects where BLM determines that incidental take may occur would be verified by NMFS for consistency with FOMBO.

The BLM interprets "hydrologic recovery" as temporal changes in peak or base flows after forest management activities. The NMFS FOMBO analyzed forest management effects on change in peak/base flows (USDC – NMFS, 2018). The FOMBO analyzed potential impact on peak/base flows related to the following actions: Timber felling and yarding (USDC – NMFS, 2018. P. 132 – 134); roadwork (USDC – NMFS, 2018. P. 134 – 135); timber and rock hauling (USDC – NMFS, 2018. P. 135 – 136); drainage network increase (USDC – NMFS, 2018. P. 136 – 137). FOMBO also analyzed spawning and rearing conditions in critical habitat for salmon and steelhead (USDC – NMFS, 2018. P. 140 – 141). The FOMBO analysis found that by applying the design criteria the project would "not preclude or significantly delay development of the critical habitat function to conserve listed species." Projects will be designed to have no significant impact on streamflow in streams with ESA listed fish present, or critical habitat, in order to be consistent with a No Effect determination by BLM or FOMBO verification by NMFS. The BLM concludes that the proposed action would be carried out without harm of the ESA listed fish species found in the project area.

### Fuels

**Commenter: OWCW and Fox Hollow Neighbors, Public Comment Letter**

*To what extent were the 2020 wildfires weather-driven, and would any treatment have been able to slow or reduce the severity of those fires? (OWCW, Public Comment Letter, p.16)*

*Clearcutting older trees and replacing them with monoculture tree farms significantly increases fire danger. The vast majority of forest damage caused by the Holiday Farm fire was to the adjacent industrial tree farms, which then spread to nearby dwellings. Old growth, multi-aged forests sustained significantly less damage from the fire. Regeneration harvest and monoculture replanting will increase fire danger to both the BLM and adjacent properties. Area location: As mentioned previously, the parcels are within 6 miles of Creswell and 5 miles of Eugene. The Holiday Farm fire in 2020 spread 12 miles to the west. A fire of that size spreading from these*

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

*parcels would endanger countless numbers of lives, residences and businesses.* (Fox Hollow Neighbors, Public Comment Letter, p.2)

### BLM Interpretation:

Consider an issue about the increased fire hazard due to regeneration logging.

### Response:

During public comment period BLM received comment to consider on how fire danger and fire behavior. BLM interprets fire danger as fire hazard. BLM considered the issue of "How would timber harvest and reforestation affect stand level fire hazard and resistance?" (EA, p.48-58).  As part of this analysis, the BLM compared how the proposed treatments would affect predicted fire behavior. To analyze this issue, the BLM gathered information from a combination of site visits, stand exams, GIS datasets, and fire modeling tools to determine site-specific effects of thinning versus regeneration harvests for the acres of the HLB land use allocation covered by this EA.  Interagency Fuel Treatment Decision Support System (IFTDSS) was utilized to evaluate and compare current versus postharvest stand conditions and potential fire behavior. The fire modeling results from IFTDSS are summarized in the EA on Fuels Table 6: Comparison of Fire Behavior in Regeneration vs Thinning Treatments: 10 years Post Harvest (EA, p. 54). Fire weather conditions for IFTDSS modeling was at the 97th percentile as determined by the Remote Automatic Weather Station closest to the center of the project. The 97th percentile is often termed "the worst-case scenario" (EA, p. 53).  At the 97th percentile, IFDTSS predicted that between 97-99% of the time, fires that occurred in the proposed treatment areas would burn on the forest floor with less than 4 foot flame lengths.  Flame length is an important fire behavior factor used to determine fire suppression tactics and limitations.  Fires burning with flame lengths under 4 feet can generally be direct attacked by persons using hand tools and handlines should hold the fire. A major advantage of direct attack is firefighter safety. Firefighters can usually escape back into the burned area for a safety zone. By contrast, the 2020 fires occurred under extreme weather events.  We reviewed the referenced 2021 document "Analyzing whether forest management practices influenced Oregon's Labor Day Fires."  The reports key findings support that the 2020 fires were primarily weather-driven. The report suggests that weather conditions were the primary driver of high severity fire, with vegetative conditions playing a secondary role.

The scope of the report was across ownerships within the fire perimeter, and found that private lands burned significantly more severely than federal lands, with the disparity between the two ownerships becoming more pronounced post-wind event.  Meanwhile, the scope of the EA analysis evaluates fire hazard and resistance to stand level replacement fire at the project scale, which is all HLB (13,225 acres) within the Siuslaw Field Office, excluding those with overlapping Areas of Environmental Critical Concern. The BLM considered evaluating fire hazard and resistance to stand level replacement fire at the sub-watershed scale. The sub-watershed is the sixth-field watershed (also referred to as HUC12) level.  The EA determined that:  Across all ownerships in the sub-watershed, the HLB acres represent approximately 3 percent of the landscape. There would be no discernable differences in effects to fire hazard and resistance to stand level replacement fire between the alternatives at this scale of analysis (EA, p. 51).

### Commenter: OWCW, Public Comment Letter, p.16

*Does commercial thinning increase or decrease subsequent fire risk, and for how long? What is the probability of a thinned stand encountering a wildfire during the time period (if any) in which fire risk is reduced in that stand? (p.16)*

### BLM Interpretation:

Consider an issue on how the Alternatives, specifically thinning, affect Fire Risk?

13

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

***BLM Response:***

BLM received comments during the public comment period asking the BLM to consider an issue on how the alternatives, specifically thinning, would affect fire risk. The BLM considered the issue of, How would timber harvest and reforestation affect fire risk? (EA, p.59-68).  This analysis evaluates fire risk at the temporal scale of 0-50 years. For the risk assessment, wildland hazard potential (WHP) was used as a measure of the probability of a fire occurring.  Wildland hazard potential (WHP) is a model used to depict the relative probability of experiencing extreme fire behavior with torching and crowning, and the potential for wildfire that would be difficult for suppression resources to contain during weather conditions favorable for fire growth. (EA, p.60). WHP at the local scale is generally Very Low/Low to Moderate.  The WHP in the proposed treatment areas is fifty-seven percent Low, forty-one percent moderate, and only two percent high (EA, p.63).  We could also add info to EA from the specialist report:  Advanced Oregon Wildfire Risk Explorer was used to calculate annual burn probably for the HLB areas and a .25 mile buffer.  Burn probability shows the annual likelihood of a wildfire greater than 250 acres in size occurring, considering weather, topography, fire history, and fuels (vegetation). Annual burn probability is 83% low and 15% moderate. (EA, p.63) The BLM evaluated the effects of thinning on under Alt 2 and determined that the effects from actions in Alternative 2 to the risk components are as follows (EA, pp.64-65):

- A decrease in fire risk associated with the hazard component because fire hazard would drop from 66 percent High to 38 percent High in the forest structural stages for the first decade, as detailed in in the Fire Hazard analysis. Each subsequent decade of harvest would experience a similar effect on changes in forest structure (see Fire Hazard Fuels Table(s) 7 and 8).
- Creation of activity fuels from the 3,889 acres of commercial thinning would fall into the Low risk category both inside and outside the WDA.
- Creation of shaded fuel breaks would increase protection capability and result in a slight decrease in fire risk.

Overall, for Alt 2, the fire risk would remain Low to Moderate inside the WDA and Very Low to Low outside the WDA. The countervailing changes in the components of fire risk are insufficient to alter the overall fire risk category at the local scale. As a result, neighboring homeowners would continue to experience the same overall fire risk that they currently experience, similar to the No Action alternative.

In relation to a comparison of alternatives the EA concludes: "Under all alternatives, including the No Action alternative, overall fire risk would remain Low to Moderate at the local scale. Over this time frame, there would be some changes among the alternatives in the individual components of fire risk, and these changes differ among the alternatives. Alternatives 2 and 3 would cause slight decreases in fire risk associated with the hazard component because of changes to the structural stage. Alternatives 4, 5, and 6 would cause slight increases in fire risk associated with the hazard component because of changes to the structural stage. The magnitude of these changes in the individual components of fire risk are not sufficient to alter the overall fire risk category at the local scale for any alternative." (EA, p. 67)

**Commenter: AFRC, Public Comment Letter, p.8**

*If the BLM proposes to decommission, abandon or obliterate road segments from the Siuslaw HLB planning area we would like to see the analysis consider potential **adverse impacts** to fire suppression efforts due to the reduced access caused by the reduction in the road network. We believe that this road network reduction would decrease access to forested areas and hamper opportunities for firefighters to quickly respond and suppress fires. On the other hand, additional and improved roads will enable firefighters quicker and safer access to suppress any fires that are ignited. We assume that the BLM will consider fire risk in the subsequent analysis for the proposed treatments. **We would like the Siuslaw Field Office to consider the benefits to fire suppression that come with improved road access and increased road miles.***

***BLM Interpretation:***

Consider an issue about the impact of road access on fire suppression.

***Response:***

BLM received comments during the public comment period asking the BLM to consider an issue about the impact of road access on fire suppression. BLM considered the impact of road access for fire suppression in the issue, "How would timber harvest and reforestation affect fire risk?" (EA, pp.59-68).  In the analysis of the issue, it was assumed that: "Development of roads and access points to BLM-administered lands would increase access for wildfire suppression which would increase effectiveness of suppression efforts." (EA, p.62). Conversely, the analysis also considered that increased public access increases the potential for human caused fires.

Under Effects Common to all Action Alternatives (Alternatives 2, 3, 4, 5, and 6) the EA states the following effects of road access to fire suppression: (EA, p.64)

o   A slight increase in fire risk associated with the ignition risk component because there would be an increase in public access from road construction and renovation. Increased access would increase the potential for human caused fires.
o   A slight decrease in fire risk associated with the protection capability component because of increased access. Road construction and renovation under Alternative 2, 3, 4, 5, and 6 would provide additional access to wildland areas and improve opportunities for firefighters to quickly respond and suppress fires.

The EA concluded that: Overall, the fire risk would remain Low to Moderate inside the WDA and Very Low to Low outside the WDA. There would be a slight increase in fire risk associated with the values component because of the likely increased presence of structures and infrastructure along the road corridors and in nearby towns, and a slight decrease because of the protection capability component due to increased access. These countervailing changes in the components of fire risk are insufficient to alter the overall fire risk category at the local scale. As a result, neighboring homeowners would continue to experience the same overall fire risk that they currently experience, similar to the No Action alternative. There would be no meaningful or measurable change in the likelihood of an ignition. If a wildfire were to occur on the BLM-administered lands of the project area, there would be an increase in the fire hazard caused by the fuels in the project area but an improvement in the ability to suppress the wildfire. The magnitude of these changes in the individual components of fire risk are not sufficient to alter the overall fire risk category at the local scale for any alternative. (EA, p.67)

**Comment: OWCW, Public Letter p, 17**

*"As we've suggested before (on the IVM-RL project), can BLM justify a plan to essentially manage its LSRs as HLB, with heavy commercial thinning and 4-acre gap creation? We think not, and that the BLM must conduct a Plan Amendment documenting the effects of treating the LSR as HLB in an EIS, and should be aware that planning for this level of logging in the LSR/RR violates the assumptions of the RMP, its BA/BiOp, and the NSO Recovery Plan.*

*BLM has said it "would conduct thinning in most of the reserves to reduce the risk of uncharacteristic wildfires and reduce potential wildfire spread and intensity under all action alternatives."[19] In the PRMP/FEIS, BLM did not take a hard look at how extensive logging in reserves would adversely affect the function of reserves in terms of conserving listed and unlisted late successional species, including spotted owls. Logging in reserves reduces canopy cover, reduces thermal buffering, increases the risk of predation, and reduces recruitment of snags and dead wood that are essential habitat for numerous late successional wildlife species.*

*The PRMP/FEIS did not address comments showing that the benefits of logging to reduce fire hazard are vastly over-estimated. Habitat degradation caused by logging for fuel reduction will greatly exceed the alleged benefits from such logging yet the PRMP/FEIS improperly did not disclose this.[20] As the issue was never given a hard look in the RMP, the agency should complete an EIS here to address fire risk and fire hazard issues properly."*

***BLMs interpretation:***

The BLM should create a Plan amendment and an EIS to consider the impacts of logging in reserves as well as logging for fuel reduction.

