Oliver J. H. Stiefel, OSB # 135436
503-227-2212 │ oliver@crag.org
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Nicholas S. Cady, OSB # 113463
541-434-1463 │ nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon nonprofit corporation; and **OREGON WILD**, an Oregon nonprofit corporation, | Case No. 6:22-cv-1344 |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPENING MEMORANDUM IN SUPPORT OF MOTION** |
| v. | |
| **CHERYL ADCOCK**, in her official capacity as Field Manager for the Siuslaw Field Office; and the **UNITED STATES BUREAU OF LAND MANAGEMENT**, | Oral Argument Requested |
| Defendants. | |

## MOTION

Plaintiffs Cascadia Wildlands and Oregon Wild ("Plaintiffs") hereby submit their *Motion for Summary Judgment* pursuant to Federal Rule of Civil Procedure 56(a). In accordance with Local Rule 7-1, the undersigned certifies that the Parties made a good faith effort to resolve the dispute but were unable to do so.

Plaintiffs challenge the final agency actions of Cheryl Adcock and the Bureau of Land Management (collectively "Defendants," "BLM," or "agency"). In approving the Siuslaw HLB[1] Landscape Plan ("Siuslaw Project" or "Project"),[2] Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C.S. § 4321 , and its implementing regulations.[3]

The Siuslaw Project is a multi-decade logging project approving commercial logging—largely through "regeneration" cutting, colloquially known as clearcutting—on 13,225 acres of BLM-administered forestland directly west of Eugene, Oregon. The BLM identified 47

---

[1] "HLB" stands for Harvest Land Base, a land use allocation under the BLM's 2016 Resource Management Plan.

[2] Although the Project is designated the "Siuslaw HLB Landscape Plan," the BLM consistently refers to it as "the project" (rather than "the plan") throughout the EA, FONSI, and DR, at one point describing it in full as the "Siuslaw HLB Landscape Plan project." AR 11. This brief, accordingly, will follow the BLM in referring to the "Project."

[3] Through NEPA, Congress established the CEQ to develop national policies to promote environmental quality. 42 U.S.C. § 4342; *id.* § 4344(4); 40 C.F.R. § 1500.1 (2019). The CEQ regulations remained virtually unchanged since their adoption in 1978. *See Wild Va. v. CEQ*, No. 21-1839, 2022 U.S. App. LEXIS 35456 (4th Cir. Dec. 22, 2022). CEQ modified the NEPA regulations by final rule on July 16, 2020, 85 Fed. Reg. 43,3304 (July 16, 2020) (codified at 40 C.F.R. §§ 1500–1508 (2021)), but has since rescinded portions of the 2020 modifications, effective May 20, 2022, 87 Fed. Reg. 23,453 (April 20, 2022) (codified at 40 C.F.R. §§ 1500–1508 (2022), and issued a Notice of Proposed Rulemaking to further amend the 2020 regulations. 88 Fed. Reg. 49,924 (July 31, 2023).

However, the BLM developed and authorized the Project under the pre-2020 version of the regulations, to which this brief will refer unless otherwise noted. AR 127. The applicable version of the NEPA regulations can be found here.

MOTION FOR SUMMARY JUDGMENT—i

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

potentially significant environmental issues associated with the Project, including numerous resource issues known to be adversely impacted by clearcut logging operations: carbon sequestration, greenhouse gas emissions, and climate change; protected wildlife such as northern spotted owls, marbled murrelets, and Bureau Sensitive Species; botany; invasive species; forest structure and species diversity; fisheries; water quality, temperature, and availability; recreation; and soils. However, the agency excluded all but five issues from detailed consideration, stating that the other 42 issues were not directly related to the Project's purpose and need and thus required no in-depth analysis. The agency further asserted that any necessary analysis of these impacts had either been done previously, in the analysis supporting the landscape-wide Resource Management Plan ("RMP"), or would be done later, at the individual timber sale level, but declined to conduct any detailed, project-specific analysis in the Environmental Assessment.

Instead of preparing an Environmental Impact Statement ("EIS"), as required for actions that may have environmentally significant impacts, the BLM approved the Project pursuant to an Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR"). Because the BLM failed to take the requisite "hard look" at the Siuslaw Project's potential effects, its determination that the Project would have no significant impacts, its failure to prepare an EIS, and its approval of the Project were arbitrary, capricious, and contrary to NEPA.

Plaintiffs respectfully ask this Court to declare that the BLM violated NEPA and its implementing regulations by (1) failing to take a hard look at, and adequately analyze and disclose, the Siuslaw Project's potentially significant impacts; and (2) failing to prepare an EIS. To remedy these violations of law, Plaintiffs further ask this Court to vacate the Siuslaw EA and FONSI/DR and remand the decision to the BLM.

MOTION FOR SUMMARY JUDGMENT—ii

In support of this *Motion*, Cascadia respectfully refers this Court to the following

*Memorandum in Support*.

MOTION FOR SUMMARY JUDGMENT—iii

## MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

GLOSSARY OF TERMS .................................................................. vii

INTRODUCTION ............................................................................1

LEGAL FRAMEWORK AND STANDARD OF REVIEW ........................................3

    I.    The National Environmental Policy Act ........................................3

    II.    The Federal Land Policy and Management Act ...............................4

    III.    The Administrative Procedures Act ...........................................5

FACTUAL AND PROCEDURAL BACKGROUND.........................................6

    I.    The 2016 Resource Management Plans and Final Environmental Impact Statement...6

    II.    The Siuslaw Project .............................................................9

    III.    Procedural History ............................................................13

ARGUMENT ...............................................................................14

    I.    NEPA Required the BLM to Consider Every Significant Aspect of the Siuslaw Project's Environmental Impacts.................................................15

    II.    The BLM's Analytical Approach is Fundamentally at Odds with NEPA..................16

    III.    The BLM Failed to Take a Hard Look at the Project's Direct, Indirect, and Cumulative Impacts .............................................................20

        A.  The BLM Failed to Analyze and Disclose the Project's Direct and Indirect Impacts, Additive to the Environmental Baseline……………..………20

            1.   The BLM Failed to Take a Hard Look at Soil Disturbance…...…….21

            2.   The BLM Failed to Take a Hard Look at Noxious Weeds and Invasive Species…………………………………………………...25

            3.   The BLM Failed to Take a Hard Look at Special Status Species…………………………………………………………...27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

B.  The BLM Failed to Analyze and Disclose the Project's Cumulative
Impacts………………………………………………………….……30

IV.  The BLM Failed to Prepare an EIS………………………………………………33

A.  The BLM's Statement of Reasons for Not Preparing an EIS is Flawed…..…34

B.  Substantial Questions Exist Over Whether the Siuslaw Project "May"
Have Significant Impacts……………………………………...…………..35

RELIEF…………………………………………………………………………………38

CONCLUSION…………………………………………………………………………39

CERTIFICATE OF COMPLIANCE ……………………………………………………40

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

# TABLE OF AUTHORITIES

## Cases

*350 Mont. v. Haaland,*
    29 F.4th 1158, 1163 (9th Cir. 2022) ...............................................................4

*Bark v. United States Forest Serv.,*
    958 F.3d 865, 872 (9th Cir. 2020) ...................................................................36

*Blue Mts. Biodiversity Project v. Blackwood,*
    161 F.3d 1208, 1214 (9th Cir. 1998) ..................................................20, 34, 35

*Cascadia Wildlands v. BLM ("Thurston I"),*
    410 F. Supp. 3d 1146 (D. Or. 2019) ...................................................... *passim*

*Cascadia Wildlands v. United States Forest Serv.,*
    937 F. Supp. 2d 1271 (D. Or. 2013) ................................................................35

*Cal. Cmtys. Against Toxics v. United States EPA,*
    688 F.3d 989, 992 (9th Cir. 2012) ...................................................................39

*Cent. Or. Landwatch v. Connaughton,*
     905 F. Supp. 2d 1192, 1197 (D. Or. 2012) .....................................................21

*Ctr. for Biological Diversity v. Kempthorne,*
    588 F.3d 701, 711 (9th Cir. 2009) ...................................................................34

*Ctr. for Biological Diversity v. United States DOI,*
    623 F.3d 633 (9th Cir. 2010) .............................................................................3

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ...................................................................14, 20

*DOT v. Pub. Citizen,*
    541 U.S. 752 (2004)..........................................................................................34

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*
    36 F.4th 850 (9th Cir. 2022) ..............................................................19, 33, 35

*Friends of Yosemite Valley v. Norton,*
    348 F.3d 789 (9th Cir. 2003) .............................................................................5

*Great Basin Res. Watch v. BLM,*
    844 F.3d 1095, 1101 (9th Cir. 2016) ...............................................................20

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Greenpeace Action v. Franklin,*
    982 F.2d 1342, 1351 (9th Cir. 1992) ...............................................................34

*Idaho Sporting Cong. v. Rittenhouse,*
    305 F.3d 957 (9th Cir. 2002) ...........................................................................16

*Kern v. United States BLM,*
    284 F.3d 1062, 1072 (9th Cir. 2002) ..........................................................16, 19

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*
    387 F.3d 989, 994 (9th Cir. 2004) ..............................................................31, 36

*Klamath Siskiyou Wildlands Center v. Boody*,
    468 F.3d 549 (9th Cir. 2006) ......................................................................34, 35

*Klamath Siskiyou Wildlands Ctr. v. United States BLM,*
    No. 1:19-cv-02069-CL, 2021 U.S. Dist. LEXIS 26040 (D. Or. Jan. 21, 2021) ...............30

*Klamath Siskiyou Wildlands Ctr. v. United States Fish & Wildlife Servs.,*
    No. 1:21-cv-00058-CL, 2022 U.S. Dist. LEXIS 52565 (D. Or. Mar. 23, 2022) ................7

*Lands Council v. Forester of Region One of the United States Forest Serv.,*
    395 F.3d 1019, 1026 (9th Cir. 2004) ..........................................................15, 17

