TODD KIM
Assistant Attorney General

LUTHER L. HAJEK (CO Bar 44303)
ALEXIS G. ROMERO (DC Bar 90006907)
United States Department of Justice
Environment and Natural Resources Division
999 18th St.
South Terrace – Suite 370
Denver, CO 80202
Email: luke.hajek@usdoj.gov
Tel: (303) 844-1376 / Fax: (303) 844-1350
Email: alexis.romero@usdoj.gov
Tel: (202) 353-5885 / Fax: (202) 305-0275

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| CASCADIA WILDLANDS; and OREGON WILD<br><br>Plaintiffs,<br><br>v.<br><br>CHERLY ADCOCK, in her official capacity as Field Manager for the Siuslaw Field Office; and the UNITED STATES BUREAU OF LAND MANAGEMENT<br><br>Defendants. | Case No. 6:22-cv-1344-MK<br><br>Hon. Mustafa Kasubhai<br><br>**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION**
**AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rules 7, 56, and ECF No. 26, Defendants Cheryl Adcock and Bureau of Land Management hereby cross-move for Summary Judgment. A memorandum of points and authorities is filed concurrently.

DATED: October 27, 2023.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

/s/ Luther L. Hajek
LUTHER L. HAJEK (CO Bar 44303)
Senior Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376 / Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

/s/ Alexis G. Romero
ALEXIS G. ROMERO (DC Bar 90006907)
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resource Section
P.O. Box 7611,
Washington, DC 20044-7611
Tel: (202) 353-5885 / Fax: (202) 305-0275
E-mail: alexis.romero@usdoj.gov

*Counsel for Defendants*

TODD KIM
Assistant Attorney General

LUTHER L. HAJEK (CO Bar 44303)
ALEXIS G. ROMERO (DC Bar 90006907)
United States Department of Justice
Environment and Natural Resources Division
999 18th St.
South Terrace – Suite 370
Denver, CO 80202
Email: luke.hajek@usdoj.gov
Tel: (303) 844-1376 / Fax: (303) 844-1350
Email: alexis.romero@usdoj.gov
Tel: (202) 353-5885 / Fax: (202) 305-0275

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| CASCADIA WILDLANDS; and OREGON WILD | |
| Plaintiffs, | Case No. 6:22-cv-1344-MK |
| v. | Hon. Mustafa Kasubhai |
| CHERYL ADCOCK, in her official capacity as Field Manager for the Siuslaw Field Office; and the UNITED STATES BUREAU OF LAND MANAGEMENT | **MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

BACKGROUND .........................................................................................................2

    I.      STATUTORY BACKGROUND ...................................................................2

          A.     Federal Land Policy and Management Act.................................................2

          B.     Oregon & California Revested Lands Act .................................................3

          C.     National Environmental Policy Act ..........................................................5

    II.     FACTUAL BACKGROUND...........................................................................6

          A.     The 2016 Resource Management Plan ......................................................6

          B.     The Siuslaw HLB Landscape Plan ...........................................................9

STANDARD OF REVIEW..........................................................................................11

ARGUMENT ...............................................................................................................12

    I.      The Siuslaw Plan is an Effective Use of Tiering and Site-Specific
          Landscape Level  Management .......................................................................12

    II.     The Siuslaw Plan Complied with NEPA's Requirement to Identify the Most
          Significant Environmental Issues ...................................................................16

    III.    The Siuslaw Plan Took a Hard Look at All Relevant Environmental Impacts
          and  Analyzed Cumulative Impacts.................................................................20

          A.     BLM Took a Hard Look at Soil Disturbance...........................................22

          B.     BLM Took a Hard Look at Noxious and Invasive Weeds ......................27

          C.     BLM Took a Hard Look at Bureau Sensitive Species ............................30

          D.     BLM Properly Analyzed Cumulative Impacts........................................34

    IV.    The Siuslaw EA and FONSI Revealed No New Significant Information, and
          Therefore an Additional EIS Was Not Required..................................................37

REMEDY .....................................................................................................................41

CONCLUSION.............................................................................................................41

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Env't Ctr. v. Kempthorne,*
  457 F.3d 969 (9th Cir. 2006) ........................................................................... 21

*Am. Forest Res. Council v. United States,*
  77 F.4th 787 (D.C. Cir. 2023) ...................................................................... 4, 8

*Anderson v. Evans,*
  371 F.3d 475 (9th Cir. 2004) ........................................................................... 40

*Audubon Soc'y of Portland v. Haaland,*
  40 F.4th 967 (9th Cir. 2022) ................................................................ 5, 30, 34

*Bark v. BLM,*
  643 F. Supp. 2d 1214 (D. Or. 2009) ............................................................... 21

*Barnes v. U.S. Dep't of Transp.,*
  655 F.3d 1124 (9th Cir.2011) .......................................................................... 39

*Blue Mts. Biodiversity Project v. Blackwood,*
  161 F.3d 1208 (9th Cir. 1998) .................................................................. 21, 38

*California v. Block,*
  690 F.2d 753 (9th Cir. 1982) ........................................................................... 11

*California v. Block,*
  690 F.3d 743 (9th Cir. 1982) ........................................................................... 20

*Cascadia Wildlands v. BLM,*
  410 F. Supp. 3d 1146 (D. Or. 2019) ......................................................... 14, 19

*Citizens to Pres. Overton Park v. Volpe,*
  401 U.S. 402 (1971) ......................................................................................... 11

*City of Los Angeles v. Fed. Aviation Admin.,*
  63 F.4th 835 (9th Cir. 2023) ........................................................................... 17

*Coalition v. Rumsfeld,*
  464 F.3d 1083 (9th Cir. 2006) ......................................................................... 20

*Conservation Nw. v. Rey,*
  674 F.Supp. 2d 1232 (W.D. Wash. 2009) ...................................................... 33

*Ctr. for Biological Diversity v. Ilano,*
  928 F.3d 774 (9th Cir. 2019) ........................................................................... 30

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock,* Case No. 6:22-cv-01344-MK

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004)..................................................................................................27

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) .............................................................. 21, 30, 34, 41

*Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983).................................................................................................20

*Great Basin Res. Watch v. BLM*,
  844 F.3d 1095 (9th Cir. 2016) ..........................................................................22, 25

*Havasupai Tribe v. Robertson*,
  943 F.2d 32 (9th Cir. 1991) ..................................................................................28

*Headwaters, Inc. v. BLM.*,
  914 F.2d 1174 (9th Cir. 1990) .................................................................... 3, 38, 39

*Kern v. BLM*,
  284 F.3d 1062 (9th Cir. 2002) ..............................................................................12

*Klamath Siskiyou Wildlands Ctr. v. BLM*,
  2014 WL 525116 (D. Or. 2014)............................................................................21

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
  962 F. Supp. 2d 1230 (D. Or. 2013)........................................................................2

*Klamath Siskiyou Wildlands v. Boody*,
  468 F.3d 549 (9th Cir. 2006) ................................................................................40

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
  No. 1:19-cv-01810-CL, 2021 WL 5356969 (D. Or. Aug. 24, 2021)...............13, 15, 16, 32, 39

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
  No. 1:19-cv-02069-CL, 2021 U.S. Dist. LEXIS 26040 (D. Or. Jan. 21, 2021) ................ 14, 33

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
  No. 1:19-CV-1810-CL, 2021 WL 5355919 (D. Or. Nov. 16, 2021) .......................................32

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
  No. 22-35035, 2022 WL 17222416 (9th Cir. Nov. 25, 2022)..........................................14, 16

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)...............................................................................................20

*Lands Council v. McNair*,
  537 F.3d 981, (9th Cir. 2008) ...............................................................................30

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989).................................................................................................5

*Murphy Co. v. Biden*,
  65 F.4th 1122 (9th Cir. 2023) ............................................................................3, 4

*N. Alaska Envtl. Ctr. v. United States DOI, BLM,*
    983 F.3d 1077 (9th Cir. 2020) ............................................................ 15, 25, 26

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
    668 F.3d 1067 (9th Cir. 2011) .......................................................................22

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
    241 F.3d 722 (9th Cir. 2001) .........................................................................40

*Native Ecosystems Council v. Dombeck,*
    304 F. 3d 886 (9th  Cir. 2002) .......................................................................36

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998) .......................................................................15

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ..........................................................................................2

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) .......................................................................11

*O'Neal v. United States,*
    814 F.2d 1285 (9th Cir. 1987) .........................................................................3

*Occidental Eng'g Co. v. Immigration and Naturalization Serv.,*
    753 F.2d 766 (9th Cir. 1985) ...........................................................................6

*Or. Nat. Desert Ass'n v. Jewell,*
    840 F. 3d 562 (9th Cir. 2016) ...................................................................22, 23

*Or. Nat. Res. Council Fund v. Brong,*
    492 F.3d 1120 (9th Cir. 2007) .......................................................................26

*Or. Nat. Res. Council v. Lowe,*
    109 F.3d 521 (9th Cir. 1997) .........................................................................15

*Or. Nat. Res. Council. v. Lyng,*
    882 F.2d 1417 (9th Cir. 1989) .......................................................................38

*Or. Wild v. BLM,*
    No. 6:14-CV-0110-AA, 2015 U.S. Dist. LEXIS 32584 (D. Or. Mar. 14, 2015) ....................40

*Pac. Rivers v. BLM,*
    815 F. App'x 107 (9th Cir. 2020) ...........................................................8, 12, 23

*Pac. Rivers v. BLM,*
    No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018)..........................4, 7, 12, 13

*Pit River Tribe v. United States Forest Serv.,*
    469 F.3d 768 (9th Cir. 2006) .........................................................................13

*River Runners for Wilderness v. Martin,*
    593 F.3d 1064 (9th Cir. 2010) .......................................................................11

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
            SUMMARY JUDGMENT
            *Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)........................................................................................5

*Salmon River Concerned Citizens v. Robertson*,
   32 F.3d 1346 (9th Cir. 1994) ............................................................6, 11, 38

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014)..........................................................................26

*Soda Mountain Wilderness Council v. BLM*,
   607 Fed.Appx. 670 (9th Cir. 2015)................................................................37

*Soda Mountain Wilderness Council v. BLM*,
   No. 1:12-cv-001171-CL, 2013 WL 12120098 (D. Or. May 29, 2013)...................4

*Soda Mountain Wilderness Council v. BLM*,
   No. 1:12-cv-1171-CL, 2013 WL 4786242 (D. Or. Sept. 6, 2013)........................4

*State Farm Mut. Auto Ins. Co. v. Weiss*,
   410 F. Supp. 2d 1146 (M.D. Fla. 2006) .........................................................14

