UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

CASCADIA WILDLANDS; and
OREGON WILD,

                Plaintiffs,

vs.

CHERYL ADCOCK; and UNITED STATES
BUREAU OF LAND MANAGEMENT,

                Defendants.

Case No. 6:22-cv-01344-MK

**FINDINGS AND
RECOMMENDATION**

_____

**KASUBHAI,** United States Magistrate Judge:

Plaintiffs Cascadia Wildlands and Oregon Wild ("Plaintiffs") filed this action alleging

violations of the National Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321 et seq., and

the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701 et seq., against the United States

Bureau of Land Management ("BLM") and Cheryl Adcock in her official capacity as Field

Manager for the BLM's Siuslaw Field Office (collectively, "Defendants"). The Court denied

Defendants' motion to dismiss this action on May 24, 2023. ECF No. 22. Now before the Court

are the parties' cross-motions for summary judgment. ECF Nos. 33, 36. For the reasons below,

Plaintiffs' motion should be granted, and Defendants' motion should be denied.

## BACKGROUND

Plaintiffs allege that Defendants violated NEPA in preparing their Siuslaw Harvest Land

Base Landscape Plan Environmental Assessment ("Siuslaw Plan EA") by failing to take a "hard

look" at the Siuslaw Plan's environmental impacts and failing to prepare an Environmental

Impact Statement. *See* Compl. ¶¶ 101–47, ECF No. 1. The Court begins by summarizing the

relevant statutory and regulatory framework and the facts underlying this action.

### I.    Statutory and Regulatory Framework

### A.    NEPA

NEPA's purpose is to require agencies to disclose "relevant environmental considerations

that were given a 'hard look' by the agency, and thereby to permit informed public comment on

proposed action and any choices or alternatives that might be pursued with less environmental

harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). It "does not mandate

particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 350 (1989).

To that end, NEPA requires agencies proposing "major Federal actions significantly

affecting the quality of the human environment" to prepare a detailed statement—an

Environmental Impact Statement ("EIS")—discussing environmental impacts of the proposed

action and a range of alternatives to avoid adverse impacts. 42 U.S.C. § 4332(C). To determine

whether a proposed action will significantly affect the quality of the human environment (and therefore require an EIS), an agency may prepare an Environmental Assessment (EA). 40 C.F.R. § 1501.5. "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1111 (9th Cir. 2015) (citation omitted).

**B.    FLPMA/O&C Act**

Under the Federal Land Policy and Management Act ("FLPMA"), the BLM must prepare Resource Management Plans ("RMPs") for its districts. 43 U.S.C. § 1712. RMPs "are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2. The BLM must manage lands governed by FLPMA "under principles of multiple use and sustained yield" 43 U.S.C.A. § 1732(a). By contrast, lands that are governed by the

Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act ("O&C Act") are managed "for permanent forest production . . . in conformity with the principal [sic] of sustained yield…" 43 U.S.C. § 2601. However, O&C Act lands are still subject to the procedural requirements of FLPMA, including preparation of RMPs. *See Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 2021 WL 4462886, at *2 (D. Or. Sept. 29, 2021).

The development of an RMP "is considered a major Federal action significantly affecting the quality of the human environment" requiring the preparation of an EIS under NEPA. 43 C.F.R. § 1601.0-6. Further site-specific actions implementing the RMP must conform to the governing RMP and require compliance with NEPA. AR 9386.

II.     **Factual Background**

A.     **2016 Resource Management Plan**

In 2016, the BLM adopted the RMP for Northwestern and Coastal Oregon ("2016 RMP"). AR 7476–77. The 2016 RMP "provides direction for management of resources on approximately 1.3 million acres of BLM-administered lands in the Coos Bay District, Eugene District, Salem District, and the Swiftwater Field Office of the Roseburg District." AR 7476. The RMP categorizes different portions of the land at issue into various land use allocations, each of which is subject to different management objectives and directions. AR 7528. The land use allocation at issue in this case is the Harvest Land Base ("HLB"). *Id.* Consistent with its obligations under the O&C Act, the objectives for the HLB allocation include managing "forest stands to achieve continual timber production," offering for sale "the declared Allowable Sale Quantity of timber" ("ASQ"), and "[i]n harvested or disturbed areas, ensur[ing] the establishment and survival of desirable trees." AR 7540. The ASQ in the Eugene sustained-yield unit was set at 53 million board feet. AR 7486–87.

The BLM issued a Final EIS ("2016 RMP FEIS") that the Ninth Circuit held satisfied its obligation under NEPA in adopting the 2016 RMP. *Rivers v. Bureau of Land Mgmt.*, 815 F. App'x 107, 110 (9th Cir. 2020). The 2016 RMP FEIS considered the impacts of both the Northwestern RMP and the RMP for Southwestern Oregon, encompassing a total of 2.5 million acres. AR 7482, 9347. The 2016 RMP FEIS acknowledges that the RMPs it evaluated do not directly authorize implementation of projects and that implementation decisions would require additional NEPA compliance. AR 9386–87.

### B.    Siuslaw Plan

In March 2022, the BLM approved a plan (the "Siuslaw Plan") to meet the Siuslaw Field Office's obligations under the 2016 RMP and the O&C Act to contribute timber to the ASQ in the Eugene sustained-yield unit. AR 124. The Siuslaw Plan involves a two-decade commercial logging project on BLM-administered forestland directly west of Eugene, Oregon. It does not "authorize any specific action" but instead "outline[s] the strategy" for meeting the Siuslaw Field Office's contribution to the relevant ASQ declared in the 2016 RMP. AR 127.