### Response

The BLM received comments during the public comment period that the BLM should create a Plan amendment and EIS to consider the impacts of logging in reserves as well as the impacts of logging for fuel reduction. This EA does not proposed logging in Reserved land use allocations. It only considers logging in the Harvest Land Base land use allocations on the Siuslaw Field Office. The Plan referenced (the BLM assumes this to be the 2016 Northwestern & Coastal Oregon Resource Management Plan) was created across multiple BLM Districts. Therefore, logging in Reserves, associated analysis, as well as creating a Plan Amendment is beyond the scope of this EA. Similarly, the proposed actions in this HLB EA do not propose logging to reduce fuel hazard. Rather this EA proposes logging to meet ASQ targets as outlined in the ROD/RMP. Therefore, providing the requested actions is beyond the scope of this EA.

## Hydrology

**Commenter: Fox Hollow Neighbors, Public Comment Letter, p.1**

*WATER Quality: There are year-round streams and wetlands on the parcels. Debris from logging and the removal of vegetation will increase sediment and decrease the quality of the watershed, impacting the large and diverse populations of the resident plants and wildlife in the area. Quantity and location: Logging increases runoff and changes the availability and location of water sources, which will also negatively impact the wildlife and plants in the area by damaging or destroying their sources of water. Water from these parcels also feeds the Camas Swale Wetlands and Camas Creek. Area location: Diminished water quality and quantity will negatively impact the water sources utilized by nearby residences and for commercial activity.*

### BLM Interpretation:

Consider an issue on water quality and purity.

### Response:

BLM received comments during the public comment period asking the BLM to consider an issue on water quality and purity. This topic was considered in the issue, "How would timber harvest affect the water supply and water purity of the neighboring households?" (EA, pp.88-90). "Debris from logging and the removal of vegetation will increase sediment" the BLM addressed these potential impacts in HLB Plan EA to include protections to water quality that would include "at least a 200 ft buffer distance for *streams* as well as any drinking water source regardless of the legal standing of the water withdrawal" (EA, p. 89). This protective buffer distance greatly exceeds the minimum requirements set by Oregon law that "all understory vegetation within 10 feet of the high-water level; all trees with 20 feet of the high-water level; and all trees leaning over the channel would be retained (OAR 629-642-0400 2 (a) (b) (c)) (EA, p. 89). Project design features to protect *domestic water resources* would include a buffer distance of 100 ft for a well or 200 feet of a spring or known diversion used as a domestic water resource (EA, p. 89). Additionally, the BLM considered additional water quality parameters: stream temperature, contaminants (mercury mobilization), and sediment delivery to streams due to stream crossing installations, timber harvest, and new road construction, "How would timber harvest and road construction affect stream temperature?" (EA, pp. 90-92); "How would road construction, renovation, and haul affect sediment delivery to streams?" (EA, pp. 92-93); "How would timber harvest affect mercury mobilization to streams due to erosion?" (EA, pp. 94-95).

The discussion on how the alternatives would affect the water quality and purity in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS."* (EA, p. 90).

**Commenter: OWCW, Public Comment Letter, p. 4**

*"Now the EA has also **failed to do the required analyses**, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to:* Peak flows (p. 4);

<u>*BLM Interpretation:*</u>

Consider an issue on peak flows.

<u>*Response:*</u>

BLM received comments during the public comment period asking the BLM to consider an issue on peak flows. BLM considered the topic of peak flow in the issue, "How would timber harvest affect peak flow events?" (EA, pp.94-95). The Final EIS set forth criteria for susceptible to peak flows due to ROS events. In general, ROS events occur when there is a rapid release of water from shallow snowpacks that are within large open areas (EA, p. 94). A timber harvest can be considered a large open area depending on the density of harvest treatment. The criteria set forth by the Final EIS addresses all parameters that would constitute a concern for peak flows due to the density of a timber harvest treatment. The following are the criteria for peak flow events in association with a timber harvest treatment:

- o Elevation of the treatment area 2,000-3,600 feet;
- o BLM-administered lands are more than 1 percent of the subwatershed;
- o The subwatershed has >100 acres of BLM land in the ROS hydroregion;
- o More than 60 percent of the subwatershed is in the ROS (USDI Bureau of Land Management, 2016b, pp. 384-394)

For a subwatershed to be considered susceptible to peak flow events due to a ROS event the subwatershed analyzed must meet all the above criteria (FEIS, p. 387).  BLM analyzed the Siuslaw HLB Landscape Plan EA area acres and the entire project area failed to meet the criteria set forth by the Final EIS for subwatersheds susceptible to peak flow events (EA, p. 94). The discussion on how timber harvest would affect peak flow in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS."* (EA, p. 95).

**Commenter: OWCW, Public Comment Period Letter, p.4; pp.14-15**

*"Now the EA has also **failed to do the required analyses**, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to: Reduced summer stream flows"* (p. 4)

*"Keep in mind the Secretary of the Interior's recent order to apply NEPA as it existed prior to the 2020 revisions; accordingly, a full cumulative impacts review must be completed. 13 S.O. 3399, Sec. 5 (Apr. 16, 2021): "Bureaus/Offices will not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020. Bureaus/Offices will continue to follow the Department's NEPA regulations at 43 C.F.R. Part 46, Department Manual procedures (516 DM Ch. 1-15), and guidance and instruction from the Office of Environmental Policy and Compliance." Streamflow impacts must be analyzed cumulatively; in fact, that is the only level at which it makes sense to evaluate them. Perry and Jones (2017), Segura et al (2020) and Coble et al. (2020) provide compelling analysis that found that past conversion of mature/old growth forest to young stands results in significant summer low flow deficits that persists for decades. Regeneration harvest as proposed involves conversion of mature forest stands into young stands. While these publications are "new information," the issue of reduced summer stream flow due to logging is not a new issue as summer stream flow deficits due to logging have been documented in the scientific literature since Hicks et al. (1991) first alerted forest managers to reduced summer flows subsequent to clearcut logging. These three most recent findings are*

*important for this decision making because the magnitude of reported reduced summer flows reported in Perry and Jones 2017, Segura et al. 2020 and Coble et al. 2020 would be expected to significantly reduce the fish rearing capability of small streams in the planning area over time.  The EA/EIS needs to inform the decision maker that cumulative impacts from LSR and RR logging in combination with HLB, private and past harvest will have significant impacts when harvest is occurs in headwater areas of perennial streams over space and time (i.e., the multi-year or multi-decade planning period). In addition, we are aware that BLM operates under the assumption that "tree retention, including the Riparian Reserve, the spatial arrangement of commercial harvest both within unit and on the landscape, and the intensity and timing of thinning would all serve to moderate summer streamflow surpluses and deficits." There is no literature that supports this subjective conjecture. BLM assertions that riparian no-cut buffers along stream channels would prevent or ameliorate summer streamflow deficits as reported in Perry and Jones (2017) are speculative and have no relevant scientific support. Perry and Jones (2017) include examples of patch-cut watersheds as well as clear-cut watersheds (in Coyote Creek and the Andrews Forest), that all experienced summer low flow deficits, even though these watersheds had very diverse riparian zones, indicating that riparian zone vegetation does not control or ameliorate the reduced streamflow response. During an April 2018 science conference at OSU regarding timber harvest and effects on lowering summer streamflows, the question was posed as to whether BLM protective Riparian Reserve management would ameliorate reduced summer low flows from logging on upland areas. Both Julia Jones and Steve Wondzell agreed that BLM Riparian Reserve management could not ameliorate reduced flows caused by upland logging. R. Nawa (KS Wild) was at this conference and it was emphatically stated several times that Riparian Reserve buffers cannot mitigate for upland logging causing depleted low summer flows. Perry and Jones (2017) showed that stands aged 40 years or older that had been thinned continued to produce summer streamflow deficits. The additional growth of the remaining trees apparently utilized the moisture made available by thinning. Again, this finding indicates that post-thinning, the treated stands > 50 years old are likely to continue to produce summer streamflow deficits relative to (baseline) intact closed canopy mature/old-growth forests. This is relevant to any cumulative effects analysis that includes thinned plantations." (p.14-15)*

### BLM Interpretation:

Consider an issue on low flow with cumulative analysis that includes fish habitat.

### *Response:*

BLM received comments during the public comment period asking the BLM to consider an issue on low flows. BLM considered the topics of Low flow, fish habitat and populations for this EA in the issues, "How would regeneration harvest affect summer low flow?" (EA, pp. 95-97) and "What are the effects of timber harvest, timber sale road work, and timber haul on fish populations and fish habitat?" (EA, pp. 86-88). Additionally, the BLM was aware that the Council on Environmental Quality issued revised regulations on NEPA implementation in 2020.  Because this EA began before September 14, 2020, the BLM did not apply that rule (EA, p.4). BLM considered the direct, indirect, cumulative effects when while considering the chance for significant impact in the issues considered but not analyzed in detail.

Commenter cites "*Perry and Jones (2016), Segura et al (2020) and Coble et al. (2020) in regard to analyses that found significant summer low flow deficits that persists for decades due to conversion of mature/old growth forest to young stands.*" The basins studied in Perry and Jones (2016) included 100 percent tree removal without stream buffers with only two comparisons of patch-cuts. The two patch-cuts in Andrews 3 and Coyote 2 occurred in 1963 with 25% (50.7s acre per patch-cut) and in 1970 30% (62.5 acres per patch-cut) of basin cut respectively (Perry & Jones, 2016, Figure 7, p. 9). Of the two patch-cuts, only Andrews 3 showed summer low flow deficits 20-25 years in a plantation forest when compared to the reference basin (Perry & Jones, 2016, p.7-8). The reference basins used for comparison were Coyote 4 (150-350 years old) and Andrews 2 (150-475 years old). The Siuslaw HLB Landscape Plan EA does not propose 100 percent tree removal without stream buffer, or patch-cuts of the magnitude, described in Perry and Jones literature previously cited. The EA includes the retention of all trees greater than 40" diameter at breast height (DBH) and established prior to 1850 (EA, p.1) and more than 99.5 percent of the project acres are under the 150 year age class (EA, p.18). For these reasons, comparing the HLB Plan EA harvest intensities and effects to low flow with this research is not applicable.

The BLM analyzed the age-class distribution of BLM lands and privately managed lands across the landscape (EA, p. 96) using LiDAR, aerial images, and GIS data for HLB, LSR, RR and private stands for each watershed in the HLB Plan EA. This analysis included forest management ownership practices for timbers harvest, current known restoration projects (of which there are none) and the associated cumulative impacts and subsequent hydrological responses thoroughly in the HLB Plan EA (EA, pp. 95-97). "... in order to see a measurable effect on low flows harvest would need to occur in the hydrologically recovered stage. The timber harvest evaluated in this EA is proposed on less than 0.1 percent of the acres within the hydrologically recovered stage (EA, p. 97). Studies on low flow responses as commenter states "...the issue of reduced summer stream flow due to logging is not a new issue" is correct and has been studied for decades as the commenter cites Hicks et al., (1991). Hibbert (1967) describes the unpredictability of low flow responses in varying treatment regimens as "Seasonal distribution of streamflow response to treatment is variable; response in streamflow may be almost immediate or considerably delayed, depending on climate, soils, topography, and other factors (Hibbert, 1967). Coble (2020), Segura (2020) and Perry & Jones (2016) end their studies in a similar fashion with the unpredictability of low flow response to varying treatment types.

The BLM Final EIS addressed the ambiguous results in scientific studies on low flows: "Many hydrologic studies summarized by Moore and Wondzell (2005) show that summer low water flows can be increased in magnitude where riparian vegetation has been harvested. The data are inconsistent between studies, and where studies found increases in flow, the increases in absolute volumes were small. Comparatively, and important difference between these studies and this analysis is that riparian vegetation would not be removed under any of the alternatives or the Proposed Riparian Reserve, none would remove stands located along streams" (FEIS, p. 409).

Commenter cites Perry & Jones (2016), Coble (2020), and Segura (2020) regarding a variety of treatment prescriptions and low flow responses (see BLM public comment "Now *the EA has also **failed to do the required analyses**, and the forthcoming DNAs...".) commenter* does not include that Perry & Jones cited in Coble (2020) names climate change as the cumulative effect causing the decline of stream flow (Perry & Jones, 2016, p.10). Coble (2020) references effects on climate change that include declines in summer precipitation, snowpack, acceleration of snowmelt, increased irrigation, drinking water extraction with dominant control on the volume and timing of summer discharge, land management from urbanization, and dam regulation (Coble et. Al., 2020, p. 1). In addition, Coble (2020) cites the need for further statistical research at larger scales to separate low flow responses to forest disturbance from climate impacts (Coble et. Al., 2020, p. 13). Segura e al (2020) states right in the abstract of the 2020 research paper "Surprisingly, contemporary forest practices (i.e., clearcutting of the plantation with riparian buffers in 2009 and 2014) had only a minor effect on streamflow deficits." The discussion in the EA on how timber harvest would affect the low flow in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS"* (EA, p. 95).