*Lands Council v. McNair,*
    537 F.3d 981, 987 (9th Cir. 2008) .....................................................................5

*Metcalf v. Daley,*
    214 F.3d 1135 (9th Cir. 2000) ...........................................................................4

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
    241 F.3d 722, 730 (9th Cir. 2001) ................................................16, 26, 36, 37

*Nat'l Parks & Conservation Ass'n v. BLM,*
    606 F.3d 1058 (9th Cir. 2010) .........................................................................17

*Native Ecosystems Council v. U.S. Forest Service,*
    418 F.3d 953 (9th Cir. 2005) ......................................................................18, 21

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
    668 F.3d 1067, 1085 (9th Cir. 2011) .............................................................2, 27

*Nw. Motorcycle Ass'n v. United States Dep't of Agric.,*
    18 F.3d 1468 (9th Cir. 1994) ............................................................................5

MEMORANDUM IN SUPPORT—iv

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Oak Ridge Envtl. Peace Alliance v. Perry*,
    412 F. Supp. 3d 786 (E.D. Tenn. 2019)....................................................17, 18

*Ocean Advocates v. United States Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2004) .........................................................................35

*Or. Nat. Desert Ass'n v. BLM*,
     625 F.3d 1092 (9th Cir. 2010) .................................................................18, 21

*Or. Nat. Desert Ass'n v. Jewell*,
    840 F.3d 562 (9th Cir. 2016) ....................................................21, 23, 25, 27

*Or. Nat. Desert Ass'n v. Rose*,
    921 F.3d 1185 (9th Cir. 2019) ................................................................23, 24

*Or. Nat. Res. Council v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) ..................................................................4, 24

*Or. Wild v. BLM*,
    No. 6:14-CV-0110-AA, 2015 U.S. Dist. LEXIS 32584 (D. Or. Mar. 14, 2015)...............38

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)..................................................................................3, 16

*Te-Moak Tribe of W. Shoshone of Nev. v. United States DOI*,
    608 F.3d 592 (9th Cir. 2010) .......................................................3, 4, 31, 33

*Western Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ....................................................................19, 33

## Statutes

43 U.S.C.S. § 1701 (a) .......................................................................................4
43 U.S.C.S. § 1712.............................................................................................4
43 U.S.C.S. § 1732.......................................................................................4, 38
42 U.S.C.S. § 4331(a) .......................................................................................3
42 U.S.C.S. § 4332 (c) .............................................................................3, 15, 33
5 U.S.C.S. § 701-6 ............................................................................................5
5 U.S.C.S. § 706(2) .....................................................................................5, 38
43 U.S.C.S. § 2601...........................................................................................7

## Regulations

40 C.F.R. § 1500.1 .....................................................................................15, 16
40 C.F.R. § 1501.5 ...........................................................................................3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

40 C.F.R. § 1502.1 ................................................................................................3
40 C.F.R. § 1502.2 (d) ......................................................................................5, 21
40 C.F.R. § 1502.13 ............................................................................................18
40 C.F.R. § 1502.15 ............................................................................................16
40 C.F.R. § 1502.4(b) .........................................................................................19
40 C.F.R. § 1502.20 ............................................................................................18
40 C.F.R. § 1508.1 (c) ........................................................................................16
40 C.F.R. § 1508.7 ..............................................................................................31
40 C.F.R. § 1508.9 ................................................................................................4
40 C.F.R. § 1508.11 ..............................................................................................3
40 C.F.R. §1508.25(b) ........................................................................................16
40 C.F.R. § 1508.27 ......................................................................30, 31, 34, 36, 38
43 C.F.R. § 1601.0-2 ............................................................................................5
43 C.F.R. § 1610.5-3 (a) .......................................................................................4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## GLOSSARY OF TERMS

| | |
|---|---|
| 2016 RMP FEIS | 2016 Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon |
| ASQ | Allowable Sale Quantity |
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| DNA | Determination of NEPA Adequacy |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy & Management Act |
| FONSI | Finding of No Significant Impact |
| HLB | Harvest Land Base |
| LSR | Late Successional Reserve |
| N126 Project | N126 LSR Landscape Plan Project |
| NEPA | National Environmental Policy Act |
| Northwestern RMP | 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan |
| Plaintiffs | Cascadia Wildlands and Oregon Wild |
| RMP | Resource Management Plan |
| Siuslaw Project | Siuslaw HLB Landscape Plan |
| Southwestern RMP | 2016 Southwestern Oregon Record of Decision and Resource Management Plan |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## INTRODUCTION

As this Court already found in recommending denial of Defendants' motion to dismiss, the BLM has committed itself to logging in the Siuslaw HLB; thus, Plaintiffs may challenge the BLM's Siuslaw Project NEPA analysis now, before the BLM takes any particular implementation step. ECF19 at 8–9. This case focuses on the adequacy of that analysis.

Specifically, Plaintiffs raise procedural NEPA claims surrounding the BLM's decision to log all available acreage within the Siuslaw District's HLB land-use allocation over the next few decades. The BLM concluded that this logging will not have a "significant" impact for purposes of NEPA, AR 1, but this conclusion is fundamentally flawed because the agency failed to first take the requisite "hard look" at the Project's impacts.

In making its "no significance" determination, the BLM preemptively eliminated from consideration 42 different issues or values that would be impacted and are related to relevant substantive standards within its governing RMP. The BLM reasoned that these issues were not related to the Project's purpose and need of generating timber volume, or were either already analyzed in the 2016 RMP FEIS, or would be addressed later at the individual timber sale level. Thus, according to the agency, no analysis of these issues was necessary to assess the Project's significance and inform the decision, AR 128; analysis of these various resources was considered "unnecessary detail." *Id.* This approach violates NEPA in several respects.

Whether the environmental impacts are directly related to the purpose and need, or whether they go "beyond" what was addressed in the RMP FEIS is not the appropriate test of significance pursuant to NEPA and its implementing regulations, nor is it an appropriate test of which issues are relevant to the decision. Critically, the analysis that was conducted in support of the RMP to which the agency attempts to "tier" was done at an enormous scale (2.5 million

MEMORANDUM IN SUPPORT—1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

acres) and lacks site-specific details that are required to inform site-specific project implementation—as this Court already has found. *Cascadia Wildlands v. BLM ("Thurston I"),* 410 F. Supp. 3d 1146, 1158 (D. Or. 2019) (holding that the RMP's "[EIS] did not analyze site-specific geographic conditions or effects"). Moreover, later analysis and data collection has no bearing on the decision the BLM already has made, nor can it retroactively cure procedural injuries. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1085 (9th Cir. 2011) (post-decisional data gathering upends NEPA's purposes—careful consideration of environmental effects and facilitation of meaningful public involvement).

The deferral or absence of the BLM's "hard look" at the Project's environmental impacts circumvents the influence the NEPA process is designed to have on the BLM's decision. The NEPA process is designed to present the decisionmaker with a choice between varied alternatives so that a path that balances impacts and outcomes pursuant to the Federal Land Policy and Management Act's multiple use mandate can be achieved. When the BLM's portrayal of these impacts is controversial or debatable, or some important factor is missing or improperly weighed, NEPA invites public participation and critique to assist the agency's ultimate decision. *Thurston I,* 410 F. Supp. 3d at 1158. Pursuant to the BLM's RMP, the decision on where and how to log is to be informed by a host of different and sometimes conflicting values that the decisionmaker must balance.

Because the BLM failed to undertake an analysis of impacts beyond those related to the generation of commercial timber volume, the decision-maker is invariably left with a choice between empty alternatives. With no established baseline and no effectual weighing of impacts, no proper comparison can occur. The approach preordains the outcome that best helps the agency meet its ambitious self-selected timber targets selected and, thereby, guts the efficacy of

MEMORANDUM IN SUPPORT—2

the NEPA process by eliminating public critique and a true weighing of costs and benefits. As

demonstrated below, this novel NEPA scheme is unlawful.

**LEGAL FRAMEWORK AND STANDARD OF REVIEW**

**I.    The National Environmental Policy Act**

"In NEPA, Congress recognized the 'profound impact' of human activities, including

'resource exploitation,' on the environment and declared a national policy 'to create and

maintain conditions under which man and nature can exist in productive harmony.'" *Ctr. for*

*Biological Diversity v. United States DOI*, 623 F.3d 633, 642 (9th Cir. 2010) (citing 42 U.S.C.S.

§ 4331 (a)).[4] To this end, NEPA and its implementing regulations set forth "action-forcing"

procedures designed to (1) ensure agencies take a "hard look" at the environmental effects of

proposed actions, and (2) foster meaningful public participation. *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA requires Federal agencies to prepare and publicly disclose a "detailed statement"

describing the environmental impacts of and alternatives to any major federal action which may

"significantly affect[] the quality of the human environment." 42 U.S.C.S. § 4332 (c).

Commonly known as an environmental impact statement, or "EIS," the statement must contain a

"full and fair discussion of significant environmental impacts" and describe "reasonable

alternatives which would avoid or minimize adverse impacts." 40 C.F.R. § 1508.11, § 1502.1;

*see also* *Te-Moak Tribe of W. Shoshone of Nev. v. United States DOI*, 608 F.3d 592, 602 (9th

Cir. 2010).

To determine whether an action will have significant environmental effects, an agency

may prepare an environmental assessment, or "EA." 40 C.F.R. § 1501.5(a-c). Although less

---

[4] Cases have been cleaned up, with internal citations omitted, unless otherwise noted.

MEMORANDUM IN SUPPORT—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

comprehensive than an EIS, an EA must contain detailed analyses of project impacts and alternatives. *Te-Moak Tribe of W. Shoshone of Nev.,* 608 F.3d at 602–03 (citing 40 C.F.R. § 1508.9(b)). If the agency does not prepare an EIS, it must provide a "convincing statement of reasons to explain why [the] project's impacts are insignificant" in a finding of no significance ("FONSI"). *350 Mont. v. Haaland*, 29 F.4th 1158, 1163 (9th Cir. 2022); *Metcalf v. Daley,* 214 F. 3d 1135, 1143 (9th Cir. 2000) ("The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or to issue a [Finding of No Significant Impact].") (citing 40 C.F.R. § 1508.9)).