*Te-Moak Tribe v. U.S. Dep't of the Interior*,
   608 F.3d 592 (9th Cir. 2010) ........................................................................12

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978)..................................................................................27, 28

*W. Watersheds Project v. BLM*,
   774 F. Supp. 2d 1089 (D. Nev. 2011) ....................................................6, 12, 15

*W. Watersheds Project v. Lueders*,
   122 F. Supp. 3d 1039 (D. Or. 2015).............................................................13

*W. Watersheds Project v. Ruhs*,
   701 F. App'x 651 (9th Cir. 2017) ..................................................................14

*Wildearth Guardians v. Provencio*,
   923 F.3d 655 (9th Cir. 2019) ........................................................................41

**Statutes**

42 U.S.C. § 4332(2)(C) ......................................................................................5, 9

42 U.S.C. § 4332(c) ...............................................................................................37

42 U.S.C. § 4336e(11) (2023) ...............................................................................15

43 U.S.C. § 1701 .....................................................................................................3

43 U.S.C. § 1712(c)(1) ............................................................................................2

43 U.S.C. § 1712(f).................................................................................................3

43 U.S.C. § 2601...................................................................................................3, 4

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
              SUMMARY JUDGMENT
              *Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

43 U.S.C. § 2605 ...................................................................................................................3

5 U.S.C. § 706 .............................................................................................. 11, 20, 21

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................................1

**Regulations**

40 C.F.R. § 1500.1(b) ............................................................................................ 16, 19

40 C.F.R. § 1500.3(g) ....................................................................................................16

40 C.F.R. § 1500.4 ................................................................................................ 17, 19

40 C.F.R. § 1501.1(d) ....................................................................................................16

40 C.F.R. § 1501.7(a)(3) ...............................................................................................17

40 C.F.R. § 1502.1 ........................................................................................................16

40 C.F.R. § 1502.13 ......................................................................................................17

40 C.F.R. § 1502.20 ...................................................................................... 6, 12, 14

40 C.F.R. § 1503.3(a) ....................................................................................................28

40 C.F.R. § 1508.27 ......................................................................................................37

40 C.F.R. § 1508.27(1)-(10) .........................................................................................37

40 C.F.R. § 1508.27(6) ..................................................................................................40

40 C.F.R. § 1508.9 (1978) ...............................................................................................5

40 C.F.R. § 1508.9(a)(1) ..................................................................................................5

40 C.F.R. § 1508.9(a-b) ...................................................................................................5

43 C.F.R. § 1610.1-6 .......................................................................................................2

43 C.F.R. § 1610.4-1 .......................................................................................................3

43 C.F.R. § 1610.4-2 .......................................................................................................2

43 C.F.R. § 1610.5-3 ............................................................................................... 3, 15

43 C.F.R. §1601.0–2 ......................................................................................................18

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

**INTRODUCTION**

Under Federal Rule of Civil Procedure 56(a) and Rule 56-1 of the Local Rules of Civil Procedure, Federal Defendants hereby move this Court for summary judgment on claims brought by Oregon Wild and Cascadia Wildlands, ("Plaintiffs") challenging the actions of the U.S Bureau of Land Management ("BLM") authorizing the Siuslaw HLB Landscape Plan—a timber harvest plan within the BLM Siuslaw Field Office in northwest Oregon.

Federal Defendants respectfully request that this Court grant summary judgment in their favor and deny Plaintiffs' Motion for Summary Judgment (ECF No. 33) (Pl's Mem.) because BLM fully complied with the National Environmental Policy Act (NEPA). BLM properly tiered the HLB environmental assessment (EA) to a comprehensive environmental impact statement (EIS) that supports a thorough resource management plan (RMP). That resource management plan, upheld by both the Ninth and D.C. Circuits, reflected BLM's judgment that some O&C lands should be allocated for conservation purposes, while other lands should be allocated for timber harvest as required by the Oregon & California Revested Lands Act (O&C Act).

The Siuslaw Plan challenged here affects land located within the latter category, where BLM intends to authorize timber harvest over the next two decades in order to meet the O&C Act's sustained yield timber targets and generate revenue to local communities. In preparing the Siuslaw Plan, BLM first identified the most pertinent environmental issues, consistent with the regulatory requirement to narrow the areas of analysis to potentially significant issues. BLM then, relevant to Plaintiffs' arguments, took a hard look at soil disturbance, noxious weeds, sensitives species, and cumulative impacts. Finally, the Siuslaw Plan properly explained why BLM was not required to prepare an additional environmental impact statement.

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

This cross-motion is supported by the following Memorandum of Points and Authorities and the Administrative Records lodged with the Court.  In accordance with Local Rule 7.1, counsel have conferred and Plaintiffs indicated that they oppose this motion.

## BACKGROUND

## I.    STATUTORY BACKGROUND

### A.    Federal Land Policy and Management Act

To "guide development and maintenance of public land," the Federal Land Policy and Management Act (FLPMA) requires BLM to manage the public lands through "land use plans." *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016) (citing 43 U.S.C. § 1712(a)).  BLM has "a great deal of discretion in deciding how to achieve" compliance with an applicable land use plan.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004).  On lands governed by FLPMA, compared to lands governed by the O&C Act, as discussed below, FLPMA provides for management guided by the goals of "multiple use and sustained yield."  43 U.S.C. § 1712(c)(1).  As to the first of these goals, "[m]ultiple use management" is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put."  *Norton*, 542 U.S. at 58 (citation omitted).  And the principle of "sustained yield" means that through land use plans, FLPMA "requires BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future."  *Id.*

BLM refers to land use plans as resource management plans, or RMPs.  *See*, *e.g.*, 43 C.F.R. § 1610.4-2.  BLM cooperates with public stakeholders and other federal agencies in preparing an RMP's analysis and a range of alternative actions for the area.  43 C.F.R. §§

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

1610.1-6.  At several stages, resource management plans go through robust public review and comment.  43 U.S.C. § 1712(f); 43 C.F.R. § 1610.4-1.  After an RMP is finalized, BLM can engage in "more detailed or specific planning" for particular areas, and these later site-specific actions must conform with the RMP.  43 C.F.R. § 1610.5-3.

### B.    Oregon & California Revested Lands Act

The Oregon & California Revested Lands Act (O&C Act or Act) governs 2.5 million acres of western Oregon BLM lands, including the land at issue here.  43 U.S.C.§ 2601; AR 9375.  The O&C Act sets aside certain timberlands "for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the princip[le] of sustained yield."  43 U.S.C. § 2601.  The Act also provides for revenue sharing from these timber sales to local communities.  43 U.S.C. § 2605.   Other purposes of the O&C Act include the protection of watersheds, regulation of streams, recreation, and the "economic stability of local communities and industries."  43 U.S.C. § 2601.  To meet these purposes, the Act authorizes the agency to "subdivide" the O&C lands into "sustained-yield forest units."  *Id.*  Each unit has individualized responsibilities for producing "a permanent source of raw materials for the support of dependent communities and local industries of the region."  *Id.*; *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023).  In sum, "the [O&C Act] directs the Department to determine *which portions* of the land should be set aside for logging and which should be reserved." *Id.* at 1134 (emphasis in original).

FLPMA's multiple-use mandate does not apply to O&C lands. 43 U.S.C. § 1701, note b.  The O&C Act is instead a primary-use statute: "the primary use of the [O&C Act] lands is for timber production to be managed in conformity with the provision of sustained yield."  *Headwaters v. BLM.*, 914 F.2d 1174, 1183 (9th Cir. 1990) (quoting *O'Neal v. United States*, 814

F.2d 1285, 1287 (9th Cir. 1987)).  *See also Rivers v. BLM* , Case No. 6:16-cv-01598-JR, 2018

WL 6735090, at *17 (D. Or. Oct. 12, 2018) ("courts have repeatedly held the O&C Act is a

"'primary'" or "'dominant'" use statute for sustained-yield timber production.").  Thus, while

BLM is subject to the procedural requirements of other applicable statutes across its lands, "the

primary use of O&C lands is timber production."  *Soda Mountain Wilderness Council v. BLM*,

2013 WL 12120098 *1, Case No. 1:12-cv-001171-CL, 2013 WL 12120098, at *1 (D. Or. May

29, 2013), *partially overruled on other grounds*, 2013 WL 4786242 (D. Or. Sept. 6, 2013).

      The timber production mandated by the O&C Act is only possible because of the layers

of discretion the Act grants BLM.  *Murphy Co.*, 65 F.4th at 1134-35 (noting that the Ninth

Circuit has "repeatedly reinforced that the O&C Act grants the Department broad discretion to

manage the lands in a flexible manner").  The D.C. Circuit recently explained how "the O&C Act

provides the Secretary three layers of discretion."  *Am. Forest Res. Council v. United States*, 77

F.4th 787, 802 (D.C. Cir. 2023).  These three layers concern (1) land classification, (2) statutory

balancing, and (3) permanent forest production.  "'[F]irst,'" the O&C Act gives BLM the

"discretion to decide how land should be classified, which includes discretion to classify land as

timberland or not."  *Id.*  "[S]econd, discretion to decide how to balance the Act's multiple

objectives."  *Id.*  "[A]nd third, discretion to decide how to carry out the mandate that the land

classified as timberland be managed 'for permanent forest production.'"  *Id.* (citing 43 U.S.C. §

2601).  The court provided these principles in a challenge to the same resource management

plans in effect here.  *See infra* at 11.  As explained in more detail below, the resource

management plans at issue here operate in part by assigning lands into different land use

allocations, some allocations focused on conservation and others on sustained yield timber

harvesting.

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

C.      **National Environmental Policy Act**

Resource management plans and subsequent site-specific decisions are subject to the

National Environmental Policy Act (NEPA).  NEPA is a procedural statute that "focus[es]

Government and public attention on the environmental effects of proposed agency action." *Marsh*

*v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).  "NEPA does not mandate particular results,

but simply provides the necessary process to ensure that federal agencies take a hard look at the

environmental consequences of their actions." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th

967, 979–80 (9th Cir. 2022) (internal quotations omitted).  In other words, by relying "on

procedural mechanisms—as opposed to substantive, result-based standards" an agency meets

NEPA's twin goals: informed decisionmaking and public participation.  *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 353, 356 (1989).

Two procedural mechanisms NEPA endorses are environmental impact statements (EISs)

and environmental assessments (EAs).  An agency must produce an EIS analyzing the impacts of

"major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C).  Not all federal actions require an EIS.  Before preparing an EIS, an agency may

instead produce an environmental assessments (EA).  40 C.F.R. § 1508.9 (1978).[1]

Environmental assessments are "concise public document[s]" which "include brief discussions of

the need for the proposal, . . . environmental impacts of the proposed action and alternatives, and

a listing of agencies and persons consulted."  40 C.F.R. § 1508.9(a-b).  If the agency determines

that the proposed plan will not have a significant impact on the environment, beyond impacts

analyzed in a previous document, the agency will issue a finding of no significant impact

(FONSI).  40 C.F.R. § 1508.9(a)(1).