The Siuslaw Plan includes the Siuslaw Plan EA, the Siuslaw Plan Finding of No Significant Impact ("FONSI"), and the Siuslaw Plan Decision Record ("DR"). AR 1, 117, 10. In approving the Siuslaw Plan, the BLM evaluated "the effects of five action alternatives that would conduct timber harvest treatments within 13,225 acres of BLM managed lands in the Harvest Land Base land use allocation and a no-action alternative." AR 1. Following scoping and public involvement, the BLM identified 47 "issues" to be considered but eliminated all but five from detailed consideration. AR 127–30. The BLM ultimately selected "Alternative 4" which would produce ASQ volume by harvesting 1,404–2,305 acres per decade, including 278–944 acres through commercial thinning and 1,126–1,361 though regeneration harvesting. AR 13. Pursuant to the analysis contained in the EA (or to the 2016 RMP FEIS to which the EA often "tiered"), the BLM found that the Siuslaw Plan would not have significant environmental impacts and therefore concluded that an EIS was not necessary. AR 1–2.

Plaintiffs are Oregon nonprofit corporations that filed this action for declaratory and injunctive relief on September 8, 2022, alleging NEPA violations based on Defendants' failure to (1) adequately analyze and disclose the Siuslaw Plan's potentially significant environmental impacts; and (2) prepare an Environmental Impact Statement as required for actions that may

have environmentally significant impacts. Compl. ¶¶ 101–47. Defendants moved to dismiss the action for lack of jurisdiction on November 14, 2022, and the Court denied the motion on May 24, 2023. ECF Nos. 10, 19, 22 (adopting Findings & Recommendation). Plaintiffs and Defendants now cross-move for summary judgment. ECF Nos. 33, 36. The Court held oral argument on the motions on February 8, 2024.

## STANDARD OF REVIEW

Plaintiffs allege violations of NEPA and its implementing regulations, which are reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 701-6. The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve such claims. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, or otherwise unlawful. 5 U.S.C. § 706(2). An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," or offered an explanation "that runs counter to the evidence before the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Reviewing courts "may not rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003) (alteration in original) (internal quotation and citation omitted).

## DISCUSSION

The parties each argue that they are entitled to summary judgment on Plaintiffs' NEPA claims. Plaintiffs argue that Defendants' actions violated NEPA because they (1) failed to take a "hard look" at, and adequately analyze and disclose, the Siuslaw Plan's potentially significant environmental impacts; and (2) failed to prepare an Environmental Impact Statement as required

for actions that may have environmentally significant impacts. Defendants argue that summary judgment is appropriate because their use of landscape-level analysis of the Siuslaw Plan's environmental impacts complies with NEPA and has been upheld by the Ninth Circuit. *See* Defs.' Reply 6–7, ECF No. 42 (*citing Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*, No. 22-35035, 2022 WL 17222416 (9th Cir. Nov. 25, 2022)).

## I.    Threshold Issues

Plaintiffs' motion begins with several sections that address the BLM's general approach to NEPA compliance with respect to the Siuslaw Plan. Plaintiffs argue that Defendants erred in (1) using a "purpose and need" statement to omit 42 out of 47 environmental issues from detailed consideration, and (2) inappropriately "tiering" the Siuslaw Plan EA to the 2016 RMP FEIS to the exclusion of analyzing site-specific impacts. The Court addresses each argument in turn.

### A.    Purpose and Need Statement

Plaintiffs contend that the BLM improperly omitted from detailed consideration specific environmental issues because such issues were "not *directly* correlated with the agency's purpose and need of timber production." Pls.' Mot. 17. Defendants argue that Plaintiffs misunderstand the BLM's approach and that it did not limit its analysis in the manner Plaintiffs contend.

In excluding 42 of 47 identified environmental issues, the BLM explained that issues only warranted "detailed analysis if (1) analysis of the issue is necessary to provide information to the decision-maker to be able to make a reasoned choice between alternatives presented (that is, it is related to the purpose and need for action); or (2) the analysis of the issue is necessary to determine the significance of the impacts." AR 128 (*citing* BLM Handbook: H-1790-1 (USDI - Bureau of Land Management, 2008, p. 41)). Plaintiffs argue that the above statement indicates that some or

all of the 42 issues omitted from detailed consideration were omitted on the basis that they were not consistent with the purpose and need to produce timber.

The Court does not read the BLM's statement—either alone or in the context of the EA as a whole—to indicate that the BLM omitted issues from detailed consideration solely because they were not consistent with the purpose and need. Instead, it is an either/or statement. In other words, it appears that the BLM considered issues in detail if they were either related to the purpose and need of the project *or* analysis was necessary to determine the significance of the impacts of the issue. Whether the BLM's decision that detailed analysis was not necessary to determine the significance of those issues' impacts constituted a failure to take a "hard look" is a separate question, addressed in the following portions of this opinion. But there is no indication in the record to suggest that the BLM declined to analyze any issues solely because they were inconsistent with the purpose and need of the Siuslaw Plan.