The comment letter also asserts that the project action, "would be expected to significantly reduce the fish rearing capability of small streams in the planning area over time." The BLM considered the effects to fish in the Issue "What are the effects of timber harvest, timber sale road work, and timber haul on fish populations and fish habitat?" (EA, pp. 86-87) and in the consultation section of the EA (p.69). The Western Oregon Forest Management Biological Opinion (FOMBO) consultation, " analyzed spawning and rearing conditions in critical habitat for salmon and steelhead (USDC – NMFS, 2018. P. 140 – 141). The FOMBO analysis found that by applying the design criteria the project would "not preclude or significantly delay development of the critical habitat function to conserve listed species." The discussion on how the alternatives would affect fish habitat in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS."* (EA, p. 87).

**Road Construction**

**Commenter: OWCW, Public Comment Letter, p.3**

*Without knowing where roads will be constructed, where timber sale units will be located, what the current stand conditions are, or what wildlife or plants are present in a particular forest stand, it is impossible to document site-level analysis of effects. This information may later be presented in a DNA document, but that document by its nature does not consider environmental impacts to NEPA's standards; it simply makes the determination that the EA already looked at the potential impacts. But again, if – as here – the EA itself never did site-specific analysis, then no DNA can legally be issued. (p.3)*

*Road Construction. The EA does not appear to mention the expected mileage of road construction per year for this project under the different alternatives. Maybe this information was buried in a table or appendix somewhere, but if so, it should be front and center as a major issue. Road construction is one of the largest timber-associated impacts to a forested landscape. The lands at issue are already heavily fragmented and over-roaded. We have asked BLM to do a full analysis of the road system on the field office and indicate where and how this program would increase road impacts. (p.13)*

*As with the agency's other proposed "programmatic" EAs, we have serious concerns regarding BLM's inventory and stand typing/aging. Our own observations and conversations with BLM staff have led us to the conclusion that there are some serious errors or data backlogs in BLM's stand inventory database. We are aware of situations in which BLM's mapping failed to capture perennial streams and infrastructure, that were pointed out by volunteers in the field. This leads to a concern that environmental impacts may be missed; for example, how can an agency predict potential impacts of logging to streams it wasn't aware of, or hydrological impacts of using roads that were not mapped during the NEPA process? (Commenter: OWCW, Public Comment Period Letter, p.13)*

**BLM Interpretation:**

Consider an issue on the environmental impact of roads resulting from forest management actions.

**Response:**

BLM received comments during the public comment period asking the BLM to consider an issue on environmental impact of roads. BLM considered the impacts from roads in the following nine issues.

- What would be the effect of timber harvest and road construction on Noxious and Invasive Weeds? (EA, p. 78-79)
- What are the effects of timber harvest, timber sale road activities, and timber haul on fish populations and fish habitat? (EA, p.86-88)
- How would timber harvest, timber sale road activities, and timber haul affect past aquatic restoration efforts? (EA, p. 88)
- How would timber harvest and road construction affect stream temperature? (EA, p. 90-92)
- How would road construction, renovation, and haul affect sedimentary delivery to streams?  (EA, p. 92-93)
- What are the effects of timber harvest, timber sale road activities, and timber haul on free flow, water quality, and outstandingly remarkable values of suitable river segments? (EA, p.97-100)
- What would be the effects to soils be from new road construction? (EA, p.105)
- What are the effects of timber harvest and road construction on hillslope stability in the Riparian Reserve? (EA, p.105-106)
- What would be the effect of road construction and timber yarding on soil erosion? (EA, p.107-108)

For each of these issues, the discussion concluded that the EA was sufficient to describe that an EIS was not required because the action has no potential for significant effects beyond those described in the Proposed RMP / Final EIS. (EA, p.79,88,92,93,100,105,106, and 108)

**Commenter: OWCW, Public Comment Letter, p.13&14**

*We also have major concerns with the overly restrictive reciprocal right- of-way agreements BLM has signed for many roads in this area; public access for recreation and to fieldcheck proposed logging units is nearly impossible in some areas, as our staff and volunteers discovered in the last two years. An EIS needs to examine the full complement of open-access and closed roads, who is responsible for maintenance, which can be closed, whether new road construction can be avoided, alternative siting for any new roads that would be built, and a host of other road-related matters that can have major impacts but were ignored in this EA. Given the negative impacts known to result from road construction, any new road construction for the purposes of vegetation management necessitates a site-specific analysis (just as is the case for mining proposals and ROW proposals) and an opportunity for site-specific analysis and public comment. The forthcoming EA/EIS for this project must do a full roads analysis*

**BLM Interpretation:**

BLM needs to consider an alternative on the access of road systems for public involvement and complete a Travel Management Planning.

**Response:**

During the public comment period, the BLM received a comment to look at an alternative on the access of road systems for public involvement and complete a Travel Management Planning. The request to complete a "*full roads analysis*", BLM interprets as Travel Management Planning. The ROD/RMP explained that the BLM has deferred implementation-level travel management planning (p. 263), in accordance with 43 C.F.R. § 8342 and current BLM policy (FEIS, p.1999). The BLM has not begun implementation level planning, and pursuant to the ROD/RMP, until implementation-level Travel Management Planning is complete, routes and trails will be managed in accordance with their designation of "closed" or "limited to existing routes" for public motorized travel activities (ROD/RMP, p.263). Conducting implementation-level Travel Management Planning is outside the scope of this EA's proposed action and does not meet the purpose and need of the project.

The reciprocal right-of-way agreements are beyond the scope of this action. The BLM does not have the authority to unilaterally amend the reciprocal right-of-way agreement process. The rules for reciprocal right-of-way agreements are governed by 43 CFR 2812. These regulations do not allow for the authorized officer to expand the scope of the rights (e.g., to include properly licensed hunters, fisherman, and other recreationalists to use the rights). Expansion of these rights is not authorized without promulgation of the rules by the Secretary per 43 CFR § 2812.6-2 (a) (1). BLM is required to follow the management direction outlined in the ROD/RMP; for existing right-of-way, BLM must "Recognize existing rights-of-way, permits, leases, and easements as valid uses" (p.82) and "Allow travel required for valid existing rights" (p.92). For any newly constructed roads in the project area would be managed under the "limited" category in the interim until the BLM completes Travel and Transportation Management Planning (p.93).

BLM is required to involve the public during the NEPA process. How the BLM involves the public is at the discretion of the BLM, so long as the opportunity for meaningful involvement is provided. 43 C.F.R. 46.305. BLM has involved the public in this NEPA process, which is outlined on page 4 and 5 of the EA and included a pre-scoping individual assessment with this commentor, a public meeting, a scoping period, and two public comment periods. Additionally, a georeferenced Transportation Map with an overlay of the project area was posted to ePlanning on 3/25/2021; this map allowed for an overview of BLM parcels that had public access.

BLM provided public involvement during the NEPA process, has adhered to the management direction for Travel, and because implementation-level Travel Management Planning is beyond the scope of this action, BLM considered this alternative but did not present it in detailed analysis.

**Silviculture:**

**Commenter: AFRC, Public Comment Letter, pp.3-4**

*In our scoping comments, we requested that the Siuslaw Field Office add an additional action alternative that treats stands in the HLB consistent with the vegetation models completed during development of the FEIS and which were used to calculate the Eugene SYU. We appreciate the recognition of the vegetation models on page 15 of the EA as they apply to the Siuslaw Field Office's annual assigned ASQ target. However, as we illustrate in the table above, **the age-class of the stands treated and the manner in which they are treated (thinning vs. regeneration) are critical to consistency with the vegetation models** and, subsequently, to the BLM obligation to manage forest land based on a sustained yield basis. We urge the Field Office to treat those stands analyzed thought the alternatives proposed in a manner that is consistent with these models. It is unlikely that implementation of any single alternative in its entirety for all 13,225 acres of HLB will accomplish this. Therefore, we urge you to use the models as a blueprint for which alternative to select for each individual stand.*

**_BLM Interpretation:_**

Consider an alternative that follows the vegetation modeling from the FEIS.

**_Response:_**

BLM received a comment to consider an alternative that follows the vegetation modeling from the FEIS. The BLM considered and followed the FEIS vegetation model, found in the FEIS Volume III, pages 1163 to 1227, for all action alternatives. As summarized in the Issue Considered but not Analyzed in Detail 5.2.7.2, "How would timber harvest affect sustained yield?" by meeting the ASQ target for the field office, the BLM would meet the sustained yield target, and would be doing so within the parameters of the vegetation modeling (EA, pp. 108 – 109). As also described in issue 5.2.7.2, although Alternative 2 proposes thinning only for the next two decades, it is reasonably foreseeable that those acres would eventually be regeneration harvested, as directed by the RMP, would contribute to the Siuslaw Field Office contribution of ASQ to the Eugene Sustained Yield Unit, and would be within the timing, sequence and intensity prescribed in the Vegetation Modeling of FEIS. The purpose and need of the project, to meet the ASQ volume of 70 MMbf per decade, with the variation of 20% decadally amounting to a range target of 56 to 84 MMbf (EA, p. 3). As described in the Purpose and Need (EA, pp. 3-4), the BLM looked at vegetation modeling for the entire Eugene Sustained Yield unit, then determined the decadal volume targets based on inventory, stand age, and acreage distribution across the Upper Willamette Field Office and Siuslaw Field Office.  An internal memorandum summarized these targets and was issued outlining the need for Siuslaw to meet the annual target of 7MMbf, based on inventory and age class distribution, in order to contribute to the ASQ target of the ESYU (USDI – Bureau of Land Management, 2019). All alternatives meet the Siuslaw's decadal ASQ target of 70 MMbf for the temporal scope of this EA of "multi-decade" (EA, p. 1), and the temporal scope of 20 years in Issue 3.2 "How each alternative meets the Siuslaw Field Office's contribution to the Eugene SYU allocated ASQ, per decade" (EA, p. 24).

The BLM considered the FEIS vegetation modeling in the design of the alternatives, and compared how closely each alternative came to the vegetation modeling harvest acres per decade predictions in Issue 3.1 "How does regeneration harvest adjust the age class distribution within the Harvest Land Base-Moderate Intensity Timber Area and Low Intensity Timber Area land use allocation in Siuslaw Field Office," and Issue 3.2 "How each alternative meets the Siuslaw Field Office's contribution to the Eugene SYU allocated ASQ, per decade." The background, assumptions, and analytical methods of these issues highlight how many of the same assumptions used in the vegetation modeling of the FEIS and ROD/RMP were also used in the development of, and analysis of effects of the alternatives (EA, pp. 15-17; 13-24). The vegetation modeling outputs created by the RMP team shows the Siuslaw harvesting approximately 150 acres a year in regeneration harvest, and 36 acres a year in thinning to reach the 7.0 MMbf target annually for the first decade (USDI – Bureau of Land Management, 2019). The ROD/RMP allowed for a variance of 40% per year, and 20% per decade to meet the sustained yield targets, or Allowable Sale Quantity. Specific stand age at time of harvest, and number of acres needed to reach the ASQ

target were not explicitly delineated within the ROD/RMP nor the FEIS vegetation modeling; only parameters of general ages and ranges of total percent of acres were used within the FEIS vegetation model to provide flexibility in timing and intensity of management to accommodate for current conditions of stands, and future desired conditions. The BLM analyzed the possible range of acres by harvest type needed to meet the ASQ target based on these parameters in Issue 3.2 "How each alternative meets the Siuslaw Field Office's contribution to the Eugene SYU allocated ASQ, per decade," and evaluated how these vegetation model percentages of acres for decadal regeneration harvest to meet ASQ contributes to an even age class in Issue 3.1 "How does regeneration harvest adjust the age class distribution within the Harvest Land Base-Moderate Intensity Timber Area and Low Intensity Timber Area land use allocation in Siuslaw Field Office." Both of these issues compared the alternatives to the vegetation modeling target acres and ASQ, and found Alternatives 3, 4 and 5 would come within the variance range allowed of the FEIS vegetation model, while Alternative 2 would be an assumed thinning entry with additional regeneration harvest in the future.