## II.    The Federal Land Policy & Management Act

Congress enacted the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C.S. § 1732, to ensure that our public lands are "managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values . . . that will provide food and habitat for fish and wildlife . . . and that will provide for outdoor recreation." 43 U.S.C.S. § 1701 (a)(8).  To achieve these goals, FLPMA requires the BLM to develop a land use planning process and draft resource management plans ("RMPs") that govern the use of BLM-administered land. 43 U.S.C.S. § 1701 (a)(2), § 1712. An RMP defines the values for which the BLM must manage the land to which it applies and contains substantive standards by which to do so. Once the plan has been adopted, the BLM must manage its lands in compliance with, and ensure that any site-specific projects conform to the applicable RMP. 43 U.S.C.S. § 1732; 43 C.F.R. § 1610.5-3 (a); *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). An RMP does not analyze or authorize any specific projects; an RMP is a preliminary step in the overall process of managing public lands and is intended to guide and control future management actions and the development of subsequent

MEMORANDUM IN SUPPORT—4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

projects. 43 C.F.R. § 1601.0-2. AR 9385-6. During the development of such projects, the BLM must conduct a site-specific analysis of environmental conditions and potential impacts and ensure that the project's effects are consistent with the governing RMP and all other relevant law. AR 9584. In other words, the NEPA analysis must address how the proposed action will comply with the RMP. *See Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1109 (9th Cir. 2010); *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005); 40 C.F.R. § 1502.2 (d).

**III.     The Administrative Procedure Act**

Plaintiffs allege violations of NEPA and its implementing regulations, which are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C.S. § 701-6. The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve such claims. *Nw. Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994)

Under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, or otherwise unlawful. 5 U.S.C.S. § 706(2). An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," or offered an explanation "that runs counter to the evidence before the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Reviewing courts "may not rubber-stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003).

///

///

///

MEMORANDUM IN SUPPORT—5

## FACTUAL AND PROCEDURAL BACKGROUND

This Court in its F&R denying Defendants' motion to dismiss highlighted key background information. ECF19 at 2–3. Plaintiffs will not repeat that discussion and instead provide this supplemental information as a backdrop for resolving the claims argued herein.

## I.    The 2016 Resource Management Plans and Final Environmental Impact Statement

In 2016, the BLM adopted its 2016 Northwestern and Coastal Oregon Record of Decision and RMP ("Northwestern RMP"), which provides "overall direction for the management of all resources" on approximately 1.3 million acres of BLM-administered lands, including the Siuslaw Field Office and the Siuslaw Project area. AR 7474–790 (RMP); AR 127.

The management objectives of the Northwestern RMP include, in relevant part, to provide a sustained yield of timber, enhance the health and stability of forest stands, prevent the introduction of invasive species, maintain older and more structurally complex conifer forests, contribute to the conservation and recovery of threatened and endangered species, provide clean water in watersheds, provide recreation opportunities, maintain and enhance carbon sequestration, and restore fire-adapted ecosystems. AR 7482. These objectives guide the management decisions for all BLM lands in Northwestern Oregon. AR 7584.

To achieve these objectives, the Northwestern RMP sets substantive standards and guidelines for managing a broad range of resource values, including for, *inter alia*, forest health and stability; fire, fuels, and wildfire management; fisheries; water quality and aquatic biodiversity; invasive species; rare, sensitive, and ESA-protected plants; recreation and visual resources; big game animals and habitat; soil function, health, and disturbance levels; special-status and ESA-protected wildlife; and wildlife habitat. AR 7557–83.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

The Northwestern RMP divides BLM-administered land between five specific land use allocations, each with different management objectives and directions that identify which future actions may or may not be allowed within a particular area. AR 7528. The Siuslaw Project is categorized as Harvest Land Base ("HLB"), managed primarily to "achieve continual timber production that can be sustained through a balance of growth and harvest" in accordance with FLPMA and the Oregon and California Railroad Lands Act ("O&C Act"). AR 7540.[5] Management directives specific to the HLB also include restoring and maintaining habitat for sensitive species; promoting the development of structural complexity; and retaining large trees. AR 7540–41. While the HLB is primarily focused on timber production, the BLM must conduct harvest "consistent with [RMP] management direction" and "may elect to defer harvest at particular times on particular stands in the ["HLB"] for reasons described in the management direction and this appendix." AR 7585–86.

In support of the Northwestern RMP, the BLM produced a four-volume final EIS ("2016 RMP FEIS"), which analyzed the impacts of and considered alternatives to the Northwestern RMP, as well as the RMP for Southwestern Oregon. AR 7836–9937. This "programmatic" FEIS thus broadly analyzed management direction for BLM-administered lands across 2.5 million

---

[5] Most BLM-administered lands in western Oregon are subject to the O&C Act, which directs the BLM to manage the lands "in conformity with the [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow . . . and providing recreational [facilities]." 43 U.S.C.S. § 2601. It also requires the BLM to set an Allowable Sale Quantity ("ASQ"), which reflects the amount of timber harvest that an area can sustain on a permanent basis while also supporting the other purposes of the O&C Act. *Id*. The BLM's management decisions must therefore balance its obligations under FLPMA, the O&C Act, and the Endangered Species Act ("ESA"), which requires the agency to protect and support the recovery of the northern spotted owl and the marbled murrelet. *See Klamath Siskiyou Wildlands Ctr. v. United States Fish & Wildlife Servs.*, No. 1:21-cv-00058-CL, 2022 U.S. Dist. LEXIS 52565, at *3 (D. Or. Mar. 23, 2022). The RMP does not dictate how BLM districts must achieve their ASQ and permits up to forty percent variation from ASQ on an annual basis and up to twenty percent variation on a decadal basis. AR 126.

MEMORANDUM IN SUPPORT—7

acres of Western Oregon. AR 7476, 9375, 9497, 9505. Vegetation, hydrology, geology, wildlife, fire history, proximity to human development, and past resource use vary widely across this expansive planning area. AR 9498–99.

Because the 2016 RMP FEIS covers the entire 2.5-million-acre planning area, and the RMPs themselves represent only "a preliminary step" in the land-management process. AR 9385–86. The 2016 RMP FEIS describes and analyzes the planning area and the anticipated impacts of implementing the RMPs, with a high level of generality. The document is intended to provide a *30,000-foot view* of the BLM's overall management objectives, not a detailed discussion of specific areas or activities. *See* AR 7484 ("BLM will carry out additional decision-making, including NEPA compliance, [ESA] consultation, and other consultation, as appropriate, before authorizing any future actions and implementation decisions that result in on-the-ground activities"); AR 7585 ("As the BLM plans and analyzes implementation actions, the BLM will have better and more specific information on the location, scope, and timing of proposed implementation actions, and site-specific conditions for project level NEPA compliance.").

This point is noted throughout the 2016 RMP FEIS, which repeats the limitations inherent in this broad scale of analysis. *See e.g.*, AR 9502, 9506, 9547–50, 9554, 9572, 9597, 9664, 9675–56, 9725. While a range of expected effects are identified, the analysis reflects the overall impact of implementing both RMPs over the entire 2.5 million acres for 50 years or more. AR 9506 ("For the purpose of this analysis, the BLM assumed full and immediate implementation of each of the alternatives and the Proposed RMP."). In short, the 2016 RMP FEIS broadly estimates impacts across all of western Oregon BLM lands and states that the agency will conduct project site-specific follow-up analysis to implement the plan.

///

MEMORANDUM IN SUPPORT—8

## II.     The Siuslaw Project

The Project authorizes commercial logging—largely through "regeneration" harvest, colloquially known as clearcutting—on 13,225 acres of BLM-administered forestland directly west of Eugene, Oregon. AR 125, 11–13. The Project's stated purpose is to "harvest timber in conformance with management direction in the [Northwestern RMP] . . . to contribute timber volume to the [ASQ]" for the Siuslaw Field Office. AR 14, 126. The commercial logging operations proposed by the alternatives, especially clearcutting, are associated with a host of environmental impacts, including disturbing soils, AR 225, causing erosion into streams, AR 216, destroying or degrading wildlife habitat, AR 237, releasing stored carbon into the atmosphere, AR 207, modifying fuel conditions and fire behavior, AR 181, spreading invasive weeds, AR 202, degrading scenery, AR 223, interfering with recreation, AR 224, and more.

In the Siuslaw EA, the BLM considered six alternatives. All but the "no action" alternative would achieve ASQ through clearcutting and/or commercial thinning, with varying levels of tree retention, methods of site preparation and logging slash disposal, snag creation, and rotation age. AR 135.[6] For example, Alternative 2 would rely solely on thinning, with no clearcuts, while Alternative 3 would rely primarily on thinning, with some clearcuts. AR 136.[7]

To analyze the effects of these alternatives, the BLM solicited input from the public and interdisciplinary agency experts and identified 47 environmental issues associated with the Project, including soils; invasive species; and Special Status Species, including ESA-listed

---

[6] "Rotation age" is the "planned number of years between the establishment of [a] . . . forest stand and its regeneration harvest"—i.e., the age at which a stand will be clearcut. AR 138.
[7] The BLM declined to consider several other alternatives incorporating elements that did not involve such intensive logging, such as "retain the largest size class of trees in the stand" and "maximize retention in logging units." AR 137.