---

[1] All cites to NEPA's regulations are to the 1978 version, filed with this motion as Attachment 1.

NEPA's regulations "encourage[]" agencies to tier earlier environmental impact statements with later environmental assessments which fall within the same program. 40 C.F.R. § 1502.20. Tiering involves the reference or reliance on earlier environmental documents. 40 C.F.R. § 1502.20-21; *W. Watersheds Project v. BLM,* 774 F. Supp. 2d 1089, 1100 (D. Nev. 2011), *aff'd*, 443 F. App'x 278 (9th Cir. 2011). Specifically, "[w]henever a broad environmental impact statement has been prepared" analyzing relevant issues "the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement." 40 C.F.R. § 1502.20. When deciding which type of document to prepare at the later site-specific stage, "[a] comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered." *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994) (citation omitted). NEPA challenges are decided on summary judgment and on the administrative record before the agency. *Occidental Eng'g Co. v. Immigration and Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).

## II.    FACTUAL BACKGROUND

### A.    The 2016 Resource Management Plan

The Siuslaw Plan EA challenged here tiers to the Final EIS (FEIS) for the 2016 Northwestern and Coastal Oregon Resource Management Plan (2016 RMP). The 2016 RMP provides management direction for about 1.3 million acres of BLM lands across what is now the Coos Bay and Northwest Oregon Districts[2], and the Swiftwater Field Office of the Roseburg District. AR 7483. BLM consulted with the Environmental Protection Agency, the U.S. Fish

---

[2] The Salem and Eugene Districts have recently merged into the Northwest Oregon District.

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

and Wildlife Service, the National Marine Fisheries Service in developing this RMP.  AR 7502.

The underlying environmental analysis for both the 2016 RMP and the related 2016

Southwestern Oregon RMP is found in one environmental impact statement – the Proposed

Resource Management Plan and Final Environmental Impact Statement for the Resource

Management Plans for Western Oregon (PRMP/FEIS or FEIS) –  which the 9th Circuit has held

complies with NEPA and the Endangered Species Act (ESA).  *Rivers*, 2018 WL 6735090 (D. Or.

Oct. 12, 2018), *aff'd*, *Rivers v. BLM*, 815 Fed. App'x 107 (9th Cir. 2020).

      The 2016 RMP meets BLM's mandates under the O&C Act and FLPMA and includes

the following purposes: [1] "[p]rovide a sustained yield of timber, [2] "[c]ontribute to the

conservation and recovery of threatened and endangered species," [3] "[p]rovide clean water in

watersheds," [4] "[r]estore fire-adapted ecosystems," [5] "[p]rovide recreation opportunities, and

[6] [c]oordinate management of lands surrounding the Coquille Forest with the Coquille Tribe."

AR 7474, 7501-02.  In meeting its stated purposes, the 2016 RMP emphasized the need for

"predictability," "consistency," and to "reduce the costs of implementation."  AR 7502.

      A key component for achieving these purposes is the 2016 RMP's categorization of BLM

land into different land use allocations.  About 20 percent of lands are allocated for sustained

yield harvest, called the Harvest Land Base (HLB).  Out of the 1.3 million acres managed under

the 2016 RMP, the remaining 80 percent of the lands are allocated to several categories of

reserves, in which any timber harvest does not count towards sustained yield timber production.

For example, the largest reserve is the Late-Successional Reserve, the purpose of which is to

promote habitat for species such as the threatened northern spotted owl.  AR 7545.  The second

largest reserve is the Riparian Reserve, the purpose of which is to protect bureau-sensitive and

ESA-listed fish, as well as the protection of water quality.  AR 7545, 7549.  "The creation of the

reserves can reasonably be viewed as an exercise of the Secretary's discretion to reclassify O & C land as non-timberland, thus removing the land from the O&C Act's 'permanent forest production' mandate." *AFRC*, 77 F.4th at 802-3 (citing 43 U.S.C. § 2601). In contrast to these reserves, the HLB area at issue here emphasizes "continual timber production." AR 7540.

The 2016 RMP sets an annual sale quantity (ASQ) for the HLB land use allocation, which for the Eugene Sustained Yield Unit, which is comprised of the Siuslaw and Upper Willamette Field Offices, is 53 million board feet (MMBF). AR 7487. The ASQ is "an estimate of the volume of O&C timber that can be cut and sold in a given year without depleting the timberland." *AFRC*, 77 F.4th at 791. BLM can only meet its timber harvest obligations under the O&C Act by logging in the HLB land use allocation. AR 7487. In other words, any logging done outside the HLB does not count towards the set ASQ.[3] AR 7487. The 2016 RMP directs BLM to use both "commercial thinning" and "regeneration harvesting" to meet its ASQ. AR 7540-41.

The D.C. Circuit recently found that the 2016 RMPs and their land use allocations "are a permissible exercise of the Secretary's discretion under the O&C Act" and "reasonably harmonize the Secretary's O&C Act duties with her obligations" under the ESA and the Clean Water Act. *AFRC*, 77 F.4th at 802. The Ninth Circuit has held that the 2016 RMPs and the PRMP/FEIS satisfies NEPA and the ESA. *Rivers*, 815 Fed.Appx. at 110.

---

[3] For example, the N126 project occurs in the Late-Successional Reserve, which contains some harvest that does not count towards the sustained yield goals under the O&C Act and has distinct management objectives. Separate litigation challenging N126 is pending. *See Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-00767-AA.

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

**B.      The Siuslaw HLB Landscape Plan**

The Siuslaw HLB Landscape Plan is the Siuslaw Field Office's current plan to meet its

obligations under the 2016 RMP and the O&C Act to produce a sustained yield of timber.  AR

124.  This plan consists of three documents.  First, the Siuslaw HLB Environmental Assessment

(Siuslaw EA) details several action alternatives and conducts the requisite analysis of the

environmental impacts of the plan.  AR 117.  Second, the Siuslaw HLB Finding of No

Significant Impact (Siuslaw FONSI) memorializes BLM's finding that the Siuslaw Plan will not

significantly affect the quality of the human impact, and thus no environmental impact statement

is needed.  AR 1; 42 U.S.C. § 4332(2)(C).  Finally, the Siuslaw HLB Decision Record (Siuslaw

DR) explains BLM's selected alternative (Alternative 4) and responds to public comments.  AR

10.

The Siuslaw Plan only governs lands in the HLB land use allocation within the Siuslaw

Field Office.  The HLB accounts for 8 percent of the total acreage managed by the Siuslaw Field

Office, with the remainder assigned to various categories of reserves.  AR 124.  Out of the 2016

RMP's annual target of 53 MMBF for the Eugene SYU, the Siuslaw Field Office aims to

contribute 7 million board feet annually.  AR 127.   The Siuslaw EA considered but did not

analyze in detail several issues such as soil, botany, and fisheries, as many of these issues were

either analyzed in the FEIS, or appropriately addressed by project design features, such that there

was no potential for significant effects beyond those analyzed in the FEIS to which this EA is

tiered.  AR 128-130.

The Siuslaw Plan considered the no-action alternative as well as several action-

alternatives for how it would produce timber on the HLB.  AR 131-37.  The one BLM selected,

Alternative 4, that would achieve ASQ volume by providing a combination of 1,126-1,361 acres

of regeneration harvest and 278-944 acres of commercial thinning per decade.  AR 13.  BLM

chose Alternative 4 because, consistent with the RMP's Record of Decision and PRMP/FEIS, it

met the agency's O&C Act targets and promoted a balance of wildfire risk, age class

distribution, and complex plant communities.[4]

      The Siuslaw DR does not authorize any specific implementation actions, it instead

outlines a program of work for managing the HLB within the project area.  AR 11.  Prior to

issuing timber sale implementation decisions encompassed by the Siuslaw DR, the BLM will

complete a tiered EA, categorical exclusion review, or a Determination of NEPA Adequacy

(DNA), as appropriate.  AR 11.

      BLM provided the public with multiple opportunities to participate in and comment on

the development of the Siuslaw Plan and EA.  In October 2019, BLM first held an informational

open house for stakeholders.  AR 127. In November 2019, BLM reached out to "environmental

groups, economic interest groups, private citizens, timber companies, tribes, and local

governments" on the scope of the plan to which both Plaintiffs here and the American Forest

Resources Council responded.  AR 128.  BLM held two more comment periods in May 2020 and

August 2021.  AR 128.  The Siuslaw EA, DR, and FONSI were finalized in March and April

2022.  AR 128.

      Plaintiffs filed their Complaint on September 8, 2022.  ECF No. 1.  On May 24, 2023, the

Court adopted the findings and recommendation denying Defendants' Motion to Dismiss on

standing grounds.  ECF No. 22.  At the time of suit, and as of these summary judgment

proceedings, BLM has not authorized any timber sales under the Siuslaw Plan.

---

[4] Also called "complex early seral ecosystem."  AR 15.  *See* AR 7783 (defining seral stages as "[t]he series of relatively transitory plant communities that develop during ecological succession from bare ground to the climax stage.").

Page 10    MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

**STANDARD OF REVIEW**

Review of Plaintiffs' NEPA claims is governed by the Administrative Procedure Act
(APA).  5 U.S.C. § 706.  Courts uphold agency action unless it is "arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law."  5 U.S.C.  706(2)(A).  The question for
the reviewing court is whether "the decision was based on a consideration of the relevant factors
and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park v. Volpe*,
401 U.S. 402, 416 (1971).  For NEPA challenges, the review is a "pragmatic judgment" of
whether the "form, content and preparation" of the agency's NEPA analysis "contains a
reasonably thorough discussion of the significant aspects of the probable environmental
consequences." *Salmon River*, 32 F.3d at 1356 (quoting *California v. Block*, 690 F.2d 753, 761
(9th Cir.1982)).  However, a court may not "overturn an agency decision because it disagrees
with the decision or with the agency's conclusions about environmental impacts." *River Runners
for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  The review is instead "'highly
deferential, presuming the agency action to be valid and affirming the agency action if a
reasonable basis exists for its decision.'" *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475
F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

**ARGUMENT**

I.    **The Siuslaw Plan is an Effective Use of Tiering and Site-Specific Landscape Level Management**

BLM's NEPA analysis considered all relevant impacts across the site-specific EA here and the tiered-to FEIS underlying the 2016 RMP.  Tiering is not just permissible under NEPA, but BLM is actively "encouraged" to tier back to earlier documents so that it has space to "concentrate on the issues specific to the subsequent action."  40 C.F.R. § 1502.20.  The only requirement allowing a court to review both documents is that the tiered-to-document was also subject to NEPA review, which the FEIS for the 2016 RMP was.  *Kern v. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002).  Therefore, it is "[o]nly where *neither* the general nor the site-specific documents address significant issues is environmental review rejected."  *Western Watersheds Project*, 774 F. Supp. 2d at 1099 (emphasis added) (citing *Te-Moak Tribe v. U.S. Dep't of the Interior*, 608 F.3d 592, 602-07 (9th Cir. 2010)).