## B.    Site-Specific Analysis and the Use of Tiering

Plaintiffs argue that the BLM's adoption of the Siuslaw Plan—a landscape-level plan— required a site-specific analysis of environmental impacts and that the Siuslaw Plan EA did not contain such analysis. Plaintiffs contend that by "tiering" to the 2016 RMP FEIS to conclude that the Siuslaw Plan would have no significant impacts, the BLM failed to consider the impacts specific to the Siuslaw Plan project area. Defendants contend that what Plaintiffs are advocating is a "sale-by-sale" approach that is not supported in the case law, and they argue that the Siuslaw Plan EA contained the required site-specificity.

It is unclear to the Court whether Section II of Plaintiffs' motion is intended to provide a general statement of the law regarding site-specificity and tiering to provide a framework to evaluate the particular issues they raise, or whether Plaintiffs seek to have the Court make a

general finding that the use of tiering in the Siuslaw Plan EA was inappropriate with respect to the BLM's analysis as a whole. The parties appear to agree that tiering is appropriate in some cases. Plaintiffs' argument is that it is not appropriate here because "none of the documents address significant issues." Pls.' Mot. 18 (*citing Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146, 1158–59 (D. Or. 2019)). Thus—as even Plaintiffs' argument implies—the question before the Court is whether the BLM did, in fact, fail to consider significant issues. To resolve that question, the Court must evaluate the BLM's analysis of specific issues. To the extent that Plaintiffs' Motion asks the Court to make a general finding that the BLM's tiering approach throughout the Siuslaw Plan EA violated NEPA, the Court cannot do so in the abstract.[1] The following sections evaluate whether the BLM's tiering approach and lack of site-specificity resulted in a failure to address specific potentially significant issues. But the Court cannot make a general finding that the BLM's approach to the Siuslaw Plan EA did not comply with NEPA simply because it tiered to the 2016 RMP FEIS.

In sum, neither of the threshold issues Plaintiffs identify establish on their own that the BLM violated NEPA. Instead, the question is whether the BLM failed to take a "hard look" at significant environmental impacts of the Siuslaw Plan, and specifically whether the BLM's use of tiering *in this particular instance* was insufficient because neither the EA nor the EIS considered specific potentially significant issues.

---

[1] Contrary to Plaintiffs' contention in their brief, the Court did not already make such a general finding in "*Thurston I*." Instead, that opinion evaluated the appropriateness of tiering and NEPA compliance with respect to the specific issue of fire hazards. *See Cascadia Wildlands*, 410 F. Supp. 3d at 1157.

II.    **Failure to Analyze and Disclose Potentially Significant Environmental Impacts**

Plaintiffs argue that Defendants violated NEPA by failing to take the requisite "hard look" at several issues in the Siuslaw Plan EA. "In NEPA, Congress recognized the 'profound impact' of human activities, including 'resource exploitation,' on the environment and declared a national policy 'to create and maintain conditions under which man and nature can exist in productive harmony.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (citing 42 U.S.C. § 4331 (a)). To this end, NEPA and its implementing regulations set forth "action-forcing" procedures designed to (1) ensure agencies take a "hard look" at the environmental effects of proposed actions and (2) foster meaningful public participation. *Robertson*, 490 U.S. at 349.

Because the BLM has "irreversibly and irretrievably" committed resources to the Siuslaw Plan, it was obligated to take a "hard look" at the Siuslaw Plan's direct, indirect, and cumulative impacts. *See Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). A "hard look" requires consideration of all foreseeable direct, indirect, and cumulative impacts. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002); 40 C.F.R. § 1508.25(c) (stating that an agency "shall consider" direct, indirect, and cumulative impacts). This includes evaluation of the additive impacts of the action on top of the environmental baseline, *see* 40 C.F.R. § 1502.15 (requiring that agencies "describe the environment of the area(s) to be affected"), and a comparison to other alternative courses of action. *See* 40 C.F.R. § 1508.25(b) (agency "shall consider" alternatives). An agency fails to take a "hard look" when an EA is speculative and conclusory. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335–36 (9th Cir. 1992).

Importantly, if the "hard look" reveals the effects of the action "may" be significant, the decision-maker cannot approve the action "unless it is either analyzed in an EIS or modified to avoid significant effects." AR 13730; *accord Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). At the same time, "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." 40 C.F.R. § 1500.1(b).

Plaintiffs' claim challenges the BLM's failure to give properly detailed consideration to 42 environmental issues. AR 2 (eliminating 42 issues from "detailed consideration"). As the Court addressed above, it does not make a finding that the BLM's general approach to the 42 issues violated NEPA but instead must make that determination with respect to such issues the BLM allegedly failed to properly consider. In their briefing, Plaintiffs target four specific issues, arguing that Defendants failed to quantify and analyze site-specific data with respect to (1) soil disturbance, (2) noxious weeds and invasive species, (3) special status species, and (4) the Siuslaw Plan's cumulative impacts on the environment.

### A.    Soil Disturbance

Plaintiffs argue that Defendants failed to take a "hard look" at soil disturbance by creating baseline averages that do not reflect soil disturbance at the harvest unit level. Defendants contend that they did conduct the requisite "hard look" through their baseline averaging and proposed mitigation measures.