As the commenters indicated, they requested an alternative be designed that matched the vegetation modeling. As described above, and thoroughly throughout the EA, the BLM crafted four alternatives that met the vegetation modeling and used the parameters of the vegetation modeling to a greater extent, allowing for more flexibility and timing of harvest to meet ASQ beyond the inflexible and static spreadsheet provided by the commenters. Further, as described in Issue 3.2 "How each alternative meets the Siuslaw Field Office's contribution to the Eugene SYU allocated ASQ, per decade," alternatives 4 and 5 are the most consistent with the vegetation modeling, hitting the acre and ASQ target per decade almost exactly as predicted (EA, p. 26), meaning they could be implemented beyond the temporal scope of the EA, and would meet the sustained yield mandate, and ASQ contribution target that was modeled in the FEIS.

## Soils

**Commenter: OWCW, Public Comment Period Letter, p.5**

*"Now the EA has also failed to do the required analyses, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to: Soil function* (p. 5)

### *BLM Interpretation:*

Consider an issue on how the alternatives affect soil function.

### *Response:*

BLM received comments during the public comment period asking the BLM to consider an issue on how the alternatives affect soil function, particularly in a site-specific way. The BLM did consider the effects of in the issue "How would timber harvest affect soil function and soil productivity?" (EA, p.107). The issue states on the same page that: "The Proposed RMP/Final EIS addresses soil functions in aggregate as the determiner of soil quality (USDI Bureau of Land Management, 2016b, p. 745) and protects soil quality by limiting detrimental soil disturbance to 20 percent or less of an activity area (USDI - Bureau of Land Management, 2016a, p. 89). By limiting the extent of soil disturbance, the FEIS presumes that primary area that will experience changes to soil functions will remain less than 20 percent." The EA outlines how soil characteristics and disturbance will be assessed under this decision in a site-specific manner to ensure compliance with the 20% threshold as a part of the issue "How would timber harvest affect soil disturbance?" (EA, p.101). This adaptive management approach, developed to reduce soil disturbance in a site-specific manner, is outlined in Soils Table 1 (EA, p. 103). This issue was considered but not presented in detailed analysis because analysis of this issue isn't necessary to evaluate how the alternatives respond to the Purpose and Need and there is no potential for significant effects beyond those described in the FEIS (EA, p.102).

**Commenter: OWCW, Public Comment Period Letter, pp.12-13**

*Soils impacts are an important issue that should be analyzed in detail. Soil microorganisms, moisture, and productivity are all impacted heavily by commercial logging. In many of the proposed units, the soil is completely undisturbed. While the RMP allows for up to 20% of area detrimental soil disturbance, BLM should disclose the more important values of undisturbed soils and the loss of those values once soil has been disturbed. The timeline is important as well. For all intents and purposes, disturbed soils require decades or more to fully recover.*

**BLM Interpretation:**

Consider an issue on how logging will impact soil biology; consider the ecological impacts from loss of undisturbed soil.

**Response:**

BLM received comments during the public comment period asking the BLM to consider an issue on how logging impacts soil biology, with consideration for the ecological impacts associated with loss of undisturbed soil. Soil biology was assessed as a component of soil function in the issue "How would timber harvest affect soil function and soil productivity?" (EA, p.107), as well as the issue "What are the effects of tree cutting and timber removal on the soil food web, fungal soil networks, and fungal mats?" (EA, p. 106). Loss of undisturbed soil is inherently addressed through limitations on soil disturbance. The process for ensuring compliance with the 20% detrimental soil disturbance limitation is outlined in the issue "How would timber harvest affect soil disturbance?" (EA, p.101). This issue was considered but not presented in detailed analysis because this issue isn't necessary to evaluate how the alternatives respond to the Purpose and Need and there is no potential for significant effects beyond those described in the Proposed RMP / Final EIS. (EA, p.107)

**Commenter: Fox Hollow Neighbors, Public Comment Letter, pp.1-2**

*The heavy equipment used in logging, in conjunction with vegetation removal, will increase runoff dramatically. Given the unstable nature of soils on sections of these parcels, the likelihood of slides will significantly increase. These slides would endanger the remaining vegetation and integrity of the soil.  Quality and texture: Logging, the construction of logging roads, and the use of heavy equipment all cause significant damage the quality and texture of the soil. The soil quality within much of these specific parcels is already very poor. It took many years and a number of replanting efforts for any regeneration to occur after the logging that followed the destructive 1962 windstorm.  Area location: Soil erosion and runoff from logging impacts and potentially endangers lives, residences, and roads in the area.*

**BLM Interpretation:**

Consider an issue how logging will affect soil physical function and stability

**BLM Response:**

BLM received comments during the public comment period asking the BLM to consider an issue on how logging impacts will affect soil physical function and hillslope stability. BLM considered these issues in the analysis as well as through the incorporation of BMPs. Soil physical functions are addressed as a component of soil function in general in the issue "How would timber harvest affect soil function and soil productivity?" (EA, p.107). Soil texture is not addressed specifically because soil texture (the proportion of sand, silt, and clay particles) is an inherent property that does not change in response to disturbance. Erosional impacts are addressed in the issue "What would be the effect of road construction and timber yarding on soil erosion?" (EA, p.107), which explains that erosional losses are included in calculations of detrimental soil disturbance, which is limited to 20% or less within the treatment unit. Further, erosion control measures that will be employed to prevent and mitigate soil erosion and hillslope instability are specifically outlined in Appendix E (EA, p.173). Changes to hillslope stability

resulting from treatments are explored in the issue "What are the effects of timber harvest and road construction on hillslope stability in the Riparian Reserve?" (EA, pp.105-106). While this issue is focused specifically on Riparian Reserve areas, it describes processes impacting hillslope stability and protective measures employed are applicable outside of Riparian Reserves. For example, timber yarding restrictions on slopes over 65% on landslide-prone geology apply to the entire harvested area, and untreated Riparian Reserve inner zone protections limit disturbance near stream courses or unstable drainage headwalls. Additionally, this undisturbed inner zone also acts as a filter and buffer for mobilized sediment from upslope harvested areas, reducing downstream transport that would threaten private values. Finally, issues of increased runoff and impacts to downstream values are addressed in hydrology issues "How would timber harvest affect the water supply and water purity of the neighboring households?" (EA, p.88) and "How would road construction, renovation, and haul affect sediment delivery to streams?" (EA, p.92). Individually and in aggregate, these issues concluded that project effects on erosion, soil physical properties, soil quality, and hillslope stability were in the range of those analyzed in the FEIS. This issue was considered but not presented in detailed analysis because this issue isn't necessary to evaluate how the alternatives respond to the Purpose and Need and there is no potential for significant effects beyond those described in the FEIS (EA, p. 108).

## Wildlife

**Comment: OWCW, Public Letter p. 5**

*"This EA does not explain whether and when and where NSO surveys have been and would be completed prior to logging. Perhaps some of this information is available in specialist reports and consultation documents, but we don't know. Despite multiple requests in the context of this project and others across this BLM District, these documents were not made publicly available on the BLM website during the EA comment period. If BLM would like to post those documents and extend the EA comment period, we would be pleased to provide input on their incorporation here."*

### *BLM's interpretation:*

The EA does not sufficiently describe when and where northern spotted owl surveys would be completed prior to logging.

### *Response*

The BLM received comments during the public comment period questioning whether spotted owl surveys have been and would be completed prior to logging. The BLM has included a response to clarify when and where northern spotted owls would be completed. In the EA (p. 115), the BLM delineates how many known and potential northern spotted owl sites would be affected by the project.

Additionally, the BLM states that surveys, as defined in established survey protocols, for spotted owls would continue in the project footprint until timber harvest has been implemented (EA, pp.116 & 174). To clarify, the established survey protocol referenced in this section directs call-back surveys consisting of two years of six visits per year prior to the start of a project that modifies spotted owl habitat. Thereafter, spot checks to determine the presence of spotted owls would occur in years 3 and 4 (EA, p.116 [NSO protocol, p. 22]). The BLM is currently using this protocol for spotted owl surveys. Therefore, spotted owl surveys would be completed at least 2 years prior to logging and spot checks would occur during years 3 and 4 until the timber has been fallen. If it takes longer for a timber sale to be implemented, the BLM would follow the guidance in the protocol to confer with the US Fish and Wildlife Service regarding appropriate survey needs in year 5 for the remaining harvest areas (NSO Protocol, p. 22).

The protocol also defines the survey area as "the area extending one provincial median annual home range radius from the perimeter of the project area for projects that would remove or modify nesting, roosting, or foraging habitat" (EA, p.116 [NSO Protocol, p.7]). The provincial median annual home range radius in the

Oregon Coast Ranges (which includes the Siuslaw Field Office) is 1.5 miles. In addition, we complete the same surveys for projects that modify or remove dispersal habitat.

**Comment: OWCW, Public Letter p. 5**

*"The EA did bury in an appendix, however, this alarming information: "HLB units fall (in whole or in part) within the home ranges of **56 known or potential sites with site centers on federal lands** (Table 1). Of these, 52 (93 percent) have site centers located in Reserved Land Use 6 Allocations. Additionally, HLB units would fall within four site centers on State lands and two on private lands. All but one has less than 10 percent suitable habitat in the core area (one has 23 percent) and all have less than 10 percent suitable habitat in the home range."3 This level of potential impact should be analyzed in an EIS."*

**<u>BLM's interpretation:</u>**

The level of impact to northern spotted owl sites should be analyzed in an EIS.

**<u>*Response*</u>**

The BLM received comments during the public comment period questioning whether spotted owl surveys have been and would be completed prior to logging. The BLM has included a response to clarify the impact to spotted owl sites. The BLM appropriately discussed the impacts to spotted owls in Appendix B – Issues Considered but not Presented in Detailed Analysis because the issue referenced (Section 5.2.8.2 What are the effects of the alternatives on known northern spotted owl sites and incidental take of spotted owls?) did not address the purpose and need and was not associated with significant impacts beyond those analyzed in the Final FEIS. The table referenced by the public comment is Table 1 under this Issue Considered but not Presented in Detailed Analysis (EA, p. 115).

In this discussion, the BLM clarifies the impact of the proposed action on known and potential spotted owl sites. Of the 56 sites referenced that are on federal lands, only 13 sites (23 percent)[1] had recent detections of spotted owls (i.e., detections within the last five years (2015-2019)). Many of the historic sites have recent barred owl detections. In order to conserve the species on the Siuslaw FO, the sites with recent spotted owl detections are given priority for conservation of habitat to "avoid or delay, to the extent consistent with the management objectives and management direction for the Harvest Land Base, near-term negative effects to known sites as northern spotted owl habitat continues to develop in the reserved land use allocations…" as addressed in the RMP, Appendix A (USDI - BLM, 2016a, pp. 107-109). This is consistent with recommendations in the Northern Spotted Owl Recovery Plan under Recovery Action 10 (USDI Fish and Wildlife Service, 2011, pp. III-43 - III-47) and the 2020 Routine Actions BO, Appendix H (USDI Fish and Wildlife Service, 2020, pp. H-1-H-8). The goal is to conserve the spotted owls that are still present on the landscape in the light of their displacement by barred owls as spotted owl continues to develop the reserved land use allocations..

At the project implementation level, the BLM will consider site-specific data pertaining to spotted owls. Per Recovery Action 10, 2020 Routine Actions BO Appendix H, (cited above) and RMP Appendix A, sites with recent detections of spotted owls will be given priority for conservation. For example, if BLM surveys indicate that a spotted owl site is "active" or had a recent detection (in the last 5 years), the Field Office would first consider harvesting an area that has been surveyed but has not had recent spotted owl detections. If this is not possible, mitigations would be included to avoid incidental take of spotted owls.

As stated in the EA, p. 115, surveys for spotted owls will continue in the project footprint until timber harvest under this EA has been implemented. If a spotted owl or unknown species of Strix is detected within the project area, occupancy status is unknown, and the project would adversely affect spotted owls if they are present, the

---

[1] Information on the other sites is found in the Wildlife Report, p. 16.

Field Office wildlife biologist would work with the Service to determine what measures, if any, are necessary to ensure that incidental take of spotted owls does not occur.

The discussion on how the alternatives would affect the northern spotted owl in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS."* (EA, p. 114-119).