MEMORANDUM IN SUPPORT—9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

species and Bureau Sensitive Species. AR 128–30.[8] However, the BLM excluded 42 issues from detailed consideration on the grounds that "analysis of [these issues] isn't necessary to evaluate how the alternatives respond to the Purpose and Need and there is no potential for significant effects beyond those described in the [FEIS and Northwestern RMP]." AR 129–30, 208.[9]

Consequently, within the Siuslaw EA, the BLM did not fully consider or disclose the impacts to, *inter alia*, fish populations and aquatic habitat; water supply, sedimentation, and water quality; invasive species; rare or sensitive plants; carbon sequestration and greenhouse gas emissions; soil disturbance, productivity, and erosion; landslide potential; tree resistance to drought or insects; forest structure; snag retention and recruitment; recreation; northern spotted owls, their habitat, and their prey animals; marbled murrelets; wildlife habitat and habitat fragmentation; or special-status wildlife species. AR 129–30, AR 481–99 (Plaintiffs raising these concerns with the agency). Instead, the BLM analyzed only five issues, including "how [ ] timber harvest [would] meet the Siuslaw Field Office's contribution to the . . . declared ASQ." AR 128–29.[10] Two of the remaining four issues considered (1) "How does regeneration harvest adjust the age class distribution" and (2) "How would timber harvest create complex early-successional ecosystems" also simply boil down to how much the BLM will log, the agency rationalizing more clearcutting was better. AR 128–29, AR 14–15. The remaining two issues analyzed were "changes to wildfire hazard and resistance, and changes to wildfire risk." AR 14.

---

[8] Special Status Species are those whose habitats have declined to well below historic levels or are associated with naturally rare habitats, such as springs or seeps. AR 248. Bureau Sensitive Species are those that require special management consideration to avoid potential future listing under the ESA. AR 13306.

[9] This language is repeated, with only slight variations, for each of the 42 issues excluded from detailed analysis. AR 201–60.

[10] It concluded that all action alternatives would, in fact, meet the ASQ target. AR 149.

MEMORANDUM IN SUPPORT—10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

As a further rationalization for dismissing issues from detailed consideration, the BLM promised follow-up, site-specific analysis at some point in the future while planning or monitoring the implementation of individual timber sales. *See* AR 127, 202, 203, 209, 225. Specifically, the BLM promises to later utilize "Determinations of NEPA Adequacy (DNA)" to determine whether "a specific project would occur within . . . stands of similar structural condition, harvest sideboards, and effects to site-specific resources which represent a sub-set of total effects disclosed in this programmatic Environmental Assessment." AR 127. The BLM also states that in some cases, like for soils and invasives, the BLM will mitigate negative impacts after timber sale implementation. AR 225. Accordingly, the EA heavily relies upon the implementation of different Project Design Features that will only be designed and laid out at the timber sale planning phase. AR 298–311.

It is clear, however, that during Project planning, the BLM had gathered data and information relevant to site-specific effects that could have been analyzed and disclosed in the NEPA process. The BLM had mapped out where the proposed logging would occur, *see, e.g.*, AR 3328, AR 3279, and surveys and data collection were taking place prior to the final decision. As an example, on May 7, 2020, the BLM requested a "variance" from the U.S. Fish and Wildlife Service to log and remove "structurally complex habitat in the range of the marbled murrelet" contained within the Mill Valley Timber Sale, a timber sale planned under the Siuslaw Project. AR 3380. In that variance, the BLM disclosed a substantial amount of site-specific forest stand data, AR 3380–82, based on site-specific surveys and data collection:

> the Field Office has significant investment of resources in this stand. Stand exams, cadastral reconnaissance, and botany surveys have already been completed and the BLM has legal access to the stand. Wildlife surveys for [marbled murrelets] and [northern spotted owls] are currently occurring. This stand was submitted to the Level 1 Team in the decadal projected project categories amounts (2019.08.16).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

AR 3382. Thus, over two years before the DR was signed, BLM had been conducting site-specific surveys for specific timber sales under the Project, meaning that this data was available and accessible and could have been disclosed so that both the decisionmaker and the public could properly consider it. As another example, this Court noted the BLM's plans with respect to the "Power Down" timber sale. ECF19 at 9 n.2. This sale was originally scheduled for August 2023, less than six months after the Project DR, *see* ECF14-1 at 2, demonstrating that this sale was being planned concurrently with the Project's decisionmaking process.

During Project planning, the BLM was also actively planning and analyzing an adjacent project: "N126 LSR Landscape Plan Project" ("N126 Project"). The N126 Project targets nearly all of the Siuslaw District's reserve allocations for commercial logging, AR 1985, while the Siuslaw Project targets the District's HLB allocated lands. AR 127; AR 125 ("This project, along with the [N126 Project], continues this comprehensive management approach for the Siuslaw Field Office."). The two land allocations are tightly intermingled across the District, *compare* AR 3328 (map of Siuslaw Project units) *with* AR 2128 (map of N126 units), and the BLM was actively planning the two projects concurrently. The Scoping Letter for the Siuslaw Project was published on November 18, 2019, and the EA and FONSI finalized on March 31, 2022. AR 9. The BLM issued a preliminary draft EA for the N126 Project on December 3, 2018, and a full draft for public comment on May 15, 2020. AR 1991. The agency released the final N126 EA, FONSI, and DR on August 11, 2020, AR 3786, and issued two individual Determinations of NEPA Adequacy that tier to the N126 DR, the Pucker-Up Density Management Project, AR 18204–41, and the Gone Fishin' Density Management Project prior to the Siuslaw Decision. AR

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

18173–203.[11] But the Siuslaw EA only mentions the N126 Project a handful of times, and never analyzes the cumulative effects of the two Projects.

Based on the truncated analysis, the BLM concluded that the Siuslaw Project would have no significant environmental impact and selected "Alternative 4" for implementation. AR 15. The BLM selected this alternative because although it increased fire risk and hazard, a less intensive alternative, one that did not propose regeneration harvest, "would produce no complex early seral ecosystem, and would not contribute to an even age class distribution." AR 15. Alternative 4 relies heavily on "regeneration harvest" to meet the ASQ: 1,126–1,361 acres per decade would be clearcut and 278–944 acres commercially thinned. AR 13. The BLM signed the DR approving the Siuslaw Project on March 31, 2022. AR 16.

## III. Procedural History

On September 8, 2022, Plaintiffs filed their complaint, alleging violations of NEPA and the APA. ECF1. Along with their complaint, Plaintiffs filed a series of standing declarations from members of the Plaintiff organizations who demonstrate aesthetic and recreational interest in the Siuslaw Project area. *See* ECF1-1, 1-2, 1-3, 14-2; ECF19 at 3. On November 14, 2022, Defendants filed a motion to dismiss the complaint on standing and ripeness grounds. *See* ECF10. Plaintiffs responded, ECF14, Defendants replied, ECF15, and this Court heard argument on March 2, 2023. ECF18. On April 21, 2023, this Court issued its Findings and Recommendation ("F&R") recommending denial of the motion to dismiss, ECF19, which was adopted by Judge McShane in full. ECF22.

---

[11] Plaintiffs have challenged the BLM's approval of the N126 Project in a separate case, No. 6:22-cv-00767, now pending before this Court.

MEMORANDUM IN SUPPORT—13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

The F&R makes several notable findings that are relevant to the instant proceedings. First, this Court clarified the finality of the Project's environmental review: "Through the [EA], the BLM made a [FONSI], meaning that the BLM will not conduct any further environmental review at this scale before moving forward with the [Project]." ECF19 at 2–3. Second, this Court put to rest the notion that the Project is at too high of a level to facilitate meaningful review: "The BLM has identified and mapped out specific tracts on which it plans to authorize logging as part of the [Project]." *Id.* at 8. Ultimately, this Court found that "Plaintiffs can challenge the [NEPA analysis] before BLM takes any particular implementation step," *id.* at 9, underscoring the importance of the analysis presently at issue.

## ARGUMENT

The BLM's NEPA analysis suffered from a series of critical errors and omissions. As this Court already has found, through the Project the BLM has committed itself to logging the Siuslaw HLB. ECF19 at 8. Because, in NEPA parlance, the BLM has "irreversibly and irretrievably" committed resources, it was obligated to take a site-specific "hard look" at the Project's direct, indirect, and cumulative impacts. *See Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) ("[W]hen the agency makes a critical decision to act . . . the agency is obligated fully to evaluate the impacts of the proposed action."). The gravity of this analysis cannot be overstated: The BLM has now offered its "final word" that the impacts of logging the Siuslaw HLB will not be significant, and this conclusion will not be revisited. *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022). It is against this backdrop that the agency's analysis must be assessed.

MEMORANDUM IN SUPPORT—14

As discussed in detail below, the BLM decidedly flunked the NEPA test, and in many cases, failed to show up for the test altogether. For numerous key resource issues, the agency provided only cursory, incomplete analyses or simply did not analyze impacts at all. These errors manifested in straightforward NEPA violations: (1) the failure to take the required "hard look" at the Project's direct, indirect, and cumulative impacts, and (2) the failure to prepare an EIS. While the BLM served up a smattering of excuses for its deficient analysis, these excuses cannot substitute for the NEPA analysis that was required to occur *before* the agency approved the Siuslaw Project. Individually, or in the aggregate, these serious errors require vacatur and remand of the EA, DR, and FONSI.

## I.    NEPA Required the BLM to Consider Every Significant Aspect of the Siuslaw Project's Environmental Impacts.

As "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1, NEPA and the process it prescribes "is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* § 40 C.F.R. § 1500.1(c). AR 13651. The NEPA process can be complicated, and the BLM has a nearly 200-page manual on how to comply with the statute. AR 13639–822. But the overall framework of the statute is fairly straightforward. AR 13653.

At its core, "NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed action and inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Lands Council v. Forester of Region One of the United States Forest Serv.*, 395 F.3d 1019, 1026 (9th Cir. 2004); *see also* 42 U.S.C.S. § 4332 (c). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a "hard look" at environmental consequences." *Id.*

MEMORANDUM IN SUPPORT—15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

A "hard look" requires consideration of all foreseeable direct, indirect, and cumulative impacts. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002); 40 C.F.R. § 1508.1 (c) (agency "shall consider" direct, indirect, and cumulative impacts.). This includes evaluation of the additive impacts of the action on top of the environmental baseline, *see* 40 C.F.R. § 1502.15 (requiring agencies to "describe the environment of the area to be affected"), and a comparison to other alternative courses of action. *See* 40 C.F.R. § 1508.25(b) (agency "shall consider" alternatives). Importantly, if the hard look reveals the effects of the action "may" be significant, the decisionmaker cannot approve the action "unless it is either analyzed in an EIS or modified to avoid significant effects." AR 13730; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).