The 2016 RMP's FEIS complied with NEPA, as found by other courts in this District and affirmed by the Ninth Circuit.  *Rivers*, WL 6735090 *2 (D. Or. Oct 12, 2018) (magistrate judge's findings and recommendations); WL 1232835 (D. Or. Mar. 15, 2019) (adopting findings and recommendations in full); 815 Fed. App'x 107 (9th Cir. 2020) (affirming district court).  In the court's words, the 2016 North and South RMP were "designed over many years in consultation with the public, its own experts, the RIEC [Regional Interagency Executive Committee], the Forest Service, FWS, and NMFS, and resulting in a 2000-plus page FSEIS."  *Rivers*, WL 6735090 at *3.  BLM developed the FEIS "on a concrete, resource-by-resource basis instead of on the basis of land type . . . and addressed site-specific future actions where those actions could be reasonably forecasted."  *Id.* at *9.  Ultimately, the FEIS "furnished a great deal of data and

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

analysis concerning the direct, indirect, and cumulative impacts" and complied with NEPA's requirement to take a hard look at those impacts. *Id.* at *10.

BLM's NEPA approach here—tiering a landscape level EA to the 2016 RMP's PRMP/FEIS—is identical to that upheld with the same EIS in *North Landscape*. *Klamath-Siskiyou Wildlands Center v. BLM* (North Landscape), Civ No. 1:19-cv-01810-CL, 2021 WL 5356969 (D. Or. Aug. 24, 2021) *aff'd* in 2022 WL 17222416. In *North Landscape*, conservation groups, including Plaintiffs here, challenged an EA from the BLM's Klamath Falls Resource Area, to which BLM had subsequently authorized four implementation-level timber sales. *Id.* at *2. That EA was tiered to the FEIS for the 2016 Southwestern Oregon RMP, which is same FEIS supporting the 2016 RMP and to which the Siuslaw EA tiered. *Id.* at 1; AR 7476. In *North Landscape,* the court reiterated that it had upheld the North and South RMPs/FEIS in previous litigation. *Id.* at 3. Therefore, the court would "not consider attacks on the programmatic analyses supporting the 2016 RMP and its land use allocation framework," claim precluding the analyses in the 2016 RMPs. *Id.* at *7. Although Plaintiffs' site-specific challenges to the EA were not precluded, the court held that the EA satisfied the requirements of NEPA and the ESA. *Id.* at *9. The Court did not reject BLM's use of tiering between the site-specific landscape EA at issue in that case to the PRMP/FEIS on any issue. *Id.* at *8. (citing *Pit River Tribe v. Forest Serv.*, 469 F.3d 768, 783 (9th Cir. 2006)) (internal citation omitted).

Likewise, in *Lueders*, a conservation group failed to establish that BLM's tiering was improper. *W. Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1048–49 (D. Or. 2015). Instead, the court found it appropriate that the EA analyzed prior impacts in the aggregate and approving of the EA's analysis viewed together with tiered NEPA analyses and mitigation methods. *Id.* at 1050–51. The Ninth Circuit affirmed and expressly disagreed with plaintiff's

argument that, because it tiered to programmatic NEPA documents, the EA lacked sufficient site-specific analysis.  *W. Watersheds Project v. Ruhs*, 701 F. App'x 651, 653–54 (9th Cir. 2017).

These authorities directly contradict Plaintiffs' claim that tiering to the 2016 FEIS "already has been rejected by the Court." Pl's Mem. 18.[5]  Plaintiffs repeatedly suggest that tiering is suspect, a mere "fallback" to BLM's analysis, or barred by some unnamed legal authority.  Pl's Mem. 24, 26.  The authorities cited by Plaintiffs, to the contrary, reflect scenarios in which there was insufficient discussion in *both* the FEIS and subsequent tiered EA.  *See, e.g.*, *Klamath Siskiyou Wildlands Ctr v. BLM*, 2021 U.S. Dist. LEXIS 26040 (D. Or. Jan. 21, 2021) (finding that an EA appropriately tiered to the 2016 FEIS concerning the Pacific fisher, but not the great gray owl, because the EIS did not sufficiently discuss the latter species which would obviate the need for further analysis in the EA); *Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1158 (D. Or. 2019) (noting that neither the FEIS "nor . . . the [EA]" sufficiently address fire hazard to neighboring homes to the project area).  Plaintiffs describe the 2016 RMP at such a broad level of generality, in hopes that the court will ignore the scientific studies, modeling analysis, and disclosure of impacts the 2000-page FEIS provides.  To do so, they repeatedly point out how the 2016 RMP does not authorize this site-specific project by itself.  *See, e.g.*, Pl's Mem. 8.  *But see Klamath-Siskiyou Wildlands Ctr*, 2022 WL 17222416 at *2 (noting that the 2016 "FEIS contains project-level analysis").  But the pertinent question is whether the EA and RMP's FEIS, taken together, provide a "reasonably thorough discussion of the significant

---

[5] Here, Plaintiffs appear to incorrectly cite 410 F. Supp. 2d 1146, an insurance action from the Middle District of Florida.  Defendants assume Plaintiffs meant 410 F. Supp. 3d 1146, but reserve the right to address any other authority intended.  Regardless of the case cited, tiering NEPA documents is allowed and encouraged.  40 C.F.R. § 1502.20.

aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998) (quoting *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997)).

In its discussion of the environmental issues, the Siuslaw EA contains an analysis that is both programmatic landscape level and site-specific. [6]  43 C.F.R. § 1610.5-3, AR 124.  A NEPA document can be both programmatic, in that it looks at a wider project area, and also provide site-specific detail.  AR 10649 (CEQ guidance noting that "[a]gencies may prepare a single NEPA document to support both programmatic and project-specific proposals").  As the Ninth Circuit has stated, "nothing in NEPA or our caselaw prevents agencies from using a single document to undertake both a programmatic-level analysis and a site-specific analysis at the level appropriate for any irretrievable commitments of resources." *N. Ala. Env't Ctr v. Dep't of Int.*, 983 F.3d 1077, 1088 (9th Cir. 2020).  Again, *North Landscape* is instructive.  When discussing an equivalent landscape-level EA to this one, the District of Oregon recognized that the EA contained a "site-specific management approach." *North Landscape*, 2021 WL 5356969 *1. Thus, Plaintiffs' blanket assertion the Siuslaw Plan "did virtually no site-specific analysis" is contradicted by the legal authorities described above and the specific analysis described below. Pl's Mem. 21.

In summary, when turning to the issues below, the question is whether BLM adequately analyzed the relevant environmental issues in the site-specific Siuslaw EA and in the 2016 RMP's PRMP/FEIS to which it tiered. *W. Watersheds Project*, 774 F. Supp. 2d at 1099.  Like in

---

[6] BLM's longstanding practice of relying on Programmatic EIS's like that supporting the 2016 RMPs has now been codified into law for all agencies, as part as NEPA reform within the Fiscal Responsibility Act.  *See* 42 U.S.C. § 4336e(11) (2023).

*North Landscape*, this Court should reject any attempts to relitigate "the 2016 RMP and its land use allocation framework." *North Landscape*, 2021 WL 5356969, at *3.  Similarly, the Court should reject any broad-based challenge to relitigate BLM's practice of tiering timber EAs to the 2016 PRMP/FEIS.  *Klamath-Siskiyou Wildlands Center*, 2022 WL 17222416 at *2 (noting that an "EA was not legally deficient when it tiered to the final environmental impact statement ("FEIS") of the 2016 RMP").  For all issues, the record shows that BLM successfully met its NEPA obligations in preparing the Siuslaw Plan EA.

## II.    The Siuslaw Plan Complied with NEPA's Requirement to Identify the Most Significant Environmental Issues

In the HLB EA, BLM identified five issues that required detailed analysis because the issues were related to the purpose and need for the project or were related to potentially significant effects; it ultimately concluded that none of the effects were significant.  For other issues, such as species protection and soil disturbance, BLM explained why additional analysis was unnecessary, often because the issue was already analyzed in the FEIS for the 2016 RMP and there was no potential for significant effects outside of those analyzed in the FEIS.  NEPA's regulations make clear that BLM must focus on the issues it considers potentially significant. 40 C.F.R. § 1502.1; AR 13688-13690.  Plaintiffs' attempt to get BLM to indiscriminately analyze forty-two additional issues, regardless of their significance, should be rejected.

"NEPA documents must concentrate on the issues that are truly significant to the action in question."  40 C.F.R. § 1500.1(b). Agencies begin the identification of environmental issues early in the scoping process and must "not only identify significant environmental issues deserving of study, but also [] deemphasize insignificant issues, narrowing the scope of the environmental impact statement process."  40 C.F.R. §§ 1500.3(g), 1501.1(d).  Issues that the agency determines do not have potential significance should be summarized or discussed "only

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

briefly" with an explanation for why that issue "will not have a significant effect on the human environment or providing a reference to their coverage elsewhere."  40 C.F.R. § 1500.4; *Id.*

BLM's NEPA Handbook defines an issue as "a point of disagreement, debate, or dispute with a proposed action based on some anticipated environmental effect."  AR 13688. Additionally, an issue must have "a cause and effect relationship with the proposed action or alternatives" and can "not be decided by law, regulation, or previous decision," among other criteria.  AR 13688.  BLM starts by identifying a broad set of "[p]reliminary issues" during the initial scoping process.  AR 13689.  "While many issues may arise during scoping, not all of the issues raised warrant analysis in an EA or EIS."  AR 13689.  BLM then narrows the preliminary issues based on two criteria.  First, whether the issue is "respon[sive] to the purpose and need" of the project.  AR 128, 13689.  *See* 40 C.F.R. § 1502.13 (requiring a statement of "the underlying purpose and need" of the action).  Second, whether the issue is "associated with a significant direct, indirect, or cumulative impact or where analysis is necessary to determine the significance of the impacts."  AR 128, 13689.  *See* 40 C.F.R. § 1501.7(a)(3) (requiring an agency to "[i]dentify and *eliminate* from detailed study the issues which are not significant or which have been covered by prior environmental review") (emphasis added).