In its EA Specialist Report for Soils and Geology, the BLM stated:

Because harvest units, harvest method, and fuels treatments are not designated at the scale of this analysis, measures of detrimental soil disturbance cannot be directly quantified. Instead, soil disturbance was based off an analysis of standard contemporary harvest and fuels treatment practices, and detrimental soil disturbance estimates from both types of treatments are presented together in following tables. To determine the likely range of treatment-related soil

> disturbance effects associated with the HLB Landscape plan, the impacts of local logging system design and standard design feature employment were independently examined.

AR 3840. The BLM noted that field surveys would occur only once it conducts a determination of NEPA adequacy ("DNA")—which is not a NEPA document. AR 3839; *see also N. Alaska Env't Ctr. v. U.S. Dep't of Interior*, 965 F.3d 705, 710 n.3 (9th Cir. 2020) ("A DNA is not itself a NEPA document; it is not subject to public comment or consultation with other federal agencies.").

The Ninth Circuit has explained that averaging environmental impacts across a larger project area can be "grossly misleading." *Or. Nat. Res. Council v. Brong*, 492 F.3d 1120, 1129–30 (9th Cir. 2007). Specifically, the Ninth Circuit explained that the averaging in that case was an attempt by the BLM "to dilute the effects of its proposed activities" and that "an agency cannot try to 'minimize' the environmental impact of an activity by simply adopting a scale of analysis so broad that it marginalizes the site-level impact of the activity on ecosystem health." *Id.* at 1130.

Here, the BLM conducted averages across the entire 13,225-acre Siuslaw Plan area. AR 3839 ("The special scale for this analysis is the 13,225-acre project area."). This is thirteen times the size of the project area averaged in *Brong*. 492 F.3d at 1129 (1,004-acre project area). The BLM also acknowledged that this averaging system was based on guesswork. In an email exchange, one of the BLM's foresters reported findings based on "just a real quick guess on what would be logged in certain ways." AR 923. The BLM's specialists also expressed confusion regarding which logging methods were proposed when making such averaging calculations. *Compare* AR 922–23 (noting that one employee from the BLM stated, "I had 4 years with an approx. 90 10 split and one year[] with a 75 cable 25 ground and one that was 55 45" and the other employee stated, "I ran my numbers assuming 17% ground based, and things were right on the threshold.") *with* AR 3841 ("Based on these considerations, this analysis assumed an HLB logging

system design that would treat 17% of the treated acres with ground-based or specialized harvest methods, and 83% with cable or aerial harvest methods."). This averaging system distorted the data contained in the EA—rendering the resulting FONSI irrational and inadequate under NEPA. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) ("[The defendants] relied on flawed assumptions in the EA that distorted and rendered irrational their finding of no significant impact. . . . This failure to take the requisite 'hard look' renders the EA inadequate under NEPA.").

Defendants argue that the Ninth Circuit does not endorse the level of site-specificity Plaintiffs urge is required. To support this argument, the BLM cites to *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006). There, the Ninth Circuit held that failing to conduct a parcel-by-parcel analysis of the environmental consequences of a projected action is not a per se violation of NEPA. *Id.* at 977. While this is true, the Ninth Circuit adopted this rule in part because the project entailed a multistage process involving inherent uncertainty, and because the plaintiffs would have additional chances to comment on future stages requiring an EIS. *Id.* ("Any later plan for actual exploration by lessees will be subject to a period of review before being accepted, rejected or modified by the Secretary. Plaintiffs will have an opportunity to comment on any later EIS.") (internal citation omitted). The Ninth Circuit has also allowed broader landscape-level plans in exploration projects where specific locations cannot reasonably be ascertained. *Te-Moak Tribe of W. Shoshone v. U.S. Dep't of Interior of Nev.*, 608 F.3d 592, 600 (9th Cir. 2010) (holding that the "BLM, in some cases, may adapt its assessment of environmental impacts when the specific locations of an exploration project's activities cannot reasonably be ascertained until some time after the project is approved"). An example of such

project is a mining operation where the exact location of minerals to be extracted is necessarily uncertain without implementation of the plan. *Id.*

Here, the landscape-level analysis was not sufficient to satisfy NEPA requirements. First, this is not a case where the BLM will conduct another EIS or EA prior to implementation of the plan—as was the case in *N. Alaska Env't Ctr.*, 457 F.3d 969. As this Court has already found, "logging will certainly occur when the BLM implements the Landscape Plan." ECF 19, at 8. The BLM stated in its EA that it could not select the "no action" alternative, so logging is sure to occur with implementation of the plan. AR 131–132. Once an agency determines no significant environmental impact and issues a FONSI, the NEPA review process concludes. *Env't Def. Ctr.*, 36 F.4th at 869.

Second, this is not a circumstance where further implementation of the plan is necessary due to an inherent uncertainty. Unlike *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d 592, this project is not an exploratory plan akin to that of mineral extraction. Rather, this is a logging plan where the location of the areas to be logged is well-suited to standard site-specific analysis. The BLM mapped out specific areas designated as potential harvest units under the plan. AR 3328. The BLM acknowledged that field surveys will occur but only after the NEPA process concludes. AR 3839. Because Plaintiffs will not have an opportunity to comment on any further agency action, and this is not a situation of inherent uncertainty, the landscape-level analysis was insufficient to satisfy NEPA.