**Comment: OWCW, Public Letter p. 6**

*"An EIS should analyze the impacts of timber harvest on Northern spotted owl sites. The EA states: "This issue was considered but not analyzed in detail because it does not address the purpose and need and is not associated with significant impacts beyond those analyzed in the Final [RMP] EIS."4*

*We disagree that this issue is not associated with significant impacts beyond those analyzed in the RMP. First, the EA asserts that the impacts of 2020's large wildfires has no bearing on its responsibility to analyze impacts to spotted owls from this HLB program. This is incorrect. The RMP analyzed impacts of statewide HLB logging to spotted owl populations over a 50-year period, using the assumption that only a limited number of acres of spotted owl habitat would burn and be salvage logged. Yet both the numbers used for determining impacts – acres burned and acres salvage-logged – were vastly exceeded in 2020, just five years into the plan. The assumptions for the 50-year timeline of the RMP are therefore no longer valid. Please recall comments previously submitted to this District on the HLB-MITA Salvage Project, attached and incorporated by reference. Pasted below is one relevant portion of those comments:*

*[In the wake of 2020's large fires] the analysis must include a full and careful review of the assumptions behind the RMP's statement that the RMP itself (and the LUAs it designated) constitutes BLM's contribution to spotted owl recovery goals. (ROD/RMP 105.) The Biological Assessment for the RMP states that a limited number of acres of spotted owl habitat were expected to burn in the first 50 years of the plan—across all BLM lands in Western Oregon. This analysis must contain an accurate assessment of how many acres of NSO habitat burned not only within the sale planning area, but also in the entire NWO District, and further on all BLM-managed lands across all of Western Oregon. As that was the planning area for the RMP and that burned/salvage acreage was the basis for the BA/BiOp, these are the only legally defensible scales at which to analyze this. It seems likely that in the project area alone, more owl habitat than the expected total (for the half-century planning period of the RMP) burned in just this year and is proposed for salvage. This is a massively significant environmental impact that must be fully analyzed in an EA, and will certainly preclude a FONSI.*

*Note, the RMP is meant to provide BLM's contribution to RA10 and RA32. However, the RMP did not envision this level of salvage logging. The BA for the RMP supposed that something like 1,737 acres of HLB-MITA and HLB-LITA would be salvage logged (on BLM lands in western Oregon) in the first 50 years of the plan. (RMP BA 36.) Yet this proposal would salvage log 910 acres of HLB, with another 7,000-8,000 acres proposed nearby by BLM, just five years after the ROD was signed, exceeding its analytical framework within the first few years of the first decade.*

*The analysis should consider regional impacts of BLM salvage logging across western Oregon; for example, the Roseburg District is planning to salvage log over 10,000 acres in the HLB there, and the North Cascade 7"*

**BLM's interpretation:**

The impacts of the 2020 large wildfires on spotted owl habitat, including habitat that was burned and subsequently salvaged, should be analyzed at the ROD/RMP scale (i.e., all BLM managed lands across Western Oregon).

**Response**

The BLM received comments during the public comment period that directed the BLM to analyze the amount of spotted owl habitat that was burned in the 2020 large fires as well as the amount of salvage that occurred as a

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

result. The BLM has appropriately addressed the effects of the large fires on the Siuslaw Field Office when the EA states that "the late-season 2020 fires in Oregon did not impact the Siuslaw Field Office" (EA, p. 113). The following discussion on that page explains why the fires in on the Cascade and Upper Willamette Field Offices did not impact spotted owls on the Siuslaw Field Office.

The BLM is including in this response the following clarification. The large fires in 2020 occurred in the Oregon Western Cascades physiographic province. The Siuslaw Field Office is located in the Oregon Coast Range physiographic province. On the Northwest Oregon District, these two provinces are separated by the Willamette Valley physiographic province. The Willamette Valley is dominated by open fields and open metropolitan areas, which spotted owls do not cross because there is a lack of cover and dispersing spotted owls would be exposed to predation by other raptors such as great horned owls and northern goshawks if they cross such large open areas.

The valley narrows in the vicinity of Cottage Grove, in the southwest corner of the Siuslaw Field Office, where forests border both sides of I-5. This area was identified in the FEIS as an area that could support spotted owl movement between the Oregon Coast Range and the Oregon Western Cascades provinces but "current habitat conditions appear to create barriers or strong filters to northern spotted owl movement and survival" (FEIS, p. 944). Under the RMP, "the BLM specifically configured its Late-Successional Reserve network to maximize its contribution to east-west northern spotted owl movement through this area" (FEIS, p. 947). This is the only area through which spotted owls can currently disperse from the West Cascade to the Oregon Coast Range provinces. This dispersal corridor is roughly 20 miles southwest of the Holiday Farm Fire (which is the closest of the 2020 fires on the District) and about 20 miles northwest of the Archie Fire (Roseburg District BLM). There was unburned habitat available much closer to either of these fires on lands administered by the Forest Service or the BLM in the Western Cascades Province. For these reasons, it is unlikely that owls displaced from either of these fires migrated through the corridor onto the Siuslaw Field Office in great numbers. Therefore, the impact of the large fires on spotted owl habitat in the Siuslaw Field Office was negligible to none. Additionally, since none of the large fires occurred on the Siuslaw Field Office in 2020, there was no subsequent salvage on this Field Office.

The commentor requests that the BLM analyze the impacts of the large fires and subsequent salvage activities at the level of the Northwest Oregon District. This is beyond the scope of this EA, as the proposed actions occur only on the Siuslaw Field Office. Further, the previous discussion clarifies why it doesn't make sense, at this scale, to include fire impacts in a different physiographic province in this analysis. The commentor also requests that this analysis expand to include all BLM managed lands across western Oregon. Again, this is not within the scope of this EA. Nor is such an analysis appropriate at the Field Office level.

The discussion on how the 2020 large wildfires did not affect spotted owl habitat on the Siuslaw Field Office was sufficient to describe that an EIS was not required because the action has "…*no potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA p. 113-114).

**Comment: OWCW, Public Letter p. 7**

*"Field Office is logging almost 1000 acres in several separate projects there, all of which received on piecemeal NEPA analysis. The BA's analysis may no longer be valid for this, and other, reasons. Accordingly, BLM would be wise to evaluate how its actions here might or might not contribute to RA10 and RA32. (RMP BA 132.)*

*As shown in Table III-27 above (from the RMP BA), the BiOp is premised on the assumption that only around 37,000 acres of spotted owl critical habitat in the entire planning area (i.e., western Oregon) would be subject to high- and moderate-intensity wildfire from 2013-2063. It assumes only 9,066 acres of critical habitat would burn in all of western Oregon between 2013-2023. (RMP BA 131-133.) It seems likely that more than that amount has burned in 2020 in just the NWO District alone, never mind the rest of western Oregon. The analysis must reveal how much critical habitat has been affected by fires and whether the agency can proceed confidently pursuant to the RMP BiOp under these conditions….*

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

*"When northern spotted owl critical habitat is altered by wildfire, representatives of the U.S. Fish and Wildlife Service informally recommended that the BLM delay and minimize the removal of primary constituent elements in those stands. . . . [T]he BLM anticipates that fewer than 10,000 acres of critical habitat on its administered lands would experience high- or moderate-intensity wildfire during any given decade; i.e., less than 0.4 percent of BLM-administered lands per decade. The BLM proposes to include 72 percent of its land base in reserves where the BLM would retain post-fire legacy components consistent with public safety and infrastructure maintenance. The BLM proposes to include 22 percent of its lands in the Harvest Land Base where the BLM would implement variable retention of legacy components as described in this assessment. (RMP BA 19.)"*

### *BLM's interpretation:*

The BA/BO for the RMP may no longer be valid because more spotted owl critical habitat has burned in western Oregon than was anticipated.

### *Response*

The BLM received comments during the public comment period questioning whether the Biological Opinion on the RMP remains valid in light of the large fires in 2020, specifically in spotted owl critical habitat. It is not up to the Siuslaw Field Office to consider whether the US Fish and Wildlife Service Biological Opinion remains valid across the action area of the ROD/RMP. This is beyond the scope of this EA and beyond the decision space for the Siuslaw Field Office Manager. What we *can* do is consider whether that analysis is valid for the Siuslaw Field Office. Since this Field Office did not experience unexpected losses of spotted owl habitat from fire and associated salvage logging, the analysis in the ROD/RMP Biological Opinion remains valid for the action area of this EA. Additionally, as stated in the EA, about 86 percent of the Field Office is in either Late Successional Reserve or Riparian Reserved land use allocations (EA, p. 118). Only about 8 percent is in HLB land use allocation (EA, p. 118). This reserves the vast majority of spotted owl habitat on the Field Office. Actions in these reserves may be taken to restore complex late successional habitat that is spotted owl habitat. The goal for Late Successional Reserves in particular is to provide large blocks of habitat to support clusters of reproducing spotted owls (EA, p. 118).

On 10 November 2021, the Final Rule withdrawing and revising spotted owl critical habitat was published in the Federal Register. It withdrew critical habitat designation on lands managed by the BLM that are in the Harvest Land Base Land Use Allocation (USDI Fish and Wildlife Service, 2021). This Proposed Rule excludes the HLB-LITA on the Siuslaw Field Office[2] from the critical habitat designation. Therefore, the LITA subdivision of HLB would no longer be critical habitat. This revised designation of spotted owl critical habitat would not change BLM implementation actions as described in this EA. There could be a small number of acres that fall within critical habitat as riparian reserve buffer boundaries are adjusted to align with conditions on the ground and land use allocations under the RMP are adjusted to align with the new boundaries. However, these would be minor adjustments, so the effects of timber harvest on spotted owl critical habitat in HLB-LITA would be insignificant and discountable. Any critical habitat that would occur in the HLB (e.g., due to boundary changes) would be considered at the project implementation level.

### Comment: OWCW, Public Letter p. 9

*When northern spotted owl critical habitat is altered by wildfire, representatives of the U.S. Fish and Wildlife Service informally recommended that the BLM delay and minimize the removal of primary constituent elements in those stands. . . . [T]he BLM anticipates that fewer than 10,000 acres of critical habitat on its administered lands would experience high- or moderate-intensity wildfire during any given decade; i.e., less than 0.4 percent of BLM-administered lands per decade. The BLM proposes to include 72 percent of its land base in reserves where the BLM would retain post-fire legacy components consistent with public safety and infrastructure*

---

[2] Per GIS layer provided by the US Fish and Wildlife Service.

*maintenance. The BLM proposes to include 22 percent of its lands in the Harvest Land Base where the BLM would implement variable retention of legacy components as described in this assessment. (RMP BA 19.)*

### BLM's interpretation

The BLM should delay and minimize removal of primary constituent elements in northern spotted owl critical habitat since the 2020 large fires removed more critical habitat than projected under the ROD/RMP.

### Response

The BLM received comments during the public comment period suggesting that the BLM delay and minimize removal of primary constituent elements in northern spotted owl critical habitat since the 2020 large fires removed more critical habitat than projected under the ROD/RMP. As clarified in the EA (p. 113-114), spotted owl movement between the North Coast and West Cascades physiographic provinces is limited to the area south of Eugene and near Cottage Grove. Therefore, the effect of the 2020 large fires did not extend to the North Coast province, where the Siuslaw Field Office is located. Spotted owl habitat conditions, including in spotted owl critical habitat, in the North Coast physiographic province have not changed as a result of these fires in the West Cascades province. Therefore, the analysis in the ROD/RMP for spotted owls remains consistent and valid for the Siuslaw Field Office.

The discussion on how the 2020 large wildfires did not affect spotted owl habitat on the Siuslaw Field Office was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA p. 114)

**Comment: OWCW, Public Letter p. 9-10**

*The agency should not proceed here without a full, EIS-level evaluation of this new, post-fire state of affairs and what it means for the spotted owl and for the agency itself, as a designated caretaker of the species.*

*The analysis should include a thorough evaluation of the impacts of logging within and near nest sites. The RMP did not account for the impacts of widespread salvage logging, even in the HLB, and certainly within the unspecified acres of hazard-tree and landing-creation logging in the LSR and Riparian Reserves. All known pre-fire nest sites must be identified, and if any logging is planned that will disturb these, a duty to consult with USFWS is triggered. The scientific recommendation is to avoid any salvage activity within 1.5 km of owl nest sites. (Bond 2009.)*

*These concerns are valid in the context of all planning by BLM in western Oregon, and further indicate that the agency should either undertake a supplemental EIS process for the RMP or do a similar level of analysis in an EIS for landscape programs, like this one.*

### BLM's Interpretation

BLM should write an EIS that evaluates the impacts of salvage logging on spotted owl nest sites and identify all pre-fire nest sites.