The analytical scope of the NEPA analysis is therefore critical. *See Kern v. United States Blm*, 284 F.3d 1062, 1072 (9th Cir. 2002). By "focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349. If, however, an agency dismisses issues from detailed consideration, the public and the decisionmaker are deprived of meaningful input and consideration and NEPA's purposes are thwarted. *Cf.* 40 C.F.R. § 1500.1(b) (environmental information must be made "available to public officials and citizens *before* decisions are made and *before* actions are taken") (emphasis added).

## II.    The BLM's Analytical Approach is Fundamentally at Odds With NEPA.

As discussed above, to inform which environmental issues the agency would analyze in detail in the EA, the BLM gathered internal and external comments to compile a set of issues considered for analysis. AR 128. This process identified 47 different environmental issues. *See*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*id.*; AR 129–30. Consideration of this wide range of issues would make sense, given that the Project would affect approximately 13,000 acres of forests, including structurally complex, mature and old-growth forests over the next few decades. AR 125; AR 3380 (complex forests over 400 years old). Heavy logging of these forests would inherently affect all of the identified issues and implicate "management direction" found in the RMP related to these issues.

The BLM, however, eliminated 42 of these issues from "detailed consideration." AR 2. As justification, BLM purported to rely on its NEPA handbook, which provides that the agency is to analyze an issue if that analysis is necessary to (1) make a reasoned choice among alternatives or (2) determine the significance of effects. AR 128; *see also* AR 13729. However, the BLM here added critical qualifications to this guidance. Specifically, if an issue was not *directly* correlated with the agency's purpose and need of timber production, it was not considered in detail. *Id.* As to significance, if, according to the BLM, an issue was addressed in the 2016 RMP FEIS or would be addressed at the individual timber sale level, it was also not analyzed in detail. *See, e.g.*, AR 225 (the "Proposed RMP/Final EIS examined the issue of treatment related soil disturbance in detail, to which this analysis is tiered"); *id.* (promising further on-the-ground evaluation and adaptive amelioration).

These purported justifications fail as a matter of law. *See Lands Council v. Forester of Region One of the United States Forest Serv.*, 395 F.3d at 1026 ("An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of the problem[.]"); *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010) ("an agency cannot define its objectives in unreasonably narrow terms").

First, the BLM's purpose and need cannot strictly dictate the scope of issues to be considered in detail. A similar agency effort was squarely addressed in *Oak Ridge Envtl. Peace*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Alliance v. Perry* where the court rejected the argument that "the purpose and need statement sets a rigid outer boundary for—in their words, that it 'dictates'—the alternatives that may legally be considered." 412 F. Supp. 3d 786, 838 (E.D. Tenn. 2019). The Court explained that "the definition of purpose only sets the "contours" for the agency's exploration of available alternatives; the failure to include certain considerations in the definition of purpose does not foreclose the agency from incorporating those considerations into the overall analysis." *Id.*; *accord* 40 C.F.R. § 1502.13; AR 13684 (explaining role of purpose and need statement). In other words, the purpose and need for an agency's action does not bypass the requirement in NEPA that the agency consider different environmental effects that action might have.

Instead, the "considerations made relevant by the substantive statute driving the proposed action must be addressed in the NEPA analysis." *See Or. Nat. Desert Ass'n v. BLM , 625 F.3d 1092, 1109-10 (9th Cir. 2010).* Here, the substantive statute is FLPMA, which requires BLM to comply with management direction found in the RMP. As discussed above, this pertains to multiple resource issues. *See supra* at pp. 6–7; *Native Ecosystems Council*, 418 F.3d at 963 (while the analysis need not be perfect, the court "must still be able reasonably to ascertain from the record" that the agency is in compliance with the plan standard).

Second, the attempt to "tier" to the 2016 RMP FEIS's NEPA analysis already has been rejected by the Court. *See generally*, *Cascadia Wildlands v. BLM,* 410 F. Supp. 2d 1146 (D. Or. 2019). While tiering in certain contexts is certainly permissible, *see, e.g.*, 40 C.F.R. § 1502.20 (encouraging agencies to tier their analyses to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review), courts "may reject such environmental review where none of the documents address significant issues." *Thurston I,* 410 F. Supp. 3d at 1158-59.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

In *Thurston I*, the BLM admitted there would be local increases to fire risk and hazard from its proposed logging, and it "discussed the issue in the local context but eliminated it from detailed analysis" because it claimed these issues were analyzed in the 2016 RMP FEIS. *Id.* at 1157. The Court rejected this justification on grounds that the 2016 RMP FEIS "did not analyze site-specific geographic conditions or effects on the immediate area, nor did the Project Environmental Assessment." *Id.* at 1158. The Court reasoned that the BLM improperly diluted the proposed action's effects by analyzing it as part of the 1.3-million-acre planning area, *id.* at 1157, and relied upon established Ninth Circuit precedent for the principle that an "agency cannot minimize an activity's environmental impact by adopting a broad scale analysis and marginalizing the activity's site-specific impact." *Id.* The same problem is present here, given the vastly different scale of this site-specific Project versus the RMP.

Third, the BLM asserted that it would gather information later for certain issues, when laying out individual timber sales and monitoring their implementation. But future data collection cannot be the basis for the decision which the BLM has already made—that the effects of the Siuslaw Project will not be significant. While the Forest Service may, or may not, undertake further NEPA review at the site-specific level for individual projects, it was incumbent on the Forest Service *at this stage* to analyze the "combined and synergistic" impacts from the Siuslaw Project. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 494 (9th Cir. 2011); *see also Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 at 869 (discussing the need to consider the "total environmental impact of the full picture"). Indeed, "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done." *Kern*, 284 F.3d at 1072; *see also* 40 CFR 1502.4(b) ("Agencies shall prepare statements on broad actions so that they are

MEMORANDUM IN SUPPORT—19

relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.").

Thus, the BLM's excuses for not considering numerous key issues in reaching its FONSI are not valid and run counter to regulation and established legal precedent. The agency cannot play a "shell game" with its NEPA analysis; the BLM was required to supply the required site-specific analysis *before* it approved the Project and "irreversibly and irretrievably" committed resources, at a time when it retained a "maximum range of options." *Conner*, 848 F.2d at 1446.

**III.    The BLM Failed to Take a Hard Look at the Project's Direct, Indirect, and Cumulative Impacts.**

Lacking any support for its refusal to analyze in detail the 42 key environmental issues, the BLM's analysis stands or falls on the information provided in the Siuslaw Project EA itself. *See Blue Mts. Biodiversity Project v. Blackwood, 161 F.3d 1208, 1214 (9th Cir. 1998)* (the EA is "where the Forest Service's defense of its position must be found"). As elaborated upon below, the BLM failed to take a "hard look" at the 42 different environmental issues, including several which were necessary to assess compliance with the 2016 RMP. In particular, the agency failed to establish baselines for these issues, failed to quantify and analyze site-specific impacts, and failed to account for cumulative impacts in violation of NEPA regulations and decades of precedent. The BLM's failure to take a hard look at these issues condemns its decision.

**A.    The BLM Failed to Analyze and Disclose the Project's Direct and Indirect Impacts, Additive to the Environmental Baseline.**

An analysis of a Project's impacts necessarily begins with an inventory of the current conditions of a project area, called the "environmental baseline." Establishing an environmental baseline before a project begins is "critical to any NEPA analysis." *Great Basin Res. Watch v. BLM, 844 F.3d 1095, 1101 (9th Cir. 2016).* Unless the agency assesses the existing conditions in

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

the project area, "there is simply no way to determine what effect the project will have on the environment and, consequently, no way to comply with NEPA." *Id.* As this Court has made clear: "To comply with NEPA's 'hard look' mandate, courts have held that agencies are obligated to maintain a current inventory of resources so that an adequate baseline exists to evaluate the environmental impacts of a proposed action. It is against baseline information that environmental impacts are measured and evaluated; therefore, it is critical that the baseline be accurate and complete." *Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012); *see also Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016).

Here, the BLM failed to establish an appropriate baseline for multiple resource issues. Lacking this foundational starting point, the agency was unable to carefully analyze the significance of the Project's direct and indirect impacts. Three key resource issues are representative of the BLM's failure to establish baseline conditions and attendant failure to take a "hard look." Each of these issues is directly tied to the agency's obligation under FLPMA to ensure compliance with the 2016 RMP. *See Native Ecosystems Council*, 418 F.3d at 965; (discussing need to disclose whether project complies with land management plan); 40 C.F.R. § 1502.2(d); *Or. Nat. Desert Ass'n*, 625 F.3d at 1109-10.[12]

### 1.    The BLM Failed to Take a Hard Look at Soil Disturbance.

The Northwestern RMP imposes a specific limit on the allowable extent of detrimental soil disturbance within a particular treatment area: 20%. AR 7570 ("Limit detrimental soil disturbance from forest management operations to a total of <20 percent of the harvest unit area."). The BLM acknowledges that its logging operations will detrimentally disturb soils in a

---

[12] As previously explained, the BLM did virtually no site-specific analysis and thus lacks an adequate baseline for most of the resource values and conditions. Its treatment of the issues below is merely illustrative of this issue.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

variety of ways, *see* AR 225 ("compaction, topsoil displacement and organic matter removal, rutting from the use of heavy equipment and the drag action of log yarding,"), and that logging operations detrimentally impacted parts of the Project area previously that resulted in an existing or baseline level of soil disturbance that is highly site-specific. *See* AR 1767 (soil specialist report discussing "long lasting" soil impacts from prior harvest that correlates generally with prior "harvest intensity"); *see also* AR 921–23 (soil specialist discussing soil disturbance levels as dependent on past treatment).