Informed by the scoping process, the Siuslaw EA narrowed down the most important issues by first preparing a "brief" statement of the purpose and need of the action.  40 C.F.R. § 1502.13.  "Agencies have discretion in drafting the purpose and need statement," so long as the statement is not "unreasonably narrow."  *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 843 (9th Cir. 2023) (citation omitted).  An agency may also draft a purpose and need statement "in light of the relevant statutory context."  *Id.* at 844.  The Siuslaw EA properly identified the purpose and need of the Siuslaw Plan, which "is to harvest timber in conformance

with management direction in the 2016 ROD/RMP." AR 126. As explained above, the 2016 RMP is a lawful and judicially-upheld exercise of BLM's discretion, and its FEIS analyzed BLM-administered lands in northwest Oregon consistent with NEPA, FLPMA, and the O&C Act.[7] The 2016 RMP then divided the lands into distinct land use allocations, placing the lands within the project area here in the HLB land use allocation and squarely under the timber harvesting mandate of the O&C Act, and giving the Eugene SYU an annual target of 53 million board feet (MMBF). AR 7487. Under FLPMA, RMPs are a preliminary step in the overall process of managing public lands, "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 CFR §1601.0–2. BLM's determination in the 2016 RMP to harvest timber in the Harvest Land Base controls the purpose and need of future management actions, including the Siuslaw Plan EA. Given this statutory framework, particularly the O&C Act's sustained yield provisions, this purpose and need statement is reasonable.

Keeping the purpose and need of the project in mind, BLM identified forty-seven preliminary issues, and narrowed the scope of its analysis to five issues analyzed in detail in the EA. One issue, directly related to the purpose and need, was how timber harvest under the Siuslaw Plan could help meet BLM's 53 MMBF "contribution to the Eugene SYU's declared ASQ per decade." AR 128. The remaining four issues dealt with potentially significant environmental impacts of the Siuslaw Plan, including timber age class, complexity of early successional ecosystems, stand level fire hazard and fire resistance, and fire risk. AR 129. Thus,

---

[7] Plaintiffs' blanket assertion that "the substantive statute is FLPMA" ignores the important and substantive role the O&C Act also plays in defining BLM's obligations. Pl's Mem. 18.

BLM met the obligation that its "NEPA documents must concentrate on the issues that are truly

significant to the action in question." 40 C.F.R. 1500.1(b).

Plaintiffs do not challenge the validity of the five issues BLM identified as potentially

significant and analyzed in detail in the EA, but demand even further consideration of all forty-

two additional issues BLM considered but did not present in detailed analysis. This scattershot

attack has no basis in NEPA. In *Thurston I*, challengers successfully identified a particular issue

(*i.e.*, fire risk) that was analyzed sufficiently neither in the EA nor in the 2016 RMP's FEIS.

*Cascadia Wildlands*, 410 F. Supp. 3d at 1157. But here, Plaintiffs instead assert that the

Siuslaw Plan "would inherently affect all the identified issues." Pl's Mem. 16. Plaintiffs also

zero in on the word "directly" as a "critical qualification" to BLM's analysis; that is, suggesting

BLM's approach was flawed by excluding issues which were not "directly" tied to the project's

purpose and need. Pl's Br. at 18. AR 231. But BLM provided a several page discussion for

each of the forty-two issues considered, but did not analyze further, detailing why those

particular issues did not warrant additional analysis in the Siuslaw EA. More importantly,

Plaintiffs' demand for BLM to analyze every issue presented ignores that BLM is required to

separate "significant environmental issues deserving of study" from other issues that either are

not significant for this action or that BLM has already analyzed. 40 C.F.R. § 1500.4

In any event, BLM did consider the additional forty-two issues initially identified. With

the issues flagged by commentators, Appendix B of the Siuslaw EA carefully explains each of

those issues and why it was excluded from further analysis. AR 201-26. *See, e.g.*, AR 201

(noxious and invasive weeds), AR 209 (fish habitat), AR 215 (sediment delivery to streams), AR

224-25 (soil disturbance), AR 248 (certain bureau sensitive species), AR 253 (fisher).

Ultimately, BLM successfully identified the Siuslaw Plan's environmental issues and analyzed in detail those issues related to potentially significant effects.

## III.   The Siuslaw Plan Took a Hard Look at All Relevant Environmental Impacts and Analyzed Cumulative Impacts

In addition to their blunderbuss claim that BLM was required to analyze in detail forty-two different resource issues in the EA, Plaintiffs next identify three specific areas where they allege BLM failed to take a hard look: soil, noxious weeds, and bureau sensitive species. Plaintiffs further allege a failure to review cumulative impacts, particularly regarding an EA for an adjacent BLM plan.  But for each issue, BLM analyzed the likely impacts, made appropriate use of modeling across forest stands, and used project design features and best management practices to avoid and reduce environmental harms.

Agencies are required to take a "hard look" at a plan's environmental impacts.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21(1976) (citation omitted).  While the hard look standard "is not susceptible to refined calibration," a few principles are well-settled.  *California v. Block*, 690 F.3d 743, 761 (9th Cir. 1982).  First, "[w]hen examining" an agency's "[s]cientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).  Courts should be mindful of the lack of certainty inherent in environmental study and "should not magnify a single line item beyond its significance as only part of a larger" dataset. *Id.* at 103.  *See also*

*'Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006) (describing hard look review as following the "rule of reason' standard").  Ultimately, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious" under the APA. *Balt. Gas*, 462 U.S. at 97-98; 5 U.S.C. § 706.

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

In reviewing BLM's compliance with NEPA's hard look requirement, the APA also makes clear that "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. In contradiction with the APA's requirement that judicial review should be on the record, Plaintiffs aim to kneecap BLM's ability to cite the years of scientific study it relies on, by suggesting that "BLM's analysis stands or falls on the information provided in the Siuslaw Project EA itself." Pl's Mem. 20. The full quote of the case they cite for this proposition merely noted that an EA may lack support if it "contains virtually no references to any material in support of or in opposition to its conclusions." *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998).

"NEPA permits an agency to gauge a project's impacts based on the *project's design features*, as long as the agency's analysis has provided sufficiently detailed information to demonstrate that it took a "hard look" at the project." *Klamath Siskiyou Wildlands Center v. BLM*, 2014 WL 525116 *12 (D. Or. 2014) (emphasis added). For example, design features can take the form of washing vehicles and re-seeding in an area to prevent weeds. *Bark v. BLM*, 643 F. Supp. 2d 1214, 1230 (D. Or. 2009) (crediting BLM's design features for weed management in holding that BLM took a hard look at "noxious weeds" and reducing "soil disturbance"). Design features may be forward looking as well, contemplating "additional protective measures" that the agency will engage in before "subsequent . . . authorizations," as needed. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006). When design features reduce the effects of a plan, the "effects are analyzed with those measures in place." *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006). Thus, design features that limit environmental impacts from the start therefore temper the level of detail the "hard look" standard requires.

### A.    BLM Took a Hard Look at Soil Disturbance

BLM took a hard look at the impacts of timber harvesting on soil disturbance.  In particular, the 2016 RMP's PRMP/FEIS explained the science behind soil impacts in Oregon and used past timber sales to estimate future impacts; then the 2016 RMP established management direction that limits the cumulative spatial extent of detrimental soil disturbance to less than 20 percent of a treatment area/harvest unit for implementation timber projects.  The Siuslaw EA explains the steps it will take to remain under the 20 percent cap for soil disturbance, pursuant to the RMP management direction, through soil surveys both before and after timber harvest.  Taken together, this explanation satisfies NEPA, because by ensuring each HLB timber sale stays under the soil disturbance cap, the effects of the HLB EA remain within the effects analyzed and disclosed to the public in the FEIS.  Plaintiffs demand a different scope of analysis that NEPA does not require, largely relying on inapposite analysis concerning a FLPMA claim.

BLM began its analysis by assessing the soil baseline conditions for western Oregon in the FEIS for the 2016 RMP.  *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1083 (9th Cir. 2011) (internal citations omitted) ("NEPA requires that the agency provide the data on which it bases its environmental analysis.")  There is no single method with which an agency must identify the "baseline conditions" of an area or resource.  "An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).  Thus, for example, an agency may estimate baseline conditions in one area by extrapolating from another area.  See *Or. Nat. Desert Ass'n v. Jewell*, 840 F. 3d 562, 570 (9th Cir. 2016).  Thus, NEPA's

requirements lie not in any particular analytical method but on whether the agency relied on "accurate information and defensible reasoning." *Id.*

Consistent with these standards, BLM first disclosed that timber harvest can have an impact on soil, citing to dozens of studies on how soil compaction might influence the growth of nearby trees and vegetation. AR 8999-9002. The FEIS for the 2016 RMP then calculates the actual amount of soil disturbance that occurred from past timber harvests, which for the whole Coastal North region was 12,688 acres. AR 9001. This analysis established that there was 6% more soil disturbance in the interior/south region compared to the coastal/north region on average. AR 9002 (calculating, by estimated maximum extent, a disturbance level of 23% in the interior/south and 17% in the coastal/north). The latter coastal/north region is where the Siuslaw Field Office is located. The 2016 RMP took this data and set a limit that each timber harvest unit will allow no more than 20% soil disturbance across its acreage. AR 7570. When the combined detrimental soil disturbance from historic operations and current implementation exceeds 20 percent of the timber harvest unit area, BLM is directed to apply mitigation or amelioration to reduce the total detrimental soil disturbance to less than 20 percent of the harvest unit area. AR 7570. As discussed above, the Ninth Circuit held that the FEIS for this 2016 RMP complied with NEPA. *Rivers*, 815 Fed.Appx. at 110 ("BLM thus reasonably took the required "hard look" at the consequences of the 2016 RMPs.").

Building off the analysis in the FEIS for the 2016 RMP, BLM then prepared a draft soil report specific for the Siuslaw EA. AR 3838. The report assessed the baseline conditions of the area by combining all available soil data for the project area acreage, including through Lidar (remote sensing laser) imagery, soil data from the Natural Resources Conservation Service, as well as seismic, earthquake, and landslide data from the United States Geological Survey. AR

3839.  Since harvest units and fuels treatment have not been designated at that preliminary stage, the soil report based its analysis from historic logging activity, predicted logging activity, predicted fuel treatments, and predicted road building.  AR 3840-44.  From these data, BLM was able to estimate the predicted impacts of soil disturbance from future timber sales.  AR 3842-43. Table 3 in the soil report then compared the modeled level of disturbance from road construction and treatment across each of the six alternatives.  AR 3843-44.  The analysis in the soil report informed BLM's conclusion, reflected in the EA, that each of the timber production alternatives would fall under the 2016 RMP's 20% soil disturbance cap.  AR 224.