Defendants also argue that any deficiencies with the averaging system are cured by future pre-treatment/harvest soil surveys at the timber sale level. While mitigation measures are necessary for NEPA analysis, they "are not alone sufficient to meet the [agency's] NEPA obligations to determine the projected extent of the environmental harm to enumerated resources *before* a project

is approved." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011) (emphasis in original); *accord Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("a post-[FONSI] analysis—conducted without any input from the public—cannot cure deficiencies in [a FONSI]"). Because the BLM will not have to conduct any further NEPA analysis for the Siuslaw Plan, it needed to conduct the requisite site-specific analysis and field surveys prior to issuing a FONSI. Failing to do so and relying on future surveys and mitigation violated NEPA.

### B.    Noxious Weeds and Invasive Species

Plaintiffs also argue that Defendants failed to take a "hard look" at noxious weeds and invasive species. Defendants argue that (1) Plaintiffs failed to adequately raise this issue during the comment period and therefore waived this argument, and (2) the Siuslaw Plan did take the requisite "hard look" at noxious weeds.

#### 1.    Waiver

As an initial matter, Defendants contend that Plaintiffs did not properly raise their claims regarding noxious weeds and invasive species by allegedly failing to address these issues with the requisite specificity during the public comment period. Plaintiffs challenging an agency action must participate in the public comment period in such a way that their statements alert the agency to the issues raised and "allow the agency to give the issue[s] meaningful consideration." *Barnes v. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011); *accord Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) (holding that the plaintiff's claims could not form the basis for agency reversal where it raised those claims after the public comment period had ended). A plaintiff need not invoke "magic words" during the comment period "to leave the

courtroom door open to a challenge." *Barnes*, 655 F.3d at 1133 (citing *Idaho Sporting Cong.*, 305 F.3d at 966).

Here, Plaintiffs provided Defendants with the requisite notice to pursue claims related to noxious weeds. In 2019, Plaintiffs provided comments to the BLM regarding the Siuslaw Plan. AR 6206–43. In that comment period, Plaintiffs stated the following: "Logging and roads will expose spread weeds by exposing mineral soil, transporting seeds, and removing native vegetation thus giving more light and nutrients to weeds. Inventories show that weeds are closely associated with roads and recently logged areas. Consider alternatives that avoid creating the conditions to spread weeds." AR 6229. In 2021, Plaintiffs restated these concerns by calling for a site-specific impacts analysis in an EIS to address various issues, including noxious weeds. AR 484–85. These comments establish that Plaintiffs sufficiently raised the issue of noxious weeds in their comments to allow Defendants to respond. *Barnes*, 655 F.3d at 1132. Defendants also addressed this issue in their DR, demonstrating that they were sufficiently apprised of the claims raised by Plaintiffs. AR 24. Plaintiffs have therefore not waived this argument.

### 2.    "Hard Look" Review

Moving to the merits of the claim, Plaintiffs argue that Defendants failed to take the requisite "hard look" at the potential impacts of noxious weeds and invasive species. Defendants contend that they did take a "hard look" at noxious weeds by tiering the Siuslaw Plan EA to the 2016 RMP FEIS and by curing any environmental impact through mitigation measures.

First—with respect to tiering—"[o]rdinarily, an agency can avoid some of the burdens of the NEPA process by 'tiering' to a prior document that has itself been the subject of NEPA review." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1118 (9th Cir. 2018). The Council for Environmental Quality ("CEQ") regulations state:

> Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

40 C.F.R. § 1502.20. The Ninth Circuit has stated that tiering is insufficient when both the programmatic EIS and the project EA contain merely general statements about an issue rather than site-specific information. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004).

Here, tiering was insufficient because neither the 2016 RMP FEIS nor the Siuslaw Plan EA contained adequately site-specific information or analysis. Both the 2016 RMP FEIS and the EA acknowledge that noxious weeds are a problem in Oregon generally. The 2016 RMP FEIS stated that the impact on noxious weeds "in any specific watershed would depend on a variety of project-specific, watershed-specific, and species-specific factors that cannot be analyzed at this scale of analysis." AR 9818. In the Siuslaw Plan EA, the BLM recognized that the Siuslaw Plan area is at high risk for increased spread of weeds based on the 2016 RMP FEIS. AR 202 ("The project area falls in watersheds considered at high to highest risk due to timber harvest, and road construction."). The EA also discussed how timber sales in the Siuslaw Plan area will increase weed infestation. AR 201 ("Several studies have documented increased weed infestation after timber sales, and timber sales in and near the project area have shown this effect as well.") (internal citation omitted). Despite these acknowledgments, the BLM declined to analyze this issue in detail in the EA. AR 202 ("For these reasons, the BLM considered this issue but did not analyze it in detail. Because analysis of this issue isn't necessary to evaluate how the alternatives

respond to the Purpose and Need and there is no potential for significant effects beyond those described in the Proposed RMP / Final EIS.").

Moreover, BLM's botanist recognized during the Siuslaw Plan EA's drafting phase that invasive species would inform which alternative to select. In an initial draft, the EA stated: "The BLM considered this issue but did not analyze it in detail because it does not inform the decision . . . ." AR 3514. The BLM's botanist rewrote this provision to say, "The BLM considered this issue but did not analyze it in detail because the BLM is not proposing to use the differences in invasive species effects to inform the decision . . . ." *Id.* In a comment the botanist explained, "As discussed above, this wording is a little misleading. We could, for example, choose the all thinning alternative to lessen effects." *Id.* The BLM did not fully disclose how each of the alternatives would affect noxious weeds despite recognizing that the project may create a significant impact on noxious weeds in the project area. Because Defendants made merely conclusory statements and failed to gather site-specific data in either the 2016 RMP FEIS or the Siuslaw Plan EA, Defendants failed to take the requisite "hard look" at noxious weeds.