### Response

The BLM received comments during the public comment period suggesting that the BLM write an EIS to evaluate the impacts of salvage logging on spotted owl nest sites. This would include the identification of all pre-fire nest sites. The Siuslaw Field Office is not proposing salvage logging in response to the 2020 wildfires in this EA. As stated in the EA (p. 113-114), the 2020 large fires in western Oregon did not occur on the Siuslaw Field Office, nor in the North Coast physiographic province in which the Siuslaw Field Office resides. Therefore, none of our nest sites were affected by fires that occurred in the West Cascades physiographic province. The discussion on how the 2020 large wildfires did not affect spotted owl habitat on the Siuslaw Field Office was

sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA, p. 114).

**Comment: OWCW, Public Letter p. 9-10**

*The EA states in several places that because the 2020 fires had little or no impact on the Siuslaw field office, that BLM is not responsible for analyzing resulting the Siuslaw field office contribution or detraction from spotted owl recovery in any meaningful way.5 The scale of analysis is off, under that assumption. Again, any "tiering" to RMP analysis is invalid because the RMP considered impacts to western Oregon and wildly underestimated the amount of owl habitat that would burn and be salvage-logged during its 50-year lifespan. In addition, the BLM should consider a district-by-district contribution to owl recovery – artificially limiting its analysis (which was already punted to the appendix as something to not consider in detail). The Northwest Oregon District of BLM was in fact the hardest-hit by 2020's fires, with several major fires within its boundaries: Holiday Farm, Lionshead, Beechie Creek, and Riverside. The state of affairs for spotted owls on the District, as well as assumptions regarding salvage logging, are far different than what is found in the RMP, and this must be acknowledged and analyzed fully. Because of this, the actions proposed here are not within the range of effects analyzed in the RMP.*

*5 E.g., "In September and October of 2020, the Holiday Farm Fire burned approximately 5,164 acres of HLB within the Eugene SYU. However, none of these acres are within the project area for this issue." EA, at 37.*

**BLM's Interpretation**

The BLM should include impacts from the 2020 large western Oregon fires that occurred on the Northwest Oregon District in this EA.

**Response**

The BLM received comments during the public comment period suggesting that the BLM evaluate the impacts on spotted owls of the 2020 large wildfires that impacted the Northwest Oregon District. All the fires cited occurred on the West Coast physiographic province. The Siuslaw Field Office is located in the North Coast physiographic province. Clarification was provided in Appendix B Section 5.2.8.1 of the EA (p. 113-114) to explain that these physiographic provinces are separate entities in most of the Northwest Oregon District. Spotted owls can disperse from one of these provinces to the other in only one location at the southern end of the District. Therefore, it is not reasonable to expect that the effects of the fire in the West Coast Province automatically also affect the North Coast Province because they are on the same BLM District.

The geographic scope of this EA does not include the area of the 2020 wildfires. Therefore, it is not relevant to the analysis. The

**Comment: OWCW, Public Letter p. 9-10**

*"The EA also indicates in several places that spotted owls may have moved into the Siuslaw field office area by escaping west from the Holiday Farm and Archie Creek fires. If so, how does the BLM intend to discover if this is the case, and how does it intend to fulfill its duty to ensure it does not "take" owls, who may be hard to detect if they have not established territories yet, 10 are still floaters, and/or are unresponsive to surveys due to barred owl presence or unfamiliarity with the terrain?"*

**BLM's interpretation**

How will the BLM avoid "taking" spotted owls that have been displaced by the large fires in 2020 that may have moved onto the Siuslaw FO?

*Response*

The BLM received comments during the public comment period questioning whether the BLM would detect any spotted owls that may have moved from the areas of the 2020 large fires and dispersed into the Siuslaw FO to avoid incidental take of spotted owls from timber harvest. In the EA (p. 116) the BLM stated that surveys for spotted owls, as defined by established protocols, would continue in the project footprint until timber harvest has been implemented under this EA. The BLM provided a further clarification of when and where it would survey for spotted owls under the current protocol in the response to a previous comment. The BLM continues to use the best science (i.e., the most recent, accepted[3], survey protocol) in its surveys for spotted owls.

Additionally, Project Design Features in the EA (p. 165-166) incorporate Project Design Criteria (PDCs) pertaining to spotted owls from the 2020 Routine Actions Biological Opinion. These are designed to avoid incurring incidental take of spotted owls as a result of timber harvest, since incidental take of spotted owls is not authorized by either this EA or the Biological Opinion under which this the actions in this EA are consulted. If a spotted owl is detected in an area scheduled for harvest, the BLM would work with the Service to mitigate the effects to the spotted owl such that incidental take does not occur. For example, seasonal restrictions could be placed on a timber sale or a given polygon of HLB could be sequenced for harvest at another time. The BLM is committed to ensuring that incidental take of spotted owls does not occur as a result proposed timber harvest in this EA and would continue to work with the Service and the Terrestrial Level 1 Team ensure this would not happen.

**Comment: OWCW Public Letter p. 7**

*"Field Office is logging almost 1000 acres in several separate projects there, all of which received on piecemeal NEPA analysis. The BA's analysis may no longer be valid for this, and other, reasons. Accordingly, BLM would be wise to evaluate how its actions here might or might not contribute to RA10 and RA32. (RMP BA 132.)*

*As shown in Table III-27 above (from the RMP BA), the BiOp is premised on the assumption that only around 37,000 acres of spotted owl critical habitat in the entire planning area (i.e., western Oregon) would be subject to high- and moderate-intensity wildfire from 2013-2063. It assumes only 9,066 acres of critical habitat would burn in all of western Oregon between 2013-2023. (RMP BA 131-133.) It seems likely that more than that amount has burned in 2020 in just the NWO District alone, never mind the rest of western Oregon. The analysis must reveal how much critical habitat has been affected by fires and whether the agency can proceed confidently pursuant to the RMP BiOp under these conditions.*

*BLM's Interpretation*

The Biological Opinion on the Proposed RMP/Final EIS is no longer valid due to the 2020 large fires in western Oregon.

*Response*

The BLM received comments during the public comment period questioning whether the Biological Opinion on the RMP remains valid, in light of the large fires in 2020, specifically regarding LSRs providing large blocks of habitat for spotted owls. The analysis in the EA under 5.2.8.1 What are the effects of the alternatives on spotted owl habitat? included taking a hard look at the impacts from the 2020 fires (EA, p.113-114). Since none of the large fires of 2020 occurred on the Siuslaw Field Office, nor in the North Coast physiographic province within which the Siuslaw Field Office resides, and no other large-scale actions occurred in this timeframe, the assumptions made in the ROD/RMP and its Biological Opinion are still accurate for the project area. As stated previously, the Siuslaw Field Office is in a different physiographic province than the one in which the large fires occurred. On the Northwest Oregon District, there is only a small corridor connecting the two provinces. It is unlikely that many, if any, spotted owls dispersed onto the Siuslaw Field Office (EA, p. 113-114). Pre-project

---

[3] Accepted by the US Fish and Wildlife Service and the BLM.

spotted owl surveys would occur prior to project implementation to determine whether spotted owls are present in the proposed project area (EA, p. 115).

The discussion on how the 2020 large wildfires did not affect spotted owl habitat on the Siuslaw Field Office was sufficient to describe that an EIS was not required because the action has "…*no potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA, p. 114).

**Comment: OWCW Public Letter p. 7**

*Also, the RMP and Biological Opinion are premised on the availability of land in the LSR to provide BLM's contribution to spotted owl recovery; but are these assumptions still valid now that presumably much nesting-roosting habitat in the LSR that NWO BLM is responsible for, may no longer be functioning as such? This must be taken into full account when evaluating the impacts of logging in the HLB. The RMP's contribution to spotted owl recovery was premised on modeling described in the BA for the RMP, which used certain assumptions regarding the amount of land subject to wildfire and to salvage logging per decade for the next fifty years. These assumptions may no longer hold true. (RMP BA 88-89.) How will this plan contribute to or detract from BLM's commitment in the RMP to manage for large blocks of spotted owl habitat, one or more of which was clearly intended to overlie the project area? (See maps below, from RMP BA 94-97.)  As the BLM committed in its BA on the 2016 RMP"*

*BLM's interpretation:*

As a result of the large fires in western Oregon in 2020, the assumptions regarding Late Successional Reserve providing the BLM's contribution to spotted owl recover may not be valid since Late Successional Reserve may have been burned by these fires.

*Response*

The BLM received comments during the public comment period questioning whether the assumptions made in the ROD/RMP and its associated Biological Opinion that Late Successional Reserves provide the BLM's contribution to spotted owl recovery remain valid in light of the 2020 large fires in western Oregon. The North Coast physiographic province in which the Siuslaw Field Office resides, did not experience the large fires referenced by the commentor. Additionally, much of the land that the ROD/RMP designated as Late Successional Reserves occurs on the North Coast province. The large blocks of habitat created by the ROD/RMP in its reserve network continue to provide spotted owl habitat on the Siuslaw Field Office as they were designed. Therefore, the assumptions in the ROD/RMP and its Biological Opinion regarding large blocks of habitat provided by reserved land use allocations remains valid.

**Comment: OWCW Public Letter p. 10**

*"This EA proposes to remove about 4,000 acres of murrelet nesting habitat within the first decade alone. As we have stated, this a per se significant impact and must be analyzed in an EIS. BLM's opinion that the HLB is a sacrifice zone that will be logged to meet ASQ despite any impacts does not mean the agency doesn't have to analyze those impacts. And "tiering" to the RMP for analysis of these impacts fails as the RMP never looked at site-specific impacts and specifically stated that such analyses would be done in implementation planning on a project-by-project basis. Yet, this analysis and others are missing from this EA."*

*BLMs interpretation:*

BLM did not analyze the impacts of removing 4,000 acres of murrelet nesting habitat in the first decade.

### *Response*

The BLM received comments during the public comment period questioning whether the BLM analyzed the impacts of removing 4,000 acres of murrelet habitat in the first decade. This is a reference to Table 5 in the EA (p. 121) under 5.2.8.6 What are the effects of the alternatives on marbled murrelet nesting habitat? This table was mistakenly presented as the planned decadal harvest of marbled murrelet nesting habitat. This was an error that the BLM has corrected; we thank the commentator for pointing out the error. The revised Table 5 shows decadal limits for harvest of marbled murrelet habitat (including thinning), that was provided to the US Fish and Wildlife Service and is part of the analysis under the 2019 Routine Actions LAA BA and the accompanying 2020 Biological Opinion from the Service. The BLM also specified that the decade for this analysis is calculated from 2017-2026, for consistency with the decadal blocks of time after RMP implementation and with the 2019 Routine Actions BA.

While the BLM properly tiered this removal of habitat to the FEIS, it did not show the context of this removal of habitat on the Siuslaw Field Office, as the FEIS did for the ROD/RMP action area. Therefore, the BLM added a table (EA, p. 121, Table 5) to the referenced section which shows that 98% of the high quality marbled murrelet habitat and 90% of the low quality murrelet habitat on the Siuslaw Field Office is in reserved land use allocations, where trees with marbled murrelet nesting structure would be conserved. Only 1 percent of high quality habitat and 9 percent of low quality habitat occur in the HLB.

The discussion on how the alternatives would affect marbled murrelet habitat in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA, p. 119-122).

### Comment: OWCW, Public Letter p. 10

*"Did BLM evaluate whether last year (or the last few years) was a poor ocean year? Surveys following a poor ocean condition year or years may show a false negative because murrelets may not try to nest that year. Several years may pass before a murrelet tries to nest again in suitable habitat. Murrelet recovery is not consistent with the loss of any additional habitat in the Coast Range. BLM has a duty to contribute to murrelet recovery, and RMP commitments to that effect may not suffice. The agency should look at whether individual projects or programs will contribute to or detract from murrelet recovery. In order to do so, all suitable habitat must now be preserved regardless of current occupancy."*

### *BLMs interpretation:*

Preserve all marbled murrelet suitable habitat regardless of current occupancy as the BLM's contribution to murrelet recovery.

### *Response*

The BLM received comments during the public comment period suggesting that the BLM's contribution to murrelet recovery should be preserving all suitable habitat regardless of occupancy. This is not consistent with the Resource Management Plan that governs the actions on BLM lands. As the EA states (p. 120), the BLM evaluated the effects of timber harvest on marbled murrelet nesting habitat, critical habitat, and known and future occupied sites. Since only 7 percent of total nesting habitat and 1 percent of high-quality nesting habitat is in HLB under the RMP, the BLM concluded in the FEIS that the loss of habitat is offset by the protection and restoration of higher quality habitat closer to the ocean where occupancy is more likely and provides better support for recovery of the species (EA, p. 120).'