Thus, to determine compliance with the RMP 20% soil disturbance standard, BLM was obligated to establish baselines for each harvest unit area, and then determine what effects various alternative logging practices would have on existing soil disturbance levels. This would dictate if logging is permitted or what logging techniques should be considered. *See* AR 223 ("[A]ll harvest activities increase detrimental soil disturbance above existing levels; however, the magnitude of that increase is highly dependent on treatment method and site-specific factors"); AR 921–23 (soil specialist discussing different yarding techniques and predicted effects to soil disturbance levels and what practices would allow the BLM to stay under the 20% level).

BLM's soil specialist describes how this can be done at the site-level:

> A determination of the [HLB] project impacts on soil quality is made using the same methods and assumptions described in the RMP, but is quantified at the project-area and treatment-unit scale utilizing local spatial data, soils and geology information sources, and treatment information. The finer spatial scale of this analysis enables greater precision, historic disturbance quantification, and site-specificity in assessing local soil quality impacts than the spatial scale of the RMP.

AR 3839.

Despite availability of a site-specific analysis approach, BLM contended that it could not determine soil baselines at the treatment-unit scale or harvest unit area here given the decision to analyze the Project at such a large scale, the 13,225-acre Project area. AR 1768–69

MEMORANDUM IN SUPPORT—22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

("[d]etrimental soil disturbance calculations [] are intended to be calculated at the timber harvest treatment area," however "individual field site assessment was not feasible at the scale of this analysis"). But the BLM "had a duty to assess, in some reasonable way, the actual baseline conditions" in the Project area. *Jewell*, 840 F.3d at 569.

In the absence of actual site-specific information, the BLM attempted to justify compliance with the RMP 20% standard by *averaging* predicted levels of soil disturbance across the entire Project across a decadal timeline. *See* AR 1768–69 ("Scale" and "Methods and assumptions" section); AR 3838 ("In order to determine whether this project will comply with the RMP 20% detrimental disturbance threshold, detrimental soil disturbance needs to be quantified for the project treatment area."). However, given that the required unit of analysis in the RMP is admittedly harvest unit scale, any conclusions from this averaging process do not have any bearing on whether the RMP is actually being followed.

The BLM admits this replacement, averaging technique is based on guesswork. AR 921–23 (soil analysis based upon a "real quick guess of what would be logged in certain ways"); AR 3841 ("[T]his analysis assumed an HLB logging system design that would treat 17% of the treated acres with ground-based or specialized harvest methods, and 83% with cable or aerial harvest methods."). This guesswork is meaningless because it did not reflect the reality of the BLM's proposed logging, *see* AR 921–22, and "many factors which control soil disturbance can only be quantified at the project scale, including the impacts of logging system design and the use of design features, fuels treatment selection, best management practices, and ameliorative actions that would reduce soil disturbance (FEIS pg. 752)." AR 3840. The BLM's soil specialist report has an entire section titled "Justification of Site-Specific Soil Analytical Approach" undermining its reliance on its project-wide averaging approach. AR 1769–70; *cf. Or. Nat.*

MEMORANDUM IN SUPPORT—23

_Desert Ass'n v. Rose_, 921 F.3d 1185, 1191 (9th Cir. 2019) (holding that "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification" for why the agency could not provide more "definitive information").

A very similar averaging approach by the BLM was addressed by the Ninth Circuit in _Brong_. There, the BLM was required to retain between eight and twelve snags per acre when conducting salvage logging. _Brong_, 492 F.3d at 1129. The BLM represented that it was meeting this acre-level standard by averaging snag retention across the entire area to be logged, despite the fact that certain areas would be completely stripped of all trees. _Id._ The court found that "BLM's representation that between eight and twelve large snags per acre will still be standing after the logging occurs is grossly misleading." _Id._ at 1129–30. The BLM is using the identical, "grossly misleading" approach here. Although the RMP mandates the 20% soil threshold is measured at the harvest unit level, BLM here is averaging soil disturbance across the entire project area in order to represent that it will not exceed this threshold. AR 3350 ("specialist report to demonstrate more clearly why we project our soil disturbance estimates will remain below 20% for the HLB project.").

As a fallback, the BLM attempted to rely on the 2016 RMP FEIS. _See_ AR 230. But that document states specifically that "the BLM does not have sufficient information to quantify detrimental soil disturbance … at [the FEIS] scale of analysis. _That level of detail should occur at the project level analysis_." AR 8999 (emphasis added). Thus, the BLM's tiering efforts here run directly counter to the very document to which the BLM attempts to tier.

In summary, the BLM concedes that the Project will detrimentally impact soils and implicate compliance issues with mandatory RMP directives. AR 225. The BLM admits it can gather the requisite information at the harvest unit level, it just has chosen not to and employed

MEMORANDUM IN SUPPORT—24

an averaging approach across the wrong analytical scale to skirt the RMP requirement. *See* AR

3839 (soil impacts can be "quantified at the . . . treatment-unit scale utilizing local spatial data,

soils and geology information sources, and treatment information"). Given that soil information

is "highly dependent on treatment method and site-specific factors," this averaged baseline

approach is simply not accurate and flouts the NEPA requirement to ensure scientific integrity,

especially given that the threshold standard in the RMP explicitly applies to an individual

treatment unit. AR 223. This is a violation of NEPA. *Jewell*, 840 F.3d at 569. (NEPA analysis

must "succinctly described the environment of the area(s) to be affected by the alternatives under

consideration, and insure that environmental information is available to public officials and

citizens before decisions are made and before actions are taken. Accurate scientific analysis is

essential to implementing NEPA").

> ### 2.    The BLM Failed to Take a Hard Look at Noxious Weeds and Invasive Species.

The Northwestern RMP provides the following management objective for invasive

species: "Prevent the introduction of invasive species and the spread of existing invasive species

infestations." AR 7561. In the Siuslaw District, invasive species are admittedly a major problem,

and the Project area itself falls in watersheds considered at "high to highest risk" for introduction

and spread of invasive plant species due to timber harvest and road construction. AR 202.

The BLM admits that baseline amounts of existing weeds in a specific area strongly

influences the risk that operating/logging in that specific area will spread invasive species. AR

202 ("Risk was higher where there were more existing weeds, and more expected disturbance.").

For past projects, the BLM has documented and measured existing weed cover, which allowed

the BLM to predict the level of "increases that could be expected in the particular locale after a

MEMORANDUM IN SUPPORT—25

timber sale." AR 201. Based on botanical surveys conducted between 2010–2019, the BLM has mapped the acres of invasive species in the Project area. AR 201.

Despite (1) the admitted importance of establishing baselines around where invasive and noxious species are concentrated, AR 202, and (2) disclosing that the agency has available mapping data in the Siuslaw Project area from recent botany surveys, *id.*, the BLM did not disclose where these weeds are *in relation* to the Siuslaw Project timber sale units, in order to establish actual baseline conditions for the Project. Troublingly, actual disclosure and consideration of this issue could have altered the Project's outcome. *See* AR3514 (BLM's Botanist explaining that invasive species impacts could inform the decision: "We could, for example, choose the all thinning alternative to lessen effect"). The failure to take a hard look at invasive species was particularly egregious here where BLM expressly admits that the action alternatives "would have potentially significant effects concerning invasive species." AR 202. Indeed, an "indirect effect of the project is that it adds to the overall inability to successfully control weeds on the Siuslaw Field Office." *Id.*

Instead of analyzing the issue in detail, the agency—like for nearly all of the 42 issues dismissed from detailed consideration—fell back on the 2016 RMP FEIS. But that programmatic document cannot resuscitate the incomplete site-specific analysis here. The 2016 RMP FEIS explains that "[w]hether an alternative would result in actual introduction and spread of invasive plant species in any specific watershed would depend on a variety of project-specific, watershed-specific, and species-specific factors that cannot be analyzed at this scale of analysis." AR 9818. And it points to implementing measures to prevent the introduction of invasive species and the spread of existing invasive species," AR 9818–19, but "did not detail their extent or expected level of success." AR 202; *Cf. Nat'l Parks*, 241 F.3d at 734 ("A perfunctory description, or mere

MEMORANDUM IN SUPPORT—26

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact.").

The BLM also attempted to "kick the can down the road." The BLM pointed to project design features to be implemented at the individual timber sale level: "Depending on assessment outcomes and field office weed treatment priorities, BLM would treat weed species prior to project activity and monitor for at least three to five consecutive years after timber sale completion, controlling infestations of invasive plant species." AR 298. This sounds thorough, but BLM admits this weed control is unlikely to actually occur given agency resources. AR 202 ("It is likely that much of the weed infestations expected to result from the action alternatives will not be adequately controlled given current resources.").

This underscores the importance of a valid NEPA analysis at the outset, which would allow for weighing different mitigating techniques or logging practices in specific areas with varying levels of infestation and proactively making a decision that is best for a specific site. Again, the BLM is obligated "to ensure that data exists before approval so that [it] can understand the adverse environment effects *ab initio*." *N. Plains Res. Council*, 668 F.3d 1067, 1085. As the Ninth Circuit has made clear, monitoring and mitigation are "not a panacea for inadequate data collection and analysis" because they have no effect on "informed decision-making and public participation, and on the outcome of the decision." *Jewell*, 840 F.3d at 570-71. The BLM's failure to take a hard look at invasive species violates NEPA.