While each alternative will keep BLM under its 20% soil disturbance cap, the Siuslaw Plan goes further to incorporate several project design features to ensure compliance with the RMP and enhance its site-specific analysis.  In particular, BLM will engage in pre-treatment/harvest soil surveys utilizing the Forest Soil Disturbance Monitoring Protocol to inform timber sale design by identifying fragile or historically disturbed areas for harvest avoidance, treatment modification, or condition improvement.  AR 225.  This protocol will assess which areas carry a "risk of creating greater than twenty percent detrimental soil disturbance," and then enforce design modifications, such as requiring the felling of trees to occur above a "slash mat" of logging debris to protect the underlying soil.  AR 225.  For the sub-set of acres where BLM authorizes timber sales, BLM will monitor those areas before sale closure and incorporate any necessary measures "into the scope of the sale contract" as needed. AR 225.  While all actions under the Siuslaw Plan are designed to be under the 20 percent soil disturbance threshold, BLM will monitor the timber harvest units yet another time after timber harvest to ensure the 20% cap was met; if not, the Siuslaw Plan explains that "[p]ost-treatment

ameliorative actions" will be implemented by timber sale purchasers before the close of the contract to comply with RMP management direction.  AR 225.

The analysis above is the same approach endorsed by the Ninth Circuit in *N. Ala. Env't Ctr v. BLM*.  983 F.3d at 1089.  There, Plaintiffs argued that an oil and gas sale violated NEPA because the analysis in question lacked a "greater degree of site specificity," just as Plaintiffs claim here. *Id.* at 1089.  *See, e.g.,* Pl's Mem. 2, 20.  The government responded that the sale was appropriately analyzed in an EIS from several years prior.  *Id.* at 1088.  The Ninth Circuit found that BLM's site-specific inquiry was adequate, reiterating that "the required degree of analytical site specificity depends on the specificity of the 'reasonably foreseeable environmental impacts in light of the *factual context*." *Id.* at 1089 (emphasis added).  The court noted that, even though an "irretrievable commitment of resources" was at stake, the challenged NEPA document could be "reasonably construed to include the subsequent action" at the level of detail BLM provided. *Id.* at 1085-6 ("we disagree with Plaintiffs' suggestion that a programmatic EIS prepared for a broad-scale land use plan categorically cannot provide the site-specific analysis required for irretrievable commitments of resources.").

Despite all of BLM's analysis to evaluate baseline conditions and monitor soil disturbances during future timber sales, Plaintiffs ask the Court to impose a burdensome and wasteful additional requirement to create harvest-unit-area specific studies before the agency knows how those harvest unit areas might be logged.  Pl's Mem. 22–23.  But that is simply not the law, as the Ninth Circuit has held that BLM "need not conduct measurements of actual baseline conditions in every situation" because it "may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch*, 844 F.3d at 1101.  Plaintiffs' demand for more site-specific data overlooks the fact that

the Siuslaw EA only provides a plan for harvest for a minority of the project area per decade and

no timber sales have yet been authorized.  AR 13 (maximum of 2305 acres harvested per decade

out of 13,225 across all methods).  This minority of logging in the Siuslaw project area is the

"factual context" within which BLM based its analysis.  *N. Ala. Env't Ctr*, 983 F.3d at 1089.  In

contrast, Plaintiffs' approach would require BLM to waste scarce resources analyzing soil across

thousands of acres that may never be logged under this plan and may have quite different soil

baselines from present-day if they were ultimately logged decades from now.  Generating soil

disturbance estimates across the entire EA acreage at the EA stage, as preferred by the Plaintiffs,

would require BLM to make large and likely inaccurate assumptions about future timber sale

prescriptions; by outlining a process for remaining within RMP thresholds, the soil analysis has a

high confidence in predicting effects while avoiding unnecessary speculation.  Regardless, no

amount of additional analysis of specific units changes the fact that BLM must ensure that the

soil disturbance is below the 20 percent threshold in each timber harvest unit.  Because courts

"do not require agencies to analyze every potential consequence of every choice they make," let

alone consequences of decisions they do not make, the Court should decline to require BLM to

conduct site-specific studies across thousands of acres before it has even determined which of

those areas will be logged, let alone how they will be logged.  *San Luis & Delta-Mendota Water*

*Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014).

     BLM's plan to meet the RMP's 20% threshold distinguishes this case from *Brong*.

There, the resource management plan had a "clear directive against removing large snags,"

which the Ninth Circuit found would be violated on two-thirds of affected acreage, thus

violating FLPMA.  *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1128–30 (9th Cir.

2007).  By contrast, the 2016 RMP's management direction sets a 20% threshold for soil

disturbance, and

BLM has explained how it intends to ensure soil disturbance stays below that cap within each timber harvest unit across the project area.

In response, Plaintiffs claim that BLM needed to analyze soil impact at the harvest unit or treatment-unit level.  Pl's Mem. 22.  But again, BLM did just that in the modeling analysis described above.  Plaintiffs repeat the incorrect assertion that the Siuslaw Plan is not "site-specific" for analytical purposes, citing to a set of soil research notes called "Justification of Site-Specific Soil Analytical Approach." AR 1769.  That same document, however, reiterates the soil disturbance analysis BLM did and concluded that the use of best management practices—i.e., the project design features described above—would have "the greatest ability to quantify impacts to soil resources" AR 1766 ensure compliance with RMP management direction.

### B.    BLM Took a Hard Look at Noxious and Invasive Weeds

BLM took a hard look at noxious weeds and invasive species.  As the FEIS for the 2016 RMP and the Plan's NEPA documents acknowledge, weeds are a problem in Oregon writ large. These issues are appropriately disclosed in BLM's analysis, noting that the Siuslaw Plan does not make the weed problem worse, and BLM incorporates project design features that meet the hard look requirement.  But Plaintiffs' invasive weeds argument suffers from a threshold problem; they failed to adequately raise this argument before the agency.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it ... alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration.") (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978), alteration in *Pub. Citizen*).  *See Cascadia Wildlands v. BLM*, 2021 U.S. Dist.

LEXIS 215907, at *31 (D. Or. Sept. 13, 2021) (recommending dismissal of plaintiffs' claim

where they failed to raise it with the requisite specificity during the administrative process).

As mentioned above, the identification of issues is informed by a scoping process in

which BLM gathers internal and external input, including comments from private parties.  AR

127.  Plaintiffs were involved in this process from the start in 2019.  That said, they provided

only passing references to spreading weeds.  AR 6215.  Given another opportunity to respond to

a later draft in 2021, Plaintiffs again provided minimal detail, simply stating that "[a]n EIS

should be completed that analyzes impacts to . . . invasive weeds."  AR 484-45.  In contrast,

Plaintiffs provided thorough comments on other topics such as spotted owl locations and stream

flows.  AR 486-90, 495.  BLM responded to these more detailed considerations in Appendix B.

AR 237-40 (spotted owls) AR 218 (summer streamflow).

This failure to provide meaningful comments on invasive weed issues is fatal under

*Vermont Yankee*.  That case reiterates the principle that "comments must be significant enough to

step over a threshold requirement of materiality before any lack of agency response or

consideration becomes of concern."  *Vermont Yankee*, 435 U.S. at 553.  As to specificity, "[t]he

comment cannot merely state that a particular mistake was made . . . it must show why the

mistake was of possible significance in the results."  *Id.* (internal citation omitted).  NEPA's

regulations echo the point that comments "shall be as specific as possible."  40 C.F.R. §

1503.3(a).  When a party has failed to provide requisite comments, instead waiting to develop

arguments more thoroughly for litigation, it is improper to "seek[] to have the agency

determination vacated."  *Vermont Yankee*, 435 U.S. at 554.  "Absent exceptional circumstances,

such belatedly raised issues may not form a basis for reversal of an agency decision." *Havasupai*

*Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

Although Plaintiffs' failure to provide comments on invasive weeds is dispositive, it remains the case that the Siuslaw Plan took the requisite hard look at invasive weeds. The 2016 RMP's PRMP/FEIS mapped the presence of invasive species across the Eugene, Coos Bay, Klamath Falls, Medford, Roseburg, and Salem districts, including the severity within each district's watersheds. AR 9809. BLM then considered how invasive species would be impacted by road construction, public motorized vehicle use, and timber harvesting. AR 9814-20. The Siuslaw EA, in turn, relying upon and tiering to the PRMP/FEIS, then mapped out the invasive species in the project area with the specific amount of acreage for some of the most harmful weeds. AR 201. These were based on botany surveys from 2010 to 2019. AR 201. BLM found that the risk of invasive plant introduction and spread in the EA was within the same range as the risk of invasive introduction and spread analyzed at the watershed scale in the 2016 RMP. AR 202. The Siuslaw EA also includes project design features for invasive maintenance, such as conducted inspections of closed roads for "non-native invasive plans, including noxious weeds." AR 309. In the Siuslaw EA, this was an issue considered but not analyzed in detail because the issue wasn't necessary to evaluate how the alternatives respond to the purpose and need and because there is no potential for significant effects beyond those described in the FEIS. AR 202.

Plaintiffs acknowledge some of this work but criticize BLM for not performing additional weed surveys "*in relation* to the Siuslaw Project timber sale units." Pl's Mem. 26. (emphasis in original). This argument puts the cart before the horse. As discussed in the motion to dismiss stage, BLM currently has two timber sales under the EA in the preliminary stages of development. There are no timber sale authorization documents for any sale under the Siuslaw Plan and before there is, BLM must complete subsequent implementation level NEPA, where appropriate, and issue implementation level decision records. AR 11. The Siuslaw Plan will

also treat only between 1,404-2,305 acres per decade, out of 13,225 HLB acres that comprise the

project area.  AR 125.  Plaintiffs' criticism thus requires BLM to have already decided which

minority of its acreage it would hold timber sales in, then conduct weed surveys for those

projects.  But "NEPA does not require an agency to consider the environmental effects that

speculative or hypothetical projects might have on a proposed project." *Ctr. for Biological*

*Diversity v. Ilano*, 928 F.3d 774, 780 (9th Cir. 2019) (citation omitted).

### C.    BLM Took a Hard Look at Bureau Sensitive Species

BLM took a hard look at the dozens of bureau sensitive species and their habitats in the

project area.  The Siuslaw Plan not only relies on the 2016 RMP FEIS's modeling but narrows

the analysis down to the Siuslaw Field Office level.  Unable to find particular flaws in the

Siuslaw EA's analysis of these species, Plaintiffs return to speaking about the size of the 2016

RMP's analysis and effectively ask this court to cast judgment about dozens of species, striking

them all.