Defendants also argue that their inclusion of mitigation measures satisfied the "hard look" requirement with respect to this issue. While the BLM did consider mitigation techniques in the 2016 RMP FEIS, it did "not detail their extent or expected level of success." AR 202. The Siuslaw Plan EA did propose possible mitigation techniques prescribed by the BLM. AR 202. However, after detailing these possible techniques, the EA stated the following:

> An indirect effect of the project is that it adds to the overall inability to successfully control weeds on the Siuslaw Field Office. Weeds are generally widespread over Siuslaw Field Office lands, as evidenced through weed mapping efforts. More acreage of infestations has been documented than can be controlled with current resources and methods. Recent financial resources have allowed weed control of high priority species and Scotch broom in the Siuslaw Field Office. High priority species such as false brome, shining geranium, and meadow knapweed are species that are not yet abundant, but have a potential for severe

> impacts. Control measures have been concentrating on these high priority species
> and Scotch broom along roadsides. Roadside infestations are prioritized as they
> have a high likelihood of being spread along the road. A lack of financial and
> personnel resources has often led to off-road infestations not being controlled.
> Blackberry has generally not been controlled as it sprouts from underground after
> cutting, and herbicides have not been available, although they have become
> available in 2020 with the Integrated Invasive Plant Management for the
> Northwest Oregon District Environmental Analysis. It is likely that much of the
> weed infestations expected to result from the action alternatives will not be
> adequately controlled given current resources.

*Id.* The BLM must provide analytical data supporting mitigation measures; otherwise, such

measures constitute "a mere listing" and fail to satisfy NEPA. *Idaho Sporting Congress v.*

*Thomas*, 137 F.3d 1146, 1151 (9th Cir. 1998) *overruled on other grounds by Lands Council*, 537

F.3d 981. Additionally—as this Court has already explained with respect to soil disturbance—

"mitigation measures, while necessary, are not alone sufficient to meet [an agency's] NEPA

obligations to determine the projected extent of the environmental harm to enumerated

resources *before* a project is approved." *N. Plains Res. Council*, 668 F.3d at 1084 (emphasis in

original). Defendants could not use mitigation alone to cure their failure to adequately consider

noxious weeds. By failing to provide both site-specific analysis and sufficient mitigation

measures, Defendants did not take the requisite "hard look" at noxious weeds and invasive

species.

### C.    Special Status Species

Plaintiffs argue that Defendants failed to take a "hard look" at special status species.

Defendants again respond that they properly tiered their analysis to the 2016 RMP FEIS. They

also respond that they did provide the requisite site-specific analysis—specifically for the pacific

fisher.

Although a larger programmatic EIS need not conduct site-specific analysis, an EA that

tiers to such programmatic EIS must conduct site-specific analysis where "a critical decision has

been made to act on site development." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006). To properly tier, Defendants would need to show site-specific analysis for special status species in the project area in either the FEIS or the Siuslaw Plan EA.

Here, neither the 2016 RMP FEIS nor the Siuslaw Plan EA take the requisite "hard look" at site-specific impacts on special status species. The 2016 RMP FEIS did not conduct site-specific analysis in the project area because its scope was the entire 2.6-million-acre project. Specifically, regarding former Survey and Manage species, the 2016 RMP FEIS stated that it "lack[ed] complete and species-specific survey information for most Survey and Manage species. It would be exorbitantly expensive and time-consuming to conduct random surveys across the decision area for all Survey and Manage species." AR 9098. Instead, the 2016 RMP FEIS discussed general consequences that the larger plan would have on these species. *See* AR 9097–103.

In the Siuslaw Plan EA, the BLM speculated on whether various species exist in the Siuslaw Plan area and generally made one of two conclusions: if the species were deemed "likely" to be in the project area, the BLM either (1) concluded that the project was unlikely to cause a trend toward listing due to its size, or (2) determined that it could employ mitigation measures to prevent any possible trends toward listing. AR 269–91. The BLM acknowledged that the following species were either possibly or likely present in the Siuslaw Field Office: bald eagle, fringed myotis, golden eagle, Oregon red tree vole, pallid bat, Townsend's big-eared bat, water flea, bufflehead, coastal greenish blue butterfly, Haddock's Rhyacophilan caddisfly, Johnson's hairstreak butterfly, monarch butterfly, Oregon coast coho salmon, Oregon coast spring chinook salmon, pacific lamprey, and Oregon coast steelhead trout. AR 272–77, 296–97. Nevertheless, the BLM's conclusions about these species were based on data regarding what

habitats those species *generally* are prone to without determining whether those species actually exist there. *See, e.g.*, *id.* at 297 ("Presence in Siuslaw Field Office . . . Possible. Spring Chinook were historically found in the mainstem Siuslaw River. It is unknown if Spring Chinook are currently present in Siuslaw Watershed currently [sic]."). The BLM also focused its analysis on whether its proposed actions on the Siuslaw Plan area are "likely to cause a trend toward listing" the species as endangered. *Id.* The BLM's approach here is inconsistent with NEPA requirements.