Similarly, on the Siuslaw Field Office, only 1 percent of high quality and 9 percent of low quality habitat is in the HLB (EA, p. 121, Table 5). Most of the high-quality habitat in HLB is in Zone 2 (between 35-50 miles from the Pacific Ocean). Only 0.2 percent of the high-quality habitat in HLB is in Zone 1 (0-35 miles from the Pacific Ocean. Likewise, most (11 percent) of the low-quality habitat in HLB is in Zone 2. Only 8 percent of low-quality habitat in HLB is in Zone 1.

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

On the Siuslaw Field Office, the vast majority of occupied murrelet sites are in Zone 1. Only one site had an occupied detection near 35 miles such that the occupied site lies partly in Zone 2. Additionally, there was an occupied detection at a site on State lands in Zone 2. Those are the only two known instances of marbled murrelet occupancy in Zone 2 on the Siuslaw Field Office. Therefore, the highest quality of suitable habitat to conserve is that in Zone 1. Under the ROD/RMP, this occurs on the Siuslaw Field Office, as 99 percent of high-quality nesting habitat and 91 percent of minimally suitable habitat occurs in Reserved land use allocations (EA, p. 121, Table 5). Conserving more of this high-value habitat is the BLM's contribution to the recovery of this species.

The discussion on how the alternatives would affect marbled murrelet habitat in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA, p. 119-122).

**Comment: OWCW, Public Letter p. 11**

*"The EA states that federally-listed martens are suspected in the area, but unlikely to be in the HLB area. No further detail is given on how this conclusion was reached. We are concerned that habitat impacts to marten require a hard look that was not was not done in the EA."*

**_BLMs interpretation:_**

Concern that the EA did not take a hard look at the impacts to Pacific marten because it did not state why it is unlikely to be in the HLB.

**_Response_**

The BLM received comments during the public comment period questioning whether the BLM took a hard look at the possibility of Pacific marten occurring in the EA action area. The Pacific marten is addressed in the EA, p. 139 in Table D-5.4.2-1. There are two references listed for the information in that table. The reference for the information in the last column (Presence in Project Area and Impacts of Project on Population) was not listed. That has been updated in the table. The reference for the information that it is unlikely that the Pacific marten would be found in HLB on the Siuslaw Field Office came from the Species Status Assessment for the Coastal Marten (*Martes caurina*) Version 2.0 compiled in July 2018 by the US Fish and Wildlife Service, Region 8, Arcata, California. The nearest population described in this document is the Central Coastal Oregon population (p. 84), which also shows a map of the area in which they have been found. There is no HLB on the Siuslaw Field Office in this area. There is one siting with fair reliability of a Pacific marten at the north end of the Siuslaw Field Office that was provided by a member of the public in 2020. Carnivore camera traps subsequently deployed in the area found no Pacific marten. If, during the project implementation level, the BLM determines that Pacific marten may occur within harvest units, the BLM would consult with the US Fish and Wildlife Service to avoid incidental take, as required under the Endangered Species Act. The BLM added an Issue Not Analyzed in Detail in the EA Appendix B, 5.2.8.12 to clarify its analysis.

The discussion on how the alternatives would affect Pacific marten habitat in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS.*" (EA, p. 133).

**Comment: OWCW, Public Letter p. 11&18**

*"The EA states that fisher are documented to exist in the Siuslaw field office, but unlikely to be in the HLB area.9 No further detail is given on how this conclusion was reached. We are concerned that habitat impacts to fisher require a hard look that was not was not done in the EA.*

*Although the Pacific fisher is not currently listed as an endangered or threatened species under the ESA in Oregon, the FWS 2020 Final Listing Rule to remove protections for the fisher is arbitrary and capricious because*

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

*the FWS withdrew the proposed listing of the West Coast population of the fisher without providing a rational connection between facts found and the choice made, the FWS ignored the fact that the West Coast population of fisher is threatened or endangered in a significant portion of its range, and the FWS failed to consider and apply the best available science indicating the serious threats faced by the West Coast population of the fisher. The attached Notice of Intent provides more detail concerning protection for the fisher."* OWCW, Public Letter p. 11)

*Why is certain management direction in the RMP treated as negotiable, while other provisions are rigidly adhered to? For example, the RMP directs BLM to: Protect fisher denning structures.* (OWCW, Public Letter p. 18)

### BLMs interpretation:

The EA does not follow management direction regarding fisher and does not provide rationale for the conclusion that fishers are unlikely to be in the HLB.

### Response

The BLM received comments during the public comment period questioning whether the BLM took a hard look at the possibility of fisher occurring in the EA action area. Fishers are addressed in the EA, p. 138 in Table D-5.4.2-1. The EA has been updated to provide the references for the BLM's conclusion that fishers are unlikely on the Siuslaw Field Office. One reference is the PRMP/FEIS which places both the analysis area for the issue pertaining to fishers in the FEIS and the current range of fishers south of the Siuslaw Field Office (FEIS, p. 872, Figure 3). The other is from the Final Species Report, Fisher (*Pekania pennanti*), West Coast Population by the US Fish and Wildlife Service, March 2016. This report shows that locality records from 1993 to 2013 show no sightings on the Siuslaw Field Office (USDI Fish and Wildflie Service, 2016, pp. 34, Figure 7). The BLM added an Issue Not Analyzed in Detail in the EA Appendix B, 5.2.8.11 to clarify its analysis.

While it is unlikely that fisher occur on the Siuslaw Field Office, the Reserve land use allocations on the Field Office contain 97 percent of the denning habitat and 90 percent of the resting habitat. Only 1 percent of denning habitat and 9 percent of resting habitat is found in the HLB land use allocation. A summary footnote to this effect for fisher was added to Table D-5.4.2-3 in the EA.

The discussion on how the alternatives would affect fisher habitat in the EA was sufficient to describe that an EIS was not required because the action has "...no *potential for significant effects beyond those described in the Proposed RMP / Final EIS."* (EA, p. 130).

Since the public comment period for the EA, BLM added the issue, "What are the effects of the alternatives on fisher habitat?" (EA, pp.128-131). That issue summarized that, "if fishers are found in the areas of HLB proposed for treatment, the RMP direction for fisher would be applied (ROD/RMP, p. 97). Therefore, removal or thinning of the 9 percent of fisher habitats that are found in the HLB may affect individuals (if present) by loss of a small amount of habitat but is not likely to cause listing of this species under the Endangered Species Act" (EA, p.130).

Below is the management direction for fisher outlined in the ROD/RMP on p. 97:

- "Do not approve, fund, or carry out actions that would disrupt normal fisher behaviors (e.g., foraging, resting, or denning) associated with known natal or maternal denning sites, except when done in accordance with an approved recovery plan, conservation agreement, species management plan, survey and monitoring protocol, or critical habitat rule, and when the action is necessary for the conservation of the species.
- Manage known natal or maternal denning sites in a manner that would not adversely affect fisher except when taking actions that are necessary to treat or protect stands from sudden oak death. Take actions necessary to treat or protect stands from sudden oak death, including actions that may adversely affect denning fisher. For actions other than those necessary to treat or protect stands from sudden oak death,

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

do the following within stands where fisher natal or maternal denning or dens are documented by the BLM based on BLM field verification (such as surveys, radio-collared fisher tracking, or cameras):

- o  Maintain ≥ 80 percent canopy cover within at least 50 feet of documented fisher natal and maternal dens.
- o  Maintain sufficient canopy cover on the remainder of the stand to support fisher denning post-project.
- o  Protect fisher denning structures ≥ 24" diameter (snags, down woody material, and live trees with cavities) within the stand. In this context, **protect fisher denning structures** means to retain the ≥ 24" diameter structures (i.e., snags, down woody material, and live trees with cavities) in the stand and if, for safety concerns, it is necessary to fall such snags or live trees with cavities, retain those cut trees or snags in the stand as additional down woody material.
- o  Do not apply vegetation treatments to all portions of the stand.

- Within 5th field-watersheds (HUC 10) where fisher are documented by the BLM to occur, favor retaining trees that have structures (e.g., cavities, mistletoe, and rust brooms) that are typically used as denning or resting sites by fisher.
- The above management direction may be modified for specific projects through implementation-level NEPA analysis on a case-by-case basis in conference or consultation with the U.S. Fish and Wildlife Service based on new information"

**Comment: OWCW, Public Letter p. 17-18**

*"We strongly suggest, in light of important new information regarding spotted owl and marbled murrelet demographics, that BLM reinitiate consultation with USFWS on this project. BLM may find itself out on a limb relying on a previous BiOp that was prepared using outdated information that has since been updated. Based on the 2021 NSO meta-analysis21 and Betts et al. 202022, it is questionable whether removal of any owl or murrelet habitat in the Coast Range is consistent with the species' survival. In addition, did the agency consider the warranted (but precluded) uplisting to "endangered" for the spotted owl?23 Does the agency have an increased responsibility to the species in light of this new information? The proposed actions may jeopardize one or both species if carried out as planned.*

*The recent uplisting of marbled murrelets from threatened to endangered under the State Endangered Species Act by the ODFW Commission24 as well as the most recent 5-year meta- analysis of northern spotted owl population data, which documents a 2-5% annual decline, correlated in the contiguous Oregon Coast Ranges population unit with barred owl competition and to a lesser degree, habitat loss due to logging or other management activities25, both speak to the importance of ensuring maximum protection of both of these species on public lands in the Coast Range."*

**<u>BLMs interpretation:</u>**

The BLM should consider the validity of the Biological Opinion under which this EA is consulted and reinitiate consultation.

**<u>Response</u>**

The BLM received comments during the public comment period questioning the validity of the Biological Opinion under which this EA is consulted and advised to reinitiate consultation. The BLM has been communicating with the Terrestrial Level 1 Team and the US Fish and Wildlife Service regarding the status of the 2019 Routine Actions LAA Biological Assessment and its accompanying 2020 Biological Opinion from the Service, under which this project is consulted. The baseline in the 2019 Biological Assessment is in the process of being updated due to the 2020 large fires. Currently, the consultation remains valid with an additional action. All timber sale actions that may affect and are likely to adversely affect listed species would be submitted to the Team (which includes the Service) as pre-project reporting to ensure that the sales are consistent with the analysis in the 2019 consultation. The updates to the BA are expected to be completed in 2022. Consultation (in the form of

Case 6:22-cv-01344-MK   Document 10-2   Filed 11/14/22   Page 46 of 49

an updated 2022 Routine Actions BA/BO) will be completed before the first project level implementation Decision under this EA occurs.

**Comment: OWCW, Public Letter p.4&5**

*Now the EA has also failed to do the required analyses, and the forthcoming DNAs will also by their nature fail to do so, meaning that no site-specific impacts analysis of the following will ever be done, despite RMP direction to manage for all of the below…. An EIS should be completed that analyzes impacts to: …Dead wood recruitment (p. 4); Reduction of high-quality owl habitat (p. 4); Bureau Sensitive Species (p. 4); Northern spotted owl prey base from logging and roads (p. 5); Fragmentation of "interior forest" (p. 5)*

### *BLM Interpretation:*

BLM did not take a hard look at dead wood recruitment, high-quality spotted owl habitat, Bureau Sensitive Species, Northern spotted owl prey base, or the fragmentation.

### *Response*

The BLM received comments during the public comment period that the BLM did not take a hard look at dead wood recruitment. The BLM considered the effects of dead wood recruitment in Appendix B, Section 5.2.8.10. The BLM appropriately tiered this analysis to the Proposed RMP/Final EIS. Additionally, it provided information on how compliance with management direction in the RMP would provide snags and downed wood in the harvested areas by retention of existing snags and downed wood, creation of new snags, and retention of live trees. Further, the EA analyzed three different levels of green tree retention to provide future recruitment of snags and downed wood in Issue 3.3 as well as three different arrangement patterns and as well as quality of snags and green tree retention. Additionally, it provided a sub-alternative that would increase the number of created snags created from the retention in addition to the one snag per acre directed by the RMP. This demonstrates that the BLM provided a reasoned analysis containing quantitative or detailed qualitative information (USDI - BLM, 2008a, p. 55) about dead wood recruitment in this EA.