### 3.    The BLM Failed to Take a Hard Look at Special Status Species.

The Northwestern RMP contains myriad management provisions related to Special Status Species. *See, e.g.*, AR 7559 ("Improve the distribution and quantity of high-quality fish habitat across the landscape for all life stages of ESA-listed, Bureau Special Status Species, and other

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

fish species."); AR 7576 ("Implement conservation measures to mitigate specific threats to

Bureau Sensitive species during the planning of activities and projects. Conservation measures

include altering the type, timing, location, and intensity of management actions."); *id.* ("Manage

naturally occurring special habitats to maintain their ecological function,"); *id.* ("Prior to

implementing actions that could result in habitat modification or species disturbance

In habitat for the Fender's blue butterfly . . . conduct surveys"); AR 7595 ("do not conduct

activities [in occupied murrelet habitat]"); AR 7581 ("Do not authorize timber sales that would

cause the incidental take of northern spotted owl territorial pairs or resident singles from timber

harvest"); *see also* AR 13260–13307 (BLM guidance for "special status species management").

BLM admits there are numerous Special Status Species, including over fifty Bureau Sensitive

Species, within the Siuslaw Project area that will be impacted by the Project, AR 248–49, 269–

90, but did not conduct site-specific analysis on the Project's impacts to those species.

BLM guidance specifically instructs the agency to "manage Bureau sensitive species and

their habitat to minimize or eliminate threats affecting the status of the species or to improve the

condition of the species habitat[.]" AR 13296. The agency is to accomplish this by, *inter alia*,

"[d]etermining, to the extent practicable, the distribution, abundance, population condition,

current threats, and habitat needs for sensitive species, and evaluating the significance of BLM-

administrated lands and actions undertaken by the BLM in conserving those species." *Id.*

Here, however, while the BLM concluded that impacts to many of these species were

"likely," AR 296–97 (Table 5.4.4 discloses impacts to Oregon Coast Coho Salmon, Pacific

Lamprey, and Oregon Coast Steelhead Trout are "likely"); AR 269–91 (Section 5.4.2 Appendix

D discusses all Special Status Species that have been documented in the Project area and admits

"likely" impacts to numerous different species in a variety of ways but does not include any site-

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

specific data or surveys or analysis), BLM did not disclose or conduct surveys to determine the

population sizes—or even the presence or absence—of Special Status Species or their special

habitats in the Project Area. AR 248–49, 269–80.[13] Nor did the agency analyze the effects of

logging and road building activities by the Siuslaw Project on those species or compare how

impacts to these species would differ between alternatives. *See id.*

This was problematic because a cost/benefit analysis of impacts to Bureau Sensitive

Species and their habitats could have influenced the decisionmaker. *See* AR 3516 (BLM's

Botanist explaining "we could choose thinning only because it would have less impact on the

rare fungi which we won't even know where they are! However, we have chosen to elevate other

issues in our purpose and need and decision factors, and lower this one.").

Instead, the agency simply referenced information from the 2016 RMP FEIS that

correlates these species generally with certain habitat types. AR 249. Again, the problem with

that approach is that the RMP FEIS analysis was conducted across the entire 2.5-million-acre

planning area, *see* AR 9100 (Table 3-250 with an analysis area of 2,478,853 acres), and does not

contain a specific analysis of impacts in the Siuslaw Project area. The FEIS analysis is

necessarily based on rough estimates and modeling. *See* AR 9088 (BLM is "analyzing effects on

Bureau Sensitive, Bureau Strategic, and the suite of focal landbird species by grouping species

with habitat needs that are roughly the same and evaluating the amount of habitat in which these

species are found.").

---

[13] As mentioned above, the BLM was apparently conducting spotted owl and murrelet surveys for certain planned sales under the Siuslaw Project umbrella, but the results of these surveys were not disclosed in the EA or FONSI. AR 3382 ("Wildlife surveys for MAMU and NSO are currently occurring" dated September 3, 2020).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

This is the exact, flawed approach invalidated by *Thurston I*, discussed above, and also in

*Klamath Siskiyou Wildlands Ctr. v. United States BLM*, No. 1:19-cv-02069-CL, 2021 U.S. Dist.

LEXIS 26040 (D. Or. Jan. 21, 2021) (Magistrate F&R), *adopted in full*, No. 1:19-cv-02069-CL,

2021 U.S. Dist. LEXIS 186940 (D. Or. Sep. 29, 2021). There, the plaintiffs alleged that the BLM

failed to take the requisite hard look at impacts to great gray owls, a Bureau Sensitive Species.

The agency attempted to rely on the 2016 RMP FEIS, but this Court rejected the approach,

finding that the "FEIS adopted in 2016 does not consider the impacts of the site-specific Project

on great gray owls. Instead, the 2016 FEIS considers the general consequences of adopting a

land management plan that covers 2.6 million acres without any site-specific analysis of the

Project area." *Id.* at *11.

Once again, the 2016 RMP FEIS itself contradicts the BLM's tiering attempt. The RMP

requires the agency to implement conservation measures to mitigate threats to Bureau Sensitive

Species "during the planning of activities and projects." AR 7576; *see also* AR 9097 (Bureau

Sensitive Species will be protected under site-specific methods for conserving sensitive species

and their unique habitats). In other words, the 2016 RMP expressly envisions and relies upon

further project-specific analysis and conservation measures to protect Special Status Species,

which did not happen here. Accordingly, because the 2016 RMP FEIS "does not contain a site-

specific, Project-level analysis" it "cannot save" the Project EA and the BLM's failure to take a

hard look at the Project's impacts to Special Status Species. *Klamath Siskiyou Wildlands Ctr.*,

No. 1:19-cv-02069-CL, 2021 U.S. Dist. LEXIS 26040 at *13.

**B.    The BLM Failed to Analyze and Disclose the Project's Cumulative Impacts.**

In determining whether a project will have a "significant" impact, agencies also must

consider whether an action may have any cumulatively significant impacts. 40 C.F.R. § 1508.27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

(b)(7). Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id*.; *see also Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004) ("Sometimes the total impact from a set of actions may be greater than the sum of the parts."). Accordingly, a cumulative impacts analysis must evaluate "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7; *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 603 ("The cumulative impacts analysis must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment . . . without such information, neither the court nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide.").

The BLM's cumulative impacts sections in the Siuslaw EA are limited to only the five issues analyzed in detail. AR 120–21. The following summary is representative: "Besides Nails Creek EA timber sales, the High Pass Salvage, Area of Environmental Critical Concern treatments and the past yarding wedges, there are no other past, present, or reasonably foreseeable actions outside of the analysis in the Siuslaw HLB Landscape Plan EA that would affect the age class distribution on the Siuslaw Field Office HLB." AR 143. The only data included comes in the discussion of timber volume. AR 149–50. The issues not considered in detail contain no cumulative impacts analysis at all.

The failure to take a hard look at cumulative impacts for the issues not analyzed in detail is unlawful and the lack of meaningful data or quantification for the issues that are analyzed in detail is insufficient under NEPA. The most glaring deficiency of BLM's cumulative impacts

MEMORANDUM IN SUPPORT—31

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

analysis is that it neglects a project that overlaps in time and space with the Siuslaw Project: the N126 Project.

Many of the units slated for logging under the Siuslaw Project are interspersed with areas of forest which the BLM intends to commercially log pursuant to the N126 Project. AR 125; AR 1980–2197 (N126 EA). The overlapping projects will have significant cumulative effects on fish and wildlife, erosion and water quality, invasive species infestations, fire hazard, forest age and structural class, and wildlife habitat. *See* AR 1992–93 (issues pertaining to "environmental effects" overlap Siuslaw Project issues); *compare* AR 3328 (map of Siuslaw Project units) *with* AR 2128 (map of N126 units).[14]

For example, in relation to the agency's discussion of early successional ecosystems (a euphemism for a post-clearcutting landscape), both projects will "create" early successional conditions through logging: The N126 project would create up to 18,000 acres of early successional ecosystems over the next 40 years, AR 2002, and the Siuslaw Project would create 1,126–1,361 acres per year. AR 13. But the BLM does not mention or consider this cumulative impact, including on wildlife species that are maladapted to such conditions. *See* AR 170 ("Excepting a large wildfire or other disturbance event, the majority of early successional habitat created on the Siuslaw Field Office within the next decade is likely through regeneration harvest analyzed in this EA."); AR 2020–21 (N126 EA cumulative impacts section does not mention the Siuslaw Project).

---

[14] In the N126 EA, the BLM similarly eliminated most of these issues from detailed consideration. *See* AR 2063–64 (noxious weeds, also admitting potentially significant effects); AR 2065 (impacts to carbon storage and greenhouse gas emissions); AR 2080 (soils); AR 2091 (Bureau Sensitive Species); and impacts to spotted owls and marbled murrelets (AR 2083–90).

MEMORANDUM IN SUPPORT—32

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Critically, while the creation of early-successional conditions was a key issue driving the consideration of alternatives and ultimately, the decision, the BLM simply disregarded the creation of early-successional conditions on directly adjacent lands. *See, e.g.*, AR 153 (chart showing purported dearth of such conditions); AR 15 (rejecting alternative focused on thinning, not regeneration harvest because it "would produce no complex early seral ecosystem and would not contribute to an even age class distribution"). The decision to proceed with the Siuslaw Project thus rested on the incorrect assumption that there were only 964 acres of early successional forest, AR 153; this obviously excluded the logging and associated early successional conditions created by N126. *Cf. EDC v. BOEM.*, 36 F.4th at 872-73. ("To take the requisite hard look, an agency may not rely on incorrect assumptions or data[.]").

The only time Siuslaw EA acknowledges N126 is in relation to the brief discussion of sedimentation and water quality impacts (issues dismissed from detailed consideration). AR 215–16. There is no cumulative impacts analysis, just an attempt to "tier" to the N126 EA's sedimentation analysis. AR 216. But this discussion only serves to highlight the need for a full and fair cumulative impacts analysis; the BLM disclosed that the projects share over 90 percent of haul routes that will be used for timber harvest, and both involve many miles of road construction in and along the same riparian areas. AR 216. What are the "combined and synergistic" impacts regarding sedimentation and water quality? *See Kraayenbrink*, 632 F.3d at 1207. The EA is silent as to this question. *Cf. Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 603 (rejecting EA for mineral exploration operation that had failed to include detailed analysis of the combined impacts of proposed mining operations nearby).