When taking a hard look at wildlife, "NEPA regulations direct the agency to consider

the degree of adverse effect on a species, not the impact on individuals of that species." *Env't*

*Prot. Info. Ctr*, 451 F.3d at 1010.  To determine the effect on a species, an agency looks at the

level of *suitable habitat* in the region.  *The Lands Council v. McNair*, 537 F.3d 981, 996, (9th

Cir. 2008) ("the amount of suitable habitat for a particular species [i]s a proxy for the viability

species").  Thus, an agency should "describe the quantity and quality of habitat that is necessary

to sustain the viability of the species in question and explain its methodology for measuring this

habitat." *Id.* at 998.  But courts "refrain from acting as a type of omnipotent scientist," and

"must defer to an agency's decision that is 'fully informed and well-considered.'" *Audubon*

*Soc'y of Portland*, 40 F.4th at 984.

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

BLM took a hard look at bureau sensitive species across its NEPA documents. A bureau sensitive species is a species that has not been listed under the ESA, but which may be in the future.[8] Bureau sensitive species are one category of special status species, AR 269, and the category which Plaintiffs emphasize as lacking analysis. Pl's Mem. 29-30. BLM's guidance for these species is to "reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA." AR 13282.

The 2016 RMP/FEIS modeled the presence of bureau sensitive species habitat and determined that the plan "would lead to an increase in habitat in 50 years for roughly half of the 66 Bureau Sensitive species for whom habitat was modeled." AR 9097. Another 45% of species would see no change. AR 249. This modeling occurred "by grouping species with roughly the same habitat requirements and evaluating the amount of habitat in which these species were found." AR 249.

The Siuslaw EA tiers to and continues this analysis of bureau sensitive species. BLM documented dozens of bureau sensitive species and the extent to which those species had habitat within the project area. AR 272-280. (Table D-5.4.2-2 and D-4.2.2-3). Even for species noted as likely to be within the project area, BLM determined that the Siuslaw Plan was not likely to cause a trend toward ESA listing. AR 272-280. The Siuslaw EA explained that there would not be a trend toward listing for a variety of reasons, such as the small size (8%) of the Harvest Land Base in comparison to habitat in the broader Siuslaw Field Office. AR 272-73. Where

---

[8] In contrast to Bureau Sensitive Species, Plaintiffs elsewhere predict that the Siuslaw EA will adversely impact several endangered species, like the marbled murrelet, spotted owl, coho salmon, and chinook salmon. Pl's Mem. 36. But for each of these species, BLM is conducting the required consultation to minimize impacts with the National Marine Fisheries Service and the Fish and Wildlife Service, as required by the Endangered Species Act. AR 192-93. Plaintiffs do not bring an ESA claim and therefore does not challenge that BLM is failing to abide by its procedural requirements for endangered or threatened species.

necessary, the EA notes whether more protection measures will be applied for particular species. *See*, e.g., AR 272 (bald eagle and golden eagle).

The fisher (a type of small mammal) is a bureau sensitive species whose analysis is representative of the Siuslaw EA's site-specific approach.  AR 254.  To determine whether fisher impacts in the Siuslaw Field Office fall within those analyzed in the 2016 RMP's FEIS, the Siuslaw Plan looked to locality records of fisher sightings.  AR 253.  Records from 1993 to 2013 showed no sightings of the fisher in the project area, and one sighting of unknown reliability. AR 253.  BLM coupled this sighting data with the scientific literature of which types of environments fishers generally prefer.  AR 275.  *See also* AR 3812-14 (habitat association table explaining how each special status species is linked to particular types of grasses, shrubs, young forests, or old forests, among other habitats).  The Siuslaw EA then reached the same conclusion as the 2016 RMP; "that the northern extent of the current range of fisher was just south of the Siuslaw Field Office."  AR 255.  Additionally, using spotted owl habitat as a proxy for fisher habitat, BLM determined that if there were any fishers, the appropriate habitat would be in one of the reserve land use allocations, rather than HLB land use allocation.  Nothing more is required.  *See North Landscape*, 2021 WL 5356969, at *7 (D. Or. Aug. 24, 2021) ("it was proper for the North EA to tier to the FEIS for the 2016 RMP because the anticipated effects of the North Project to the NSO [northern spotted owl], NSO habitat . . . are within the impacts analyzed in the 2016 PRMP/FEIS"), report and recommendation adopted sub nom. *Klamath-Siskiyou Wildlands Ctr. v. BLM*, No. 1:19-CV-1810-CL, 2021 WL 5355919 (D. Or. Nov. 16, 2021), aff'd sub nom., *Klamath-Siskiyou Wildlands Ctr. v. BLM*, No. 22-35035, 2022 WL 17222416 (9th Cir. Nov. 25, 2022).

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

*Griffin Half Moon* provides a helpful example of when an agency has taken a hard look at a bureau sensitive species or not. *Griffin Half Moon, 2021 U.S. Dist. LEXIS 26040 *17-*18.* There, Plaintiffs raised and the court considered whether BLM took a hard look at two specific species: great gray owls and pacific fisher. *Id.* at 12, 19. The court ruled that the *Griffin Half Moon* project did not sufficiently consider great gray owls in part because the tiered FEIS incorporated by reference analysis performed under a prior land use plan that contained "legally invalidated analysis of effect to great gray owls" and there "would be insufficient habitat within the species' range." *Griffin Half Moon*, 2021 LEXIS 26040 at 12. *(citing Conservation Nw. v. Rey,* 674 F.Supp. 2d 1232 (W.D. Wash. 2009). The court found that because the RMP FEIS lacked site-specific analysis of impacts to great gray owls, it could not save the EA that also lacked site-specific analysis of impacts to the species. *Id.* But the court held the opposite for the pacific fisher. The RMP FEIS to which the EA tiered provided "a detailed quantified analysis" of the pacific fisher and noted that the "habitat would increase in reserve lands" and overall; the challenged EA then looked at fisher habitat impacts for its particular project area, using northern spotted owl habitat as a proxy for fisher habitat. *Id.* at 17-18. The court concluded that "it was rational for the BLM to determine that the Griffin Half Moon timber sale would not exceed the predictions of effects to the Pacific fisher *under the 2016 RMP* or trend the fisher towards a further protective listing." *Id.* at 19 (emphasis added).

Consistent with their overall attack of BLM's use of tiering to the 2016 RMP's PRMP/FEIS, Plaintiffs present exactly one-half of this *Griffin Half Moon*'s discussion of wildlife, focusing only on the Court's findings regarding great gray owls and ignoring the Court's findings regarding pacific fisher. Pl's Mem. 30. The fairer reading illustrates that *Griffin Half Moon* took the same approach as with other hard look issues — determining whether

the FEIS and EA in conjunction contain an adequate discussion of a particular species' habitat impacts.  Here, unlike in *Griffin Half Moon*, Plaintiffs fail to present with any detail which species it alleges BLM failed to analyze.

Rather than focusing on the effects to any specific bureau sensitive species, Plaintiffs primary concern seems to be that BLM conduct "surveys to determine the population sizes" for some undefined set of species' habitats.  Pl's Mem. 29.  But they cite no caselaw requiring surveys focusing on exact population size, and BLM policy does not require surveys for bureau sensitive species.  AR 13296.  Again, NEPA envisions a project's "effect on a species," measured by habitats, and effects to species as a whole, "not the impact on individuals." *Env't Prot. Info. Ctr.*, 451 F.3d at 1010.  Ultimately, BLM's modeling and analysis were adequate and, with no particular species identified, Plaintiffs "ha[ve] not demonstrated that other information was "essential to a reasoned choice among alternatives." *Audubon Society of Portland*, 40 F.4th at 984 (citing 40 C.F.R. § 1502.22).

### D.    BLM Properly Analyzed Cumulative Impacts

BLM properly analyzed the cumulative effects for each of the five issues considered in detail in the EA.  AR 143 (age class distribution within HLB in Siuslaw Field Office); 149–50 (contribution to allocated ASQ); 170 (complexity levels for early successional *ecosystems* in HLB); 181 (stand level fire hazard and resistance in HLB); 191 (fire risk).  Despite this analysis of cumulative effects for the five issues analyzed in detail, Plaintiffs contend that EA needed to also analyze the cumulative impacts of 42 other issues.  Pl's Mem. 31.  The Court should reject this part of Plaintiffs' argument because tiering to the EIS (and its analysis of cumulative impacts) is entirely appropriate.  *See supra* at 15.

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

Plaintiffs also allege that BLM erred by not analyzing the cumulative impacts of the N126 plan. Unlike the Siuslaw Plan that analyzes treatment of HLB—Harvest Land Base— lands, AR 124, the N126 Project analyzes treatments in the Late-successional Reserve (LSR), AR 1985, which are managed in quite different ways. While HLB lands are managed for sustained yield timber contribution to meet ASQ, BLM manages the LSR land use allocation, among other goals, to promote northern spotted owl habitat and restore complex late-successional forest. AR 1985-1986. .

Despite the distinct nature of these two plans and their respective land use allocations, Plaintiffs contend that the two plans will have cumulative impacts on early successional "conditions." Pl.'s Mem. 32. Plaintiffs' argument focuses on a superficial similarity between the EAs: the Siuslaw EA analyzes impacts on "early successional ecosystems," AR 153, while the N126 EA notes that its treatment will create "early-successional habitat." AR 2002. But Plaintiffs seek to conflate these two distinct terms under the umbrella term of "early successional conditions." Pl.'s Mem. 32. More specifically, Plaintiffs contend that "[t]he N126 project would create up to 18,000 acres of early successional ecosystems over the next 40 years, AR 2002, and the Siuslaw Project would create 1,126–1,361 acres per year. AR 13." Pl's Mem. 32. This obfuscation incorrectly attributes the creation of "early successional ecosystems" to the N126 Project, Pl.'s Mem. 32 (citing AR 2002), when the N126 EA never discusses that term. *See* AR 1980–2197.

Early successional habitat under N126 versus early successional ecosystems under the Siuslaw Plan are distinct. Where BLM discusses the creation of acres of early successional *habitat* in N126, this means restoring stand complexity, by creating multi layered canopies with hardwood trees and understory shrubs, grasses, and forbs—the kind of habitat that support the

rodents that northern spotted owls prey on.  AR 2026.  Development of early successional habitat

is consistent with N126's treatment of the LSR, whose management objectives focus in part on

"maintain or restoring northern spotted owl" habitat.  AR 1986; AR 2022 ("Habitat for woodrats

and lagomorphs (rabbits and hares) is quantified with the acres of understory complex early

successional vegetation in each alternative.").  Accordingly, the N126 Project involves thinning

in the LSR to create understory habitat for certain types of prey.

Early successional *ecosystems*, by contrast, are a particular stage in the forest regrowth

process following stand-clearing events such as wildfires, flooding, or regeneration harvesting.