To comply with NEPA, Defendants needed to conduct site-specific analysis to determine which species do in fact exist in the *local* project area. *Anderson v. Evans*, 314 F.3d 1006, 1019–20 (9th Cir. 2002) ("The crucial question, therefore, is whether the hunting, striking, and taking of whales from this smaller group could significantly affect the environment in the local area."). Courts give deference to agency decisions so long as they are "fully informed and well-considered." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022) (quoting *N. Alaska Env't Ctr.*, 457 F.3d at 975). Defendants argue that they did conduct the requisite site-specific analysis by relying on sighting data for the entire HLB as well as scientific literature discussing the kinds of habitats certain species generally reside within. This is insufficient. Defendants did not determine whether these species do—in fact—exist in the areas to be logged. They did not assess what the environmental effects would be on the populations of species residing in the HLB—such as whether logging in a specific area would eliminate an entire population of a species in that local area. For many species, the data Defendants relied on was limited to whether such species were "suspected of occurring on the Siuslaw Field Office." *See, e.g.*, AR 249. Without site-specific data determining whether those species do exist in the area,

Defendants' analysis was speculative and conclusory—which is insufficient to satisfy NEPA.

*Greenpeace Action*, 14 F.3d at 1335–36.

Additionally, Defendants failed to satisfy NEPA by neglecting to analyze how these species will be impacted in the local area. Even if these special status species will not become closer to being listed as endangered, the populations of these species may be significantly affected in the *local* area. This is a critical inquiry that the Ninth Circuit has determined NEPA requires. *Anderson*, 314 F.3d at 1019–20 ("Even if the eastern Pacific gray whales overall or the smaller PCFA group of whales are not significantly impacted by the Makah Tribe's whaling, the summer whale population in the *local* Washington area may be significantly affected. Such local effects are a basis for a finding that there will be a significant impact from the Tribe's hunts.") (emphasis in original). The Ninth Circuit has also explicitly rejected the "trend toward listing" conclusion—holding that such a general statement cannot "constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Ecology Ctr., Inc. v. Austin*, 430 F.3d 1057, 1067 (9th Cir. 2005) *overruled on other grounds by Lands Council*, 537 F.3d 981 (internal quotation omitted); *accord Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1172 (9th Cir. 2006) *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

Defendants failed to conduct site-specific analysis for populations of special status species in the local area and failed to analyze the harm that would occur to those specific local populations. By relying on such conclusory and speculative data, Defendants failed to comply with NEPA.

### 4.    Cumulative Impacts

Plaintiffs next argue that Defendants failed to analyze and disclose cumulatively significant impacts. A "hard look" requires consideration of cumulative impacts. *Idaho Sporting Cong.*, 305 F.3d at 963; 40 C.F.R. § 1508.25(c) (agency "shall consider" direct, indirect, and cumulative impacts). Such analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 994 (internal quotations and citation omitted).

Plaintiffs argue that the BLM failed to consider the cumulative impacts of the Siuslaw Plan in combination with the "N126 Project," which "overlap[] in time and space." Pl.'s Mot. 31–32. They note that both projects identify similar effects, *compare* AR 1992–93 *with* AR 128–30, and in some of the same geographic locations, *compare* AR 3328 *with* AR 2128, but the Siuslaw Plan EA did not consider the cumulative impacts of these issues. To illustrate the problem with the BLM's analysis, Plaintiffs contend that while both projects will create early successional ecosystems that have impacts on certain wildlife species, the Siuslaw Plan EA fails to consider the cumulative impacts of such creation. Defendants contend Plaintiffs have erroneously conflated two distinct impacts—"early successional ecosystems" for the Siuslaw Plan with "early-successional habitat" for the N126 Project—each of which have distinct meanings and different impacts.

The Court agrees that Defendants failed to consider the cumulative effects of the N126 Project and the Siuslaw Plan. As Plaintiffs point out, the N126 EA identifies several of the same impacts as the Siuslaw Plan EA. *Compare* AR 1992–93 *with* AR 128–30. Yet the Siuslaw Plan EA omits consideration of the cumulative effects of these impacts. While it discusses the cumulative impacts of road construction on sediment delivery to streams for both projects, AR

215–16, it is otherwise completely silent on the cumulative impacts of these projects. Defendants' arguments about the technical distinction between "early successional ecosystems" and "early-successional habitat" fail to explain the general lack of discussion of cumulative impacts of the Siuslaw Plan and the N126 Project; the Court understands Plaintiffs' discussion of the early successional issue to be illustrative of the BLM's failure to address cumulative impacts, not the sum total of Plaintiffs' argument.

The cases cited by Plaintiffs establish that an adequate cumulative impacts analysis must consider the impacts of nearby timber sales. *See, e.g.*, *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1077–78 (9th Cir. 2002) (holding the BLM's NEPA analysis insufficient because it made "no attempt to analyze the cumulative impacts of the Sandy–Remote timber sales when combined with 'reasonably foreseeable future actions' (such as other timber sales) outside the Sandy–Remote Area"); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (holding the BLM's NEPA analysis insufficient where it failed to consider cumulative impacts of reasonably foreseeable timber sales within the same watershed); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("Because the three proposed sales in this case were 'reasonably foreseeable,' the Forest Service was obligated to assess the cumulative impact of all sales on the availability of old growth habitat for the pileated woodpecker.").