The BLM received comments during the public comment period that the BLM did not take a hard look at high-quality spotted owl habitat. The BLM considered the effects of the proposed action on spotted owl habitat in Appendix B, Section 5.2.8.1. In this Issue, the BLM disclosed the amount of spotted owl habitat in the HLB by type (EA, p.114, Table 3). There are only 7 acres of complex suitable (i.e., high-quality suitable) habitat in the HLB on the Siuslaw Field Office. There are 399 acres of suitable (i.e., nesting/roosting/foraging) habitat in the HLB and 55 acres of foraging only habitat (i.e., does not contain structural elements for nesting or roosting). The majority of spotted owl habitat in the HLB on the Siuslaw Field Office is in dispersal habitat (65%) or non-habitat (35%). This demonstrates that the BLM provided a reasoned analysis containing quantitative or detailed qualitative information (USDI - BLM, 2008a, p. 55) about the impacts of the proposed action on spotted owl habitat, including high-quality habitat, in this EA.

The BLM received comments during the public comment period that the BLM did not take a hard look at Bureau Sensitive Species. The BLM considered the effects of the proposed action on Bureau Sensitive Species in Appendix B, Section 5.2.8.9 as well as Appendix D. Tables 5.4.2. The tables in Appendix D provide information on if a species is likely to exist in the project area (HLB). If so, the effects are also listed. Many species would benefit from regeneration harvest as they are dependent on open habitat. For example, about 35 percent of the species analyzed in Appendix D, Table D-5.4.2 have grass/forb dominated areas as one of their primary habitats and about 35 percent are strongly associated with shrub habitat (EA, p. 126). For the species that are associated with late-successional habitat, the Reserves, which comprise 89 percent of the land base managed by the BLM on the Siuslaw Field Office, would provide sufficient habitat even with the loss of some habitat in the HLB (the entire HLB on the Siuslaw Field Office is only 9 percent of the land that managed by the BLM in the Siuslaw Field Office). This demonstrates that the BLM took a hard look at the impacts of the proposed action on Bureau Sensitive Species as well as species on other conservation lists (Table D-5.4.2-1 Species listed or proposed for listing under the ESA [pp. 144-146], Table D-5.4.2-2, species with management direction in the

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

RMP but not listed under ESA [pp. 147-148], Table D-5.4.2-3 BLM Sensitive Species [pp. 149-155], Table D-5.4.2-4 US Fish and Wildlife Service Focal Species and Birds of Conservation Concern [pp. 156-160], and Table D-5.4.2-5 Partners in Flight Species of Continental Concern for Western Forests [pp. 161-166]). This demonstrates that the BLM provided a reasoned analysis containing quantitative or detailed qualitative information (USDI - BLM, 2008a, p. 55) about the impacts of the proposed action in this EA on, not only Bureau Sensitive Species, but also species of conservation concern on other recognized lists.

The BLM received comments during the public comment period that the BLM did not take a hard look at northern spotted owl prey base. The BLM considered the effects of the proposed action on northern spotted owl prey species in Appendix B, Section 5.2.8.3. As stated in the issue, the BLM evaluated the effects of timber harvest of spotted owl prey species by considering their habitat associations. For example, northern flying squirrels and red tree voles favor the same mature and structurally complex habitat that northern spotted owls prefer (EA, p. 117). Reference is made to the 2020 Biological Opinion on Timber Harvest and Routine Activities where spotted owl suitable habitat is defined as nesting, roosting, and foraging habitat. Foraging habitat implies the presence of sufficient prey to sustain territorial spotted owls (EA, p. 117). The Reserves (i.e., 89 percent of lands managed by the BLM in the Siuslaw Field Office) also serve as habitat for spotted owl prey species. Therefore, the analysis of spotted owl habitat in the Proposed RMP/Final EIS and, specifically for the Siuslaw Field Office in this EA, demonstrates that the BLM provided a reasoned analysis containing quantitative or detailed qualitative information (USDI - BLM, 2008a, p. 55) related to spotted owl prey species.

The BLM received comments during the public comment period that the BLM did not take a hard look at fragmentation of "interior forest." The BLM considered the issue of habitat fragmentation and connectivity on spotted owls and marbled murrelets in Appendix B, Section 5.2.8.8. The Proposed RMP/Final EIS delineated the Late Successional Reserves to create large blocks of habitat for spotted owls in Issue 1 and connectivity in Issue 2 (EA p. 124). The Proposed RMP/Final EIS analyzed the amount of core and edge habitat for marbled murrelets on BLM managed lands (EA, p. 125). These analyses are valid on lands managed by the BLM in the Siuslaw Field Office as well, since 60 percent of the land managed by the BLM is in Late Successional Reserves and an additional 26 percent is in Riparian Reserves. Including Congressionally Reserved lands, the Siuslaw Field Office has 89 percent of its land base in Reserved land use allocations. Therefore, the analysis of spotted owl and marbled murrelet habitat in the Proposed RMP/Final EIS is appropriate for the Reserved land use allocations on the Siuslaw Field Office and demonstrates that the BLM provided a reasoned analysis containing quantitative or detailed qualitative information (USDI - BLM, 2008a, p. 55) on habitat fragmentation and connectivity.

The discussion on how the alternatives would affect these issues in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS."*

**Comment: AFRC, Public Comment Letter, p.5**

*In past BLM documents, the agency has determined a need to "maintain" dispersal habitat within priority NSO sites in order to avoid incidental take. An Information Bulletin dated July 21, 2017 was sent to the District Managers of each BLM District managing under the 2016 RMPs. This bulletin was titled "Timber sale planning approaches to avoid take of northern spotted owls under the 2016 RMPs." Appendix 2 of this bulletin titled "Evaluation of Take Potential" includes guidance on how to assess incidental take. Page 1-16 of this Appendix reads that the best available science indicates that forest habitat needs of the owl should be assessed at the core and home-ranges scales. Specifically, that literature has demonstrated the "importance of having sufficient amounts of NRF habitat within owl core areas" and that "populations are stable when the average proportion of NRF habitat in the home range is 30-50%." Nowhere in this document is there any guidance or scientific literature that suggests the home-range and core area as adequate scales for assessing needs of dispersal habitat. In fact, on the contrary, page 1-19 of this bulletin suggests that "the effects analysis for owl dispersal habitat considerations is informed by landscape conditions, as suggested by Thomas et al. (1990) along with Lint et al. (2005) and Davis et al. (2016)." More specifically this page goes on to read that "as assessment of dispersal habitat condition was recommended on the quarter-township scale by Thomas et al. (1990)" and that "the U.S. Fish and Wildlife Service has subsequently used fifth-field watersheds or larger landscapes for*

*assessing dispersal habitat conditions because watersheds or provinces offer a more biological meaningful way to conduct the analysis." **In light of this scientific documentation and clear direction, we would like the BLM to assess incidental take in the context of suitable NSO habitat, not dispersal habitat, which is properly assessed at the landscape, not site, scale.***

### <u>BLM Interpretation:</u>

Consider an issue that analyzes northern spotted owl suitable habitat instead of spotted owl dispersal habitat when determining incidental take.

### <u>*Response*</u>

The BLM received comments during the public comment period that the BLM consider an issue that analyzes northern spotted owl suitable habitat instead of spotted owl dispersal habitat when determining incidental take. This is not appropriate for an issue because the process does not change between alternatives. The process was determined through consultation (EA, p. 69) with the Service under the 2020 Routine Actions Biological Opinion (USDI Fish and Wildlife Service, 2020, p. entire). Also, the potential for incidental take is assessed at the project implementation level. To clarify the process, the BLM provides the following.

Suitable spotted owl habitat is defined as spotted owl nesting, roosting, and foraging habitat. Nesting and roosting habitat provides structural features for nesting, protection from adverse weather, and cover to reduce predation risks for adults and young. In many cases the same habitat also provides for foraging. However, habitat that provides for foraging may also occur in younger stands with some legacy features, hardwood forest patches, and the edges between old forest and hardwoods (US Fish and Wildlife Service, 2021, pp. 71906-71907). In addition, suitable habitat supports the transience and colonization phases of dispersal. In cases where nesting, roosting, or foraging habitats are insufficient to provide for dispersing or nonbreeding owls, younger stands with adequate tree size and canopy cover to provide protection from avian predators and minimal foraging opportunities (typically called "dispersal" habitat) may be used by owls during the transience and colonization phases of dispersal (US Fish and Wildlife Service, 2021, p. 71907).

The Biological Opinionclarifies that in cases where suitable habitat is already below recommended levels (i.e., at least 50 percent of the core area and at least 40 percent of the home range is in suitable habitat), removal of young stands that provide forage opportunities may impair the functionality of a spotted owl territory (USDI Fish and Wildlife Service, 2020, pp. 38-39). In these cases, the wildlife biologist would consider the totality of habitat available to a spotted owl territory since, by definition, dispersal habitat also provides foraging opportunities, albeit less than in the more optimal suitable habitat. Some territories that have limited suitable habitat nonetheless have reproducing spotted owls. Therefore, these owls are utilizing dispersal habitat for at least some foraging.

Habitat quality is on a continuum. We use discrete categories such as "suitable" or "dispersal" habitat for accounting purposes, in order to report effects to the species during consultation. As dispersal habitat grows into foraging habitat (i.e., suitable habitat) the opportunities for foraging increase and the stand may be used more frequently by spotted owls. Site specific characteristics, such as wood rat middens, may also increase the value of habitat that might otherwise be classified as "dispersal" habitat.

The evaluation of the probability of incidental take would consider all these elements at the project implementation level. In addition, the BLM would evaluate the likelihood of disturbance or disruption of spotted owls from the project. If there is a question about whether incidental take might occur, the BLM would confer with the Service to ensure that incidental take does not occur as a result of proposed actions under this EA.

**Comment: Fox Hollow Neighbors, Public Letter p.2**

*These parcels are home to a rich and diverse array of plants and wildlife. Attached is an inventory of birds sighted within .5 miles of the parcels. We are working on an inventory of plants and other wildlife and will send them once completed. Area location: All of the property around these parcels is under private ownership by*

1792A
EA-20-0002
Siuslaw HLB Landscape Plan

*individuals or timber companies, and surrounding sections have been subject to extensive clearcut logging within the last few years. The BLM parcels contain the only intact forest within many miles. Regeneration harvest of these parcels could destroy the only remaining habitat in this area for many of these species.*

### BLMs interpretation:

Take a hard look at birds sighted within a half mile of the HLB parcels near the commentors' residences.

### Response

The BLM received comments during the public comment period that the BLM take a hard look at the impacts of the proposed project on birds seen within half a mile from lands administered by the BLM in the Siuslaw Field Office in the area known as Fox Hollow. In response, the BLM added an Issue not analyzed in detail to the EA: 5.2.8.13 What are the effects of the timber harvest on birds observed in the Fox Hollow area? (EA, p.133-135)

BLM considered all the birds submitted by the neighbor group (EA, p.134) and found most (84 percent) have a Global IUCN status of "species of Least Concern" which is the category for those that are most abundant. For these birds, the effects to habitat were considered as the primary basis for the effects to species. The general habitat types used by these species on the Fox Hollow list were evaluated in the 2016 Proposed RMP / Final EIS (USDI Bureau of Land Management, 2016b, pp. 833-852). Additionally, five species are not native species in Oregon: Barred owl, Eurasian collared dove, European starling, House sparrow, and Wild Turkey. BLM determined that all alternatives would provide enough habitat to maintain or restore populations to viable levels (EA, p.134).

The remaining birds on the list had already been considered in the EA. The BLM evaluated the effects of timber harvest on habitats used by Bureau Sensitive, Bureau Strategic, Survey and Manage Species, and Landbird Focal Species (EA, p.134). Two species (Olive-sided flycatcher and Rufous hummingbird) are considered "near threatened" and one as "vulnerable" (Evening grosbeak), all three species are likely to be found in the project area. The EA concluded the Evening grosbeak would experience, "Beneficial effect from an increase in big leaf maple and shrubby early successional habitat after harvest. Benefits from an increase in seeds and berries found in early successional habitat, such as big leaf maple, elderberry, huckleberry, and salmonberry." (EA. p163). The Olive-sided flycatcher would see "beneficial effect from snags retained after regeneration harvest and from isolated remnant trees in regeneration harvest units" (EA, p.164). The Rufous hummingbird would see a "beneficial effect from an increase in flowering herbs and shrubs in early successional habitat after harvest" (EA, p.164).

The discussion in the EA was sufficient to describe that an EIS was not required because the action has "…no *potential for significant effects beyond those described in the Proposed RMP / Final EIS"* (EA, p. 135).