In summary, the BLM did not take a hard look at Project's impacts when added to the N126 Project's impacts. The agency's shallow analysis risks irreparable harm to the environment

MEMORANDUM IN SUPPORT—33

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

and fails to provide sufficient information to the public and this Court such that anyone "can be assured that the [agency] provided the hard look that it is required to provide." *Id*. Accordingly, the BLM has acted arbitrarily, capriciously, and in violation of well-settled law and precedent.

## IV.    The BLM Failed to Prepare an EIS.

NEPA requires agencies "to the fullest extent possible" to prepare an EIS for "every . . . major Federal actio[n] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). The EIS requirement is the heart of NEPA. *DOT v. Pub. Citizen*, 541 U.S. 752, 757 (2004). If an agency decides not to prepare an EIS, it must provide a "convincing statement of reasons" explaining why the proposed project's impacts are insignificant. *Blue Mts.*, 161 F.3d at 1212.

"An EIS must be prepared if substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 711 (9th Cir. 2009). Whether a proposed action "significantly affects" the environment is a two-part consideration assessing both "context and intensity." 40 C.F.R. § 1508.27; *see also Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004). "Context" refers to and depends on the effects on the environment within the local area. 40 C.F.R. § 1508.27(a); "Intensity" refers to "the severity of the impact." 40 C.F.R. § 1508.27(b).

To prevail on a claim that the agency violated NEPA by failing to prepare an EIS, a Plaintiff need not show that significant effects *will* occur; it is enough to raise "substantial questions" whether a project *may* have a significant effect on the environment. *See Greenpeace Action v. Franklin*, 982 F.2d 1342, 1351 (9th Cir. 1992). As the Ninth Circuit consistently has held, this is a low standard. *See, e.g.*, *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

562 (9th Cir. 2006). Indeed, a single intensity factor alone may require preparation of an EIS.

*Ocean Advocates*, 402 F.3d at 865.

A.    **The BLM's Statement of Reasons for Not Preparing an EIS is Flawed.**

The BLM's statement of reasons for not preparing an EIS fails for the same reasons

described in detail above. *See supra* pp. 14–33. Rather than taking a hard look at "potentially

significant effects," *see, e.g.,* AR 202 ("The action alternatives would have potentially significant

effects concerning invasive species"), the BLM fell back on the Western Oregon-wide 2016

RMP FEIS. AR 1 ("None of the action alternatives would have significant environmental

impacts beyond those already address in the [2016 RMP FEIS] to which the EA is tiered"). As

the Ninth Circuit has held, however, "[c]onclusory assertions about insignificant impacts will not

suffice." *EDC v. BOEM.*, 36 F.4th at 879. Indeed, the Ninth Circuit already has rejected the

"proposition that any scale of logging project is exempt from a project-specific EIS simply

because an EIS for a forest plan contemplates that logging may occur." *Blue Mts.*, 161 F.3d at

1214. According to the court: "[n]othing in the tiering regulations suggests that the existence of a

programmatic EIS for a forest plan obviates the need for any future project-specific EIS, without

regard to the nature or magnitude of a project." *Id.* The BLM's failure to take a hard look, and

attempt to skirt a finding of significance based on the landscape-wide 2016 RMP is arbitrary. *Cf.*

*EDC v. BOEM.*, 36 F.4th at 879 (FONSI is arbitrary where agency's EA "did not fully evaluate

the environmental impacts" of the proposed action).

B.    **Substantial Questions Exist Over Whether the Siuslaw Project "May" Have
      Significant Impacts.**

The Siuslaw Project triggers a host of intensity factors, which, individually or

collectively, require an EIS. *Cf. Cascadia Wildlands v. United States Forest Serv.*, 937 F. Supp.

2d 1271, 1283-84 (D. Or. 2013) (holding that when considered individually, certain intensity

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

factors might not have triggered the need for an EIS, but "when considered collectively, they do").

As discussed in detail above, *see supra* pp. 30–33, "it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). The Project's overlapping impacts with those of the N126 Project may be cumulatively significant but are unaddressed in the EA and FONSI. *Cf. Bark v. United States Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) (analysis insufficient where there was no "meaningful analysis" of other logging projects).

The Project also "may adversely affect an endangered or threatened species or its [critical habitat]." 40 C.F.R. § 1508.27(b)(9). The Project will adversely affect marbled murrelets and its critical habitat, AR 192, including the removal of structurally complex habitat over 400 years old. AR 3380. The Project also will adversely affect the northern spotted owl and its critical habitat, AR 192, Oregon Coast Coho Salmon and its critical habitat, *id.,* and Upper Willamette River Chinook Salmon, AR 193.

Courts have regularly held that impacts to listed species are significant. *Cascadia,* 937 F. Supp. 2d at 1283 (agency's "determination that the proposed project was likely to adversely affect the northern spotted owl was, at a minimum, significant"). Yet, impacts to these ESA-listed species were given short-shrift in the EA. *See, e.g.*, AR 192–93 ("Effects from the project would vary from no effect, not likely to adversely affect, or likely to adversely affect."). This is an excellent example of perfunctory "analysis," devoid of any sense or meaning that courts have repeatedly rejected. *Klamath-Siskiyou Wildlands Ctr.,* 387 F.3d at 993.

Moreover, the effects of the Project are "highly uncertain." 40 C.F.R. § 1508.27(b)(5). The fact that the BLM has proposed to address a multitude of issues through later surveys,

MEMORANDUM IN SUPPORT—36

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

subsequent mitigation, or best management practices highlights the high degree of uncertainty. Under Ninth Circuit precedent, the agency must evaluate these issues in an EIS, rather than rely on future mitigation measures. *See Nat'l Parks*, 241 F.3d at 733 ("source of uncertainty is the Parks Service's ability to offset the environmental impact of the increase in vessel traffic through its proposed mitigation measures.").

For example, regarding invasive species, it is entirely unclear if the BLM will (or can) apply the mitigating measures it says it will apply. AR 200 ("It is likely that much of the weed infestations expected to result from the action alternatives will not be adequately controlled given current resources"). As another example, the BLM provides a list of up to 21 mitigating Best Management Practices or BMPs that are "potentially applicable" for mitigating impacts to soils. AR 226–27. While some of these measures will be purportedly planned by the BLM at some point, most measures will be applied at the discretion of the timber operator, including those to mitigate soil disturbance that exceeds the RMP 20% threshold. *Id.* ("Harvest Implementation" measures will be applied by the timber operator)*; see also* AR 225 (soil mitigation will be only applied to extent consistent with harvest contract). BLM has clearly stated that the actual effectiveness of these measures varies greatly on site-specific conditions, AR 1769–70, and the Ninth Circuit has explained that reliance on a "mere listing of mitigation measures without supporting analytical data is insufficient to support a finding of no significant impact." *Nat'l Parks*, 241 F.3d at 734.[15]

Because the Project "threatens a violation of federal . . . law," an EIS should have been

---

[15] Also, regarding listed and Bureau Sensitive species, BLM says throughout the EA that different habitats and species will be buffered, but it is unclear whether surveys for these species and habitats will actually take place, *See, e.g.*, AR 302 (protections for eagles and Fender's blue butterfly), and the botanist specifically states that "we don't do many surveys at all, compared to all the acreage out there." AR 3523.

MEMORANDUM IN SUPPORT—37

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

completed. 40 C.F.R. § 1508.27(b)(10). As explained above, there are significant questions as to whether the Project will comply with RMP management direction pertaining to a number of the "issues not analyzed in detail," including the detrimental soil threshold, invasive species, and Bureau Sensitive species. *See* 43 U.S.C.S. § 1732 (BLM must manage lands in accordance with RMP).

Finally, the fact that the Siuslaw Project sets logging targets for the next several decades in the Project area, and that the agency did not select the no action alterative because it failed to meet the Project's purpose and need, establishes the precedential nature of the Project. 40 C.F.R. § 1508.27(b)(6) ("degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration"); *see also Or. Wild v. BLM*, No. 6:14-CV-0110-AA, 2015 U.S. Dist. LEXIS 32584, *26-27 (D. Or. Mar. 14, 2015).

Here, the EA and FONSI are "programmatic documents that 'pre-determine the future' and there is no real possibility that the BLM will not pursue site-specific projects"). *See* ECF19 at 8. Indeed, the BLM has "identified and mapped out specific tracts" for logging, and the logging prescriptions will be driven by BLM internally developed volume targets. AR 126 ("internal target" of "7 MMbf annually").

Substantial questions exist over whether the Siuslaw Project may have significant impacts, and the BLM's excuses for not addressing these questions are improper, thus, an EIS is required.

## RELIEF

Vacatur is the presumptive remedy under the APA for violations of NEPA. *See* 5 U.S.C.S. § 706(2) (providing that the reviewing court shall "hold unlawful and set aside agency

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"). It is the agency's burden to demonstrate that vacatur should not result. *Cal. Cmtys. Against Toxics v. United States EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Because the agency's errors here were "serious," and because there would be no "severe" disruptive consequences of vacatur, this Court should apply the presumptive remedy. *See id.* ("[W]e have only ordered remand without vacatur in limited circumstances.").

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully asks this Court to grant the Motion for Summary Judgment, hold unlawful and set aside the BLM's EA, DR, and FONSI, and remand to the agency to comply with NEPA.

DATED this 8th day of September, 2023.


Respectfully submitted

/s Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
503-227-2212 │ oliver@crag.org
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

/s Nicholas S. Cady
Nicholas S. Cady, OSB # 113463
541-434-1463 │nick@cascwild.org
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440

*Attorneys for Plaintiffs*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's Order of September 7, 2023, which granted parties' joint motion to increase the word count limitation set forth in LR 7-2(b)(1) from 11,000 words to 13,000 words. ECF22. This brief is 12,755 words and below the limitation.


s/ Nicholas Cady
Nicholas Cady

*Counsel for Plaintiffs*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*