AR 151.  Plaintiffs even tacitly admit that these terms have distinct meanings.  *Compare* Pl's

Mem. 32 (describing "early successional ecosystems" as "a euphemism for a post-clearcutting

landscape"), *with* AR 1980–2197 (analyzing no regeneration harvesting for the N126 Project).

Because the N126 Project is outside of the geographic scope of the HLB effects analysis for the

complex early successional ecosystem issue, there was no need for BLM to analyze N126s's

cumulative impact on that issue.  Additionally, the N126 Project does not result in the creation of

early successional *ecosystems*.[9]

Additionally, Plaintiffs' early-successional-conditions arguments overlook the

differences between the N126 and Siuslaw project areas.  "Determination of the scope of an

analysis area [for a cumulative effects analysis] requires application of scientific methodology,

and, as such, is within the agency's discretion." *Dombeck,* 304 F. 3d at 902 (internal citations

omitted).  The Ninth Circuit has explained that when a separate project "falls outside the

---

[9] In contrast, BLM did consider the relationship between N126 and the Siuslaw Plan regarding
road construction, renovation, and haul because the two plans shared haul routes.  AR 215-16.
BLM found that the "total increase in sediment delivery" was less than .05 percent, consistent
with the N126 analysis.  AR 216.

[challenged] Project's cumulative impacts analysis area," Plaintiffs must show "that the BLM's determination of [the challenged Plan's] area was arbitrary." *Soda Mountain Wilderness Council v. BLM*, 607 Fed.Appx. 670, 673 (9th Cir. 2015). Plaintiffs make no argument as to why the Siuslaw Plan's 13,225-acre geographic scope for the early successional ecosystem issue, which was confined to the Siuslaw EA's HLB lands, was arbitrary.

## IV.    The Siuslaw EA and FONSI Revealed No New Significant Information, and Therefore an Additional EIS Was Not Required

BLM properly explained why it was not required to prepare an additional EIS beyond the 2016 RMP's FEIS. The Siuslaw Plan challenged here is not the first EA of its kind in western Oregon; it is similar to other landscape plan EAs in size and scope. BLM also explained in the FONSI why the various regulatory factors regarding the context and intensity of an action do not require an EIS here. Plaintiffs' explanation for why the Siuslaw Plan is particularly significant or precedential fails.

NEPA requires an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). NEPA's regulations have a variety of factors that an agency considers for determining the "significance" of an action, all centered around the context and intensity of the plan at issue. 40 C.F.R. § 1508.27. For "intensity," an agency has the particularly complex task of weighing ten different factors: the action's beneficial or adverse impacts, public health, proximity to ecologically critical areas, whether the effects are "highly controversial," the "precedent for future actions," cumulative impacts, relationship to historical resources, impact on ESA species, or any threatened violation of law. 40 C.F.R. § 1508.27(1)-(10).

A site-specific EA is usually sufficient when tiered to a broader programmatic EIS. In other words, "[a] comprehensive programmatic impact statement generally obviates the need for

a subsequent site-specific or project-specific impact statement, unless *new and significant environmental impacts* arise that were not previously considered." *Salmon River*, 32 F.3d 1346, 1356 (emphasis added).  Moreover, site-specific impacts which were contemplated by the tiered to EIS do not constitute new and significant environmental impacts.  *Headwaters v. BLM*, 914 F.2d 1174 ,1178 (9th Cir. 1990) ("Where an environmental impact is "encompassed by the terms of the [regional] EIS," its site-specific effects "d[o] not constitute 'significant new circumstances' requiring a supplemental EIS.") (quoting *Oregon Natural Res. Counc. V. Lyn*, 882 F.2d 1417, 1423 (9th Cir. 1989)).

BLM explained each of the context and intensity factors in its Finding of No Significant Impact (FONSI).  AR 1-9.  For example, BLM noted each ESA-listed specifies and how impacts on them would be minimized by following the 2016 RMP's management direction.  AR 3-4.  BLM confirmed that no lands within the project area were "ecologically critical," which would be the case if there was a national park or statutorily designated wild and scenic river.  AR 4.  Similarly, at this stage BLM had identified no cultural resources, but BLM noted it will continue consultation with the Oregon State Historic Preservation Office.  AR 6.  The FONSI detailed the remaining impacts as discussed in the EA, and ultimately determined that the Siuslaw Plan "would not have a significant impact on the human environment within the meaning of [NEPA], and that an EIS is not required." AR 9.

As to tiering, it is true that BLM is not per se released from considering whether it needs to provide a project-specific EIS because it tiers to an EIS.  Instead, an agency should consider "the nature or magnitude of a project." *Blue Mountain. Biodiversity Project*, 161 F.3d at 1214.  It is relevant, therefore, that BLM's decision here is of a similar magnitude compared to other EAs in the region.  As the Siuslaw EA explains, BLM has previously issued several landscape plans within the Siuslaw Field Office, all of which were analyzed through EAs.  AR 124 (Upper Siuslaw Landscape

Plan Environmental Assessment, Long Tom Environmental Assessment, and the North Lake Creek Landscape Plan).  AR 124.  These three EA-supported plans combined ultimately authorized 13,405 acres of HLB treatment from 2005-2018 (*see* AR 124-125), falling well within the decadal projection of HLB harvest in the SYU; this approach is similar to the Siuslaw Plan's 1,404-2,305 acres of treatment estimate per decade.  AR 13.  When considering the plan in *North Landscape*, which analyzed 11,879 acres, the court concluded that an EIS was not required because the EA and FONSI "fulfilled BLM's obligations to take a hard look" at the requisite environmental impacts.  *North Landscape*, 2021 WL 5356969, at *8.

Plaintiffs would weigh the context and intensity factors differently to require an EIS.  In doing so, they largely restate their hard look challenges to the Siuslaw EA and 2016 RMP, ignoring the need to identify new scientific and significant evidence to justify an additional EIS.  Pl's Mem. 35.  But, as explained, the FEIS for the 2016 RMP and the tiering of the HLB EA to that FEIS complied with NEPA's hard look requirement.  Section III.A-C.  The key question then is whether there is significant new information post-dating the 2016 RMP requiring a new EIS.  As the Ninth Circuit has said, "when environmental effects are described in a regional EIS and discussed in site-specific EA, *a site-specific SEIS will not be required unless significant new evidence* not considered in the EIS is presented."  *Headwaters v. BLM*, 914 F.2d 1174, 1178 (9th Cir. 1990) (emphasis added).  BLM determined that no significant new evidence existed requiring an EIS, and Plaintiffs did not present any new evidence in their opening brief.  *Id.*  (noting that plaintiffs had "not pointed to any significant factual information not discussed generally in the EIS and specifically in the EA").

The Siuslaw Plan also does not meet the EIS intensity factor that the plan be precedential. In fact, "EAs are usually highly specific to the project and the locale, thus creating no binding precedent." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir.2011) (citation

omitted). The FONSI makes clear that the Siuslaw EA, too, "would not establish a precedent for future actions." AR 5. Plaintiffs argue that the Siuslaw EA is precedential by the mere fact that it sets decadal logging targets for the project to contribute to the RMP's O&C Act-required declaration of ASQ, but the precedential regulation is about whether the EA "may establish a precedent for *future actions*," not the current action itself. 40 C.F.R. § 1508.27(6) (emphasis added). In other words, the Siuslaw Plan neither requires nor limits BLM's discretion to plan other projects and NEPA documents in the future, and therefore the Siuslaw EA is not precedential. *See also Oregon Wild*, 2015 U.S. Dist. LEXIS 32584 at 27 (noting that the precedential factor, when the plan is non-binding on future decisions, is "insufficient on its own to demonstrate a significant environmental impact") (quoting *Anderson v. Evans*, 371 F.3d 475, 493 (9th Cir. 2004)).

Nor does the Siuslaw Plan have highly uncertain impacts. As just shown, the Siuslaw Plan is of similar nature and magnitude as other plans. The remaining cases Plaintiffs cite are unpersuasive. In *Boody*, the agency prepared neither an EIS *nor* an EA. *Klamath Siskiyou Wildlands v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). *Oregon Wild* involved what the court described as an "experimental pilot project" to develop new silviculture techniques for spotted owl maintenance, swaying the uncertainty and precedential factors. 2015 U.S. Dist. LEXIS 32584 *25 (D. Or. 2015). This is also not a case, such as in *National Parks*, where there is widespread uncertainty about a particular impact. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732 (9th Cir. 2001) (noting "uncertainty manifested through the EA" due to a "lack of data regarding the practical effect of increased traffic"). Plaintiffs can do no more than to assert that it does not believe BLM or operators will engage in the required project design features and best management practices with respect to soil, weeds, invasive species, and Bureau

Sensitive Species.  Those concerns are unfounded and inconsistent with the case law's

requirement to consider environmental impacts with "mitigation measures . . . in place." *Env't

Prot. Info. Ctr*, 451 F.3d at 1015.  In the end, Plaintiffs' claims ignore that "[a]gencies can

thoughtfully consider suggestions but ultimately decide to reject them, and the presence of an

articulated concern does not alone trigger the need to conduct an EIS." *Wildearth Guardians v.

Provencio*, 923 F.3d 655, 672 (9th Cir. 2019).

## REMEDY

In the event the Court finds error, Defendants respectfully request separate briefing on

remedy.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Defendants.

Respectfully submitted this 27th day of October, 2023.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

*/s/ Luke L. Hajek*
LUTHER L. HAJEK (CO Bar 44303)
Senior Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376 / Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

*/s/ Alexis G. Romero*
ALEXIS G. ROMERO (DC Bar 90006907)
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resource Section

P.O. Box 7611,
Washington, DC 20044-7611
Tel: (202) 353-5885 / Fax: (202) 305-0275
E-mail: alexis.romero@usdoj.gov

*Counsel for Defendants*

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of October, 2023, I filed the above pleading with the

Court's CM/ECF system, which provided notice of this filing by email to all counsel of record.


<u>/s/ Alexis G. Romero</u>
Alexis G. Romero

*Counsel for Defendants*

MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT
*Cascadia Wildlands v. Adcock*, Case No. 6:22-cv-01344-MK

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the Court's September 7, 2023 order, which granted parties'

joint motion to increase the word count limitation set forth in LR 7-2(b)(1) from 11,000 words to

13,000 words.  ECF No. 22.  This brief is 12,715 words, including headings, footnotes, and

quotations, but excluding the caption, table of contents, table of cases and authorities, signature

block, exhibits, and any certificates of counsel.


                                                        */s/ Alexis G. Romero*
                                                        Alexis G. Romero

                                                        *Counsel for Defendants*