Here, in omitting almost all consideration or discussion of the cumulative impacts of the Siuslaw Plan and the N126 Project despite the overlap in time, space, and types of anticipated effects, the BLM violated NEPA's requirement to consider cumulative impacts.

III.    **Failure to Prepare an Environmental Impact Statement**

Plaintiffs next argue that summary judgment is appropriate because Defendants failed to prepare an EIS as required by NEPA. NEPA requires federal agencies to prepare and publicly disclose a "detailed statement" describing the environmental impacts of, and alternatives to, any major federal action that may "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). Commonly known as an environmental impact statement, or "EIS," the statement must contain a "full and fair discussion of significant environmental impacts" and describe "reasonable alternatives which would avoid or minimize adverse impacts." 40 C.F.R. §§ 1508.11, 1502.1; *accord Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 602.

To determine whether an action will have significant environmental effects, an agency may prepare an environmental assessment, or "EA." 40 C.F.R. § 1501.5(a)–(c). Although less comprehensive than an EIS, an EA must contain detailed analyses of project impacts and alternatives. *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 602–03 (citing 40 C.F.R. § 1508.9(b)). If the agency does not prepare an EIS, it must provide a "convincing statement of reasons to explain why [the] project's impacts are insignificant" in a FONSI. *350 Mont. v. Haaland*, 29 F.4th 1158, 1163 (9th Cir. 2022) (internal quotation and citation omitted); *accord Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) ("The purpose of an EA is to provide the agency with sufficient evidence and analysis for determining whether to prepare an EIS or to issue a [Finding of No Significant Impact].") (citing 40 C.F.R. § 1508.9)).

To prevail on a claim that the agency violated NEPA by failing to prepare an EIS, a claimant need not show that significant effects will occur; it is enough to raise "substantial questions" whether a project may have a significant effect on the environment. *See Greenpeace Action v. Franklin*, 982 F.2d 1342, 1351 (9th Cir. 1992). As the Ninth Circuit has consistently

held, this is a low standard. *See, e.g.*, *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). Significance is evaluated using context and intensity factors. 40 C.F.R. § 1508.27. A single intensity factor may require preparation of an EIS. *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

Here, Plaintiffs argue that Defendants violated NEPA because (1) the BLM's reasons for not preparing an EIS are flawed; and (2) substantial questions exist over whether the Siuslaw Plan may have significant impacts.

First, with respect to whether the BLM provided a convincing statement of reasons for not preparing an EIS, the Court has already addressed the ways in which the BLM failed to take the requisite "hard look" at various environmental impacts of the Siuslaw Plan. The resulting FONSI and supporting statement of reasons are unconvincing for the same reasons.

Second, the Court agrees that substantial questions exist regarding whether the Siuslaw Plan may have significant impacts. Regulations identify several intensity factors to consider in evaluating the significance of impacts. *See* 40 C.F.R. § 1508.27(b) (listing intensity factors). Plaintiffs argue that several intensity factors raise substantial questions here:

- 40 C.F.R. § 1508.27(b)(7) ("Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."). Here, as addressed above, the cumulative impacts of the Siuslaw Plan with those of the N126 Project may be significant but are unaddressed in the EA and FONSI.

- 40 C.F.R. § 1508.27(b)(9) ("The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under

the Endangered Species Act of 1973."). Here, the record raises substantial questions about the adverse effects on numerous threatened species and their critical habitat, including marbled murrelets, the northern spotted owl, Oregon Coast Coho Salmon, and Upper Willamette River Chinook Salmon. *See* AR 192–93.

- 40 C.F.R. § 1508.27(b)(5) ("The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."). Here, as addressed above, the lack of information about several site-specific impacts of the Siuslaw Plan and the ability of those impacts to be mitigated render such effects highly uncertain.

Individually, and certainly cumulatively, the Court finds that several intensity factors raise substantial questions over whether the Siuslaw Plan may have significant impacts. Accordingly, the BLM must prepare an EIS.

## IV.    Remedy/Relief

Plaintiffs argue that, because vacatur is the presumptive remedy under the APA for violations of NEPA, the Court should order such relief now. Defendants decline to address the issue now and request separate briefing on the remedy issue. In particular, Defendants note that briefing the issue before knowing what errors or violations the Court would find is premature. The Court agrees that Defendants should be given the opportunity to address the appropriate remedy in light of the Court's specific findings here.

## RECOMMENDATION

For the reasons above, Defendants' Motion for Summary Judgment (ECF No. 36) should be DENIED. Plaintiffs' Motion for Summary Judgment (ECF No. 33) should be GRANTED. Should the district court adopt this Findings and Recommendation, the parties are directed to

contact the Court within 30 days of that order to arrange a status conference to discuss a briefing schedule for the appropriate remedy.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed. R. of App. P. 4(a)(1) should not be filed until entry of the district court's judgment or appealable order. The Findings and Recommendation will be referred to a district judge. Objections to this Findings and Recommendation, if any, are due fourteen (14) days from today's date. *See* Fed. R. Civ. P. 72. Failure to file objections within the specified time may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED this 10th day of April 2024.